CARLIN METZGER (*pro hac vice*)
cmetzger@cftc.gov
MICHAEL FRISCH (*pro hac vice*)
mfrisch@cftc.gov
ERIC SCHLEEF (*pro hac vice*)
eschleef@cftc.gov
JOSEPH KONIZESKI (*pro hac vice*)
jkonizeski@cftc.gov
JONATHAN KRAMER (*pro hac vice*)
jkramer@cftc.gov
Attorneys for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe, Suite 1100
Chicago, Illinois 60661
Tel. 312-596-0700; Fax 312-596-0714

KENT KAWAKAMI (Bar #149803)
Assistant United States Attorney (Local Counsel)
United States Attorney's Office, Civil Division
Central District of California
kent.kawakami@usdoj.gov
300 North Los Angeles St., Room 7516
Los Angeles, California 90012
Tel.: 213-894-4858; Fax: 231-894-2380

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT CALIFORNIA
### (SOUTHERN DIVISION)

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION | Case No: 8:17-cv-01868-JVS-DFM |
| Plaintiff, | Hon. James V. Selna |
| vs. | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| MONEX DEPOSIT COMPANY, et al. | |
| Defendants. | |

# CONTENTS

I. PRELIMINARY STATEMENT ...................................................................... 1

II. LEGAL STANDARD ................................................................................... 2

III. ARGUMENT ................................................................................................ 2

    A. Count I of the Complaint Sufficiently Alleges Facts Showing a Violation of Section 4(a) of the Commodity Exchange Act. ....................... 2

    B. The CFTC Is Not Required To Plead the Absence of an Affirmative Defense. ...................................................................................... 4

    C. The Complaint Sufficiently Alleges Facts Showing that Monex Does Not Actually Deliver Commodities in Leveraged Atlas Transactions. ......... 6

    D. Defendants Have Had Fair Notice at all Relevant Times that the Atlas Program Is Unlawful Under the CEA. ........................................... 9

        1. Fair Notice Here Is Provided by the Plain Language of the Statute. ................................................................................. 9

        2. The CFTC Provided Fair Notice Through Its Interpretative Guidance. .............................................................................. 9

        3. Monex Received Notice of the CFTC's Interpretation of Actual Delivery Through the CFTC's Investigation Here. ........................... 11

        4. A Settlement Order Against Another Metals Firm—Worth Bullion—Is Irrelevant. .......................................................... 12

    E. Counts 2 and 3 of the Complaint State Claims for Fraud In Violation of Sections 4b and 6(c)(1) of the CEA, and Regulation 180.1. .................. 13

        1. Sections 4b and 6(c)(1) of the CEA, and Regulation 180.1 Are Broad Antifraud Provisions. ................................................... 13

        2. Monex Fails To Disclose Material Facts to Its Victims. ................... 16

        3. Monex's Affirmative Statements Are Misleading. .......................... 17

        4. Section 6(c)(1) of the CEA Provides the CFTC with Authority To Prosecute Monex's Fraud Independent from Its Authority over Retail Commodity Transactions. ........................................ 19

    F. Louis And Michael Carabini Are "Control Persons" Of Monex Pursuant to Section 13(b) of the Commodity Exchange Act. ................... 24

        1. The Complaint Alleges that Louis and Michael Carabini Have General Control over Monex. ................................................. 25

        2. The Complaint Alleges Facts Showing that Louis and Michael Carabini Lacked Good Faith, and Knowingly Induced Monex's Violations of the CEA and Regulations. ...................................... 26

IV. CONCLUSION ........................................................................................... 28

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) .................................18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................2

*Auer v. Robbins*, 519 U.S. 452 (1997) ..................................................................23

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................2

*Burgess v. United States*, 553 U.S. 124 (2008) ....................................................21

*CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) .................................................25

*CFTC v. Carnegie Trading Grp., Ltd.*, 450 F. Supp. 2d 788
(N.D. Ohio 2006) ............................................................................................16

*CFTC v. Gibraltar Monetary Corp.*, 2006 WL 1789018, at *18-19
(S.D. Fla. May 30, 2006), *aff'd*, 575 F.3d 1180 (11th Cir. 2009) ..........25, 26

*CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317
(S.D. Fla. 2014) ....................................................................................*passim*

*CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967 (11th Cir. 2014) ..... *passim*

*CFTC v. Hunter Wise Commodities, LLC*, 2013 WL 718503
(S.D. Fla. Feb. 26, 2013) ..................................................................................8

*CFTC v. Hunter Wise Commodities, LLC*, Order Denying Motions to Dismiss,
12-cv-81311, dkt. 155 (S.D. Fla. June 21, 2013) .........................................5, 6

*CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 996 (N.D. Ill. 2015) ......................20

*CFTC v. Midland Rare Coin Exch.*, 71 F. Supp. 2d 1257
(S.D. Fla. 1999) ..............................................................................................25

*CFTC v. Monex Deposit Co.*, 824 F.3d 690 (7th Cir. 2016) ............................. 3, 12

*CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321 (11th Cir. 2002)...................*passim*

*CFTC v. S. Trust Metal, Inc.*, 880 F.3d 1252 (11th Cir. 2018) ......................*passim*

*CFTC v. Sidoti*, 178 F.3d 1132 (11 Cir. 1999) ......................................................27

*CFTC v. Southern Trust Metals*, 180 F. Supp. 3d 1124 (S.D. Fla. 2016) ....... *passim*

*CFTC v. Worth Group, Inc.*, No. 13-80796 (S.D. Fla. Feb. 1, 2016).....................13

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*
467 U.S. 837 (1984).........................................................................................22

*Currency Trading Int'l, Inc.*, No. CV 02-05143PA, 2004 WL 2753128 (C.D.C.A.
Feb. 2, 2004) ........................................................................................*passim*

1  *Dixon v. United States*, 548 U.S. 1 (2006) ........................................................4

2  *EEOC v. The Chicago Club*, 86 F.3d 1423 (7th Cir. 1996)........................5, 6

3  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ...........................10

4  *Fla. Dept. of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008) ..................5

5  *Grayned v. City of Rockford*, 408 U.S. 104 (1972) ......................................10

6  *Gen. Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) ............................ 9, 11

7  *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010)..........................20

8  *Heckler v. Chaney*, 470 U.S. 821 (1985) .....................................................12

9  *In re Convergent Techs. Sec. Lit.,* 948 F.2d 507 (9th Cir. 1991) .....................18

10  *In re Gilead Sciences Sec. Litig,* 536 F.3d 1049 (9th Cir. 2008).......................2

11  *Javierre v. Cent. Altagracia*, 217 U.S. 502 (1910) .........................................4

12  *JCC, Inc. v. CFTC*, 63 F.3d 1557 (11th Cir.1995) ......................................24

13  *Mattingly v. United States*, 924 F.2d 785 (8th Cir. 1991) ..............................27

14  *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677 (7th Cir. 2001). ......................12

15  *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316 (1819) ..................................9

16  *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845 (9th Cir. 2017)...............................23

17  *New Amsterdam Casualty Co. v. Waller*, 323 F.2d 20 (4th Cir. 1963) ...............12

18  *NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706 (2001) .............................4

19  *Pa. State Police v. Suders*, 542 U.S. 129 (2004) ...........................................4

20  *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011) ...........................................9

21  *Russello v. United States*, 464 U.S. 16 (1983).............................................24

22  *SEC v. C.R. Richmond & Co.,* 565 F.2d 1101 (9th Cir. 1977) ........................19

23  *SEC v. Hasho*, 784 F. Supp. 1059 (S.D.N.Y. 1992) ......................................18

24  *SEC v. Rana Research, Inc.,* 8 F.3d 1358 (9th Cir.1993).................................15

25  *United States v. Lanier*, 520 U.S. 259 (1997)..............................................21

26  *United States v. McGee*, 993 F.2d 184 (9th Cir. 1993) ...................................4

27  *Valerio-Ochoa v. I.N.S.*, 241 F.3d 1092 (9th Cir. 2001) ..................................5

28

**Statutes**

7 U.S.C. §§ 1a(28) (2012)................................................................3

7 U.S.C. § 2(c)(2)(D) (2012) .................................................... *passim*

7 U.S.C. § 6(a) (2012)....................................................................2

7 U.S.C. §§ 6b(a) (2012)................................................................13

7 U.S.C. § 6d (2012) ......................................................................3

7 U.S.C. § 13c(b) (2012)...............................................................24

Cal. Corp. Code § 29531(b) (West 2017).............................................11

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,
   Public Law 111–203, 124 Stat. 1376............................................3

**Rules and Regulations**

17 C.F.R. § 180.1 (2017) ......................................................... *passim*

7 U.S.C. § 9 .......................................................................... *passim*

Federal Rule of Civil Procedure 12(b)(6) ............................................2

**Other Authorities**

Prohibition on the Employment, or Attempted Employment, of Manipulative and
   Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398,
   41399 (July 14, 2011)........................................................ 15, 22

Retail Commodity Transactions Involving Virtual Currency, 82 F.R. 60335, 60336
   (Dec. 20, 2017) ........................................................................21

Retail Commodity Transactions Under Commodity Exchange Act, 76 Fed. Reg.
   77670-62 (Dec. 14, 2011)..............................................................10

Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed. Reg.
   52426, 52428 (Aug. 23, 2013)..................................................... 10, 11

1

## I.  PRELIMINARY STATEMENT

2      Defendants[1] claim that this case is "unprecedented."  It is not.  In reality, this is

3 one of a series of enforcement actions the CFTC has brought against firms and

4 individuals engaging in illegal leveraged retail commodity transactions since the

5 passage of the Dodd-Frank Act in 2010.  Moreover, several of these enforcement

6 actions directly addressed the jurisdictional argument Defendants make in their

7 motion to dismiss.  *See, e.g., CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967

8 (11th Cir. 2014) (holding that the "actual delivery" exception in Section 2(c)(2)(D) of

9 the U.S. Commodity Exchange Act requires transfer from the seller to the buyer of

10 possession and control over commodities).  As set out in the Complaint, Monex does

11 not transfer possession of or control over metals to customers in leveraged metals

12 trades on the Monex Atlas trading platform.  Monex's purported delivery of

13 commodities on its Atlas platform is a sham.  Monex's leveraged Atlas transactions

14 are therefore subject to the Commodity Exchange Act, and Defendants are required to

15 conduct these transactions on a regulated board of trade.  (*See, e.g.*, Compl. ¶¶ 39-42,

16 70-78.)

17      Defendants make three basic arguments in their motion to dismiss.  They argue

18 that the CFTC's Complaint does not allege sufficient facts to show that (1) Monex is

19 engaging in fraud; (2) Monex's leveraged Atlas transactions are subject to the

20 CFTC's jurisdiction; and (3) Louis and Michael Carabini are "control persons" under

21 the Commodity Exchange Act ("CEA").  Defendants' motion should be denied.  The

22 Complaint contains detailed factual allegations explaining the structure of Monex's

23 Atlas trading platform and why Defendants are operating an unregistered commodity

24 trading platform (Count 1 of the Complaint), and why Defendants are engaging in

25 conduct which requires registration with the CFTC (Count 4).  The Complaint

26

27 [1] Monex Deposit Company, Monex Credit Company, Newport Services Corporation
(collectively "Monex"), Louis Carabini and Michael Carabini (the "Individual

28 Defendants," and, together with Monex, "Defendants").

likewise contains detailed factual allegations describing Monex's fraudulent scheme to lure retail customers into leveraged trading on the Atlas platform (Counts 2 and 3 of the Complaint). These counts allege fraud by omissions (for example that the vast majority of its leveraged Atlas customers lose money), and by deceptive statements about the safety, security and profitability of Atlas transactions. Finally, the Complaint contains more than sufficient allegations to support control person liability on the part of Monex's owners Louis and Michael Carabini including that both Carabinis are signatories on Monex's bank accounts, execute contracts on behalf of Monex and its affiliates, and have the authority to hire and fire Monex employees.

## II. <u>LEGAL STANDARD</u>

A complaint should not be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure so long as it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 663. In ruling on a motion to dismiss, a court must accept as true the allegations in the complaint, as well as all reasonable inferences to be drawn from them, construing the complaint in the light most favorable to the plaintiff. *See, e.g., In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## III. <u>ARGUMENT</u>

### A. **Count I of the Complaint Sufficiently Alleges Facts Showing a Violation of Section 4(a) of the Commodity Exchange Act.**

Count 1 of the Complaint alleges that Defendants are violating Section 4(a) of the CEA, 7 U.S.C. § 6(a) (2012), by engaging in off-exchange leveraged commodity transactions with retail customers. The elements of this claim are straightforward — Defendants are violating Section 4(a) if (1) their leveraged commodity transactions are within the scope of Section 2(c)(2)(D) of the CEA, 7 U.S.C. § 2(c)(2)(D) (2012),

1    and (2) the transactions are not executed on a regulated exchange.  There is no

2    question that Defendants' transactions are not being conducted on a regulated

3    exchange.  Therefore, the only question that must be resolved by the Court is whether

4    the Complaint adequately alleges that Defendants' Atlas transactions are within the

5    scope of Section 2(c)(2)(D) of the CEA.

6         Section 2(c)(2)(D) was added to the CEA by the Dodd-Frank Act.  Effective

7    July 16, 2011, the Dodd-Frank Act extended the CFTC's jurisdiction to cover

8    leveraged commodity transactions with retail investors.  *See* Dodd-Frank Wall Street

9    Reform and Consumer Protection Act of 2010, Public Law 111–203, 124 Stat. 1376;

10   *accord, CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1336 (S.D.

11   Fla. 2014).  Section 2(c)(2)(D) broadly applies to any transaction in any commodity

12   that is entered into with, or offered to, retail customers on a leveraged, margined or

13   financed basis.  Section 2(c)(2)(D) further provides that such retail commodity

14   transactions are subject to sections 4(a), 4(b), and 4b of the CEA "as if" the

15   transactions are futures contracts.  7 U.S.C. § 2(c)(2)(D)(iii).  As a result, retail

16   commodity transactions must be executed on a regulated exchange.  *Id*.  Retail

17   commodity transactions that are not conducted on a regulated exchange violate

18   Section 4(a) of the CEA.  *See CFTC v. Southern Trust Metals*, 880 F.3d 1252, 1261-

19   62 (11th Cir. 2018).  Persons offering retail commodity transactions are also subject

20   to registration, recordkeeping and reporting requirements as Futures Commission

21   Merchants.  *Id*.; *see also* 7 U.S.C. §§ 1a(28), 6d.

22        The Complaint makes sufficient factual allegations to put Defendants on notice

23   of the basis for the CFTC's jurisdiction, or as the Seventh Circuit Court of Appeals

24   put it, the facts that bring the Atlas program "within the agency's remit."  *CFTC v.*

25   *Monex Deposit Co.*, 824 F.3d 690, 694 (7th Cir. 2016).  The Complaint alleges that

26   Monex offers retail customers off-exchange trading of silver, gold, platinum and

27   palladium on a leveraged, margined or financed basis.  (Compl. ¶¶ 24, 27, 28.)  It

28   alleges that from July 16, 2011 to March 31, 2017, Monex executed approximately

3

1   140,000 trades for more than 12,000 customer accounts engaging in leveraged

2   commodity trading on Monex's Atlas trading platform.  (*Id.* ¶ 26.)  The Complaint

3   alleges that Monex's Atlas transactions are not conducted on a regulated commodity

4   exchange.  (*Id.* ¶ 75.)  Monex cannot, and does not, dispute these allegations.  Thus,

5   the Complaint alleges that Monex's leveraged commodity transactions are squarely

6   within the scope of Section 2(c)(2)(D) of the CEA, yet Monex has failed to conduct

7   these transactions on a regulated board of trade.  Nothing more is required to plead a

8   violation of Section 4(a) of the CEA in this case.

9        **B.    The CFTC Is Not Required To Plead the Absence of an Affirmative**

10            **Defense.**

11       Defendants' only argument in opposition to Count 1 is that Monex's Atlas

12   transactions fall within an exception to Section 2(c)(2)(D) for transactions that

13   "result[] in actual delivery" of commodities.  7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa) (the

14   "actual delivery" exception).  Monex argues that the Complaint "fails to plead that

15   actual delivery did not occur."  (Defs.' Mem. 20, 23.)  However, it is well-settled that

16   a plaintiff need not plead facts in its complaint in order to avoid potential affirmative

17   defenses, like the actual delivery exception.  *See, e.g., Pa. State Police v. Suders*, 542

18   U.S. 129, 152 (2004) (explaining that there is no legal requirement for a plaintiff to

19   allege facts in anticipation of an affirmative defense); *United States v. McGee*, 993

20   F.2d 184, 187 (9th Cir. 1993) ("The government is not required to plead on the

21   subject of an anticipated affirmative defense.").

22       Rather, the burden of proving a statutory exception lies with the party claiming

23   the benefit of that exception, in this case Defendants.  *See NLRB v. Ky. River Cmty.*

24   *Care, Inc.*, 532 U.S. 706, 711 (2001) (applying rule to hold that the "burden of

25   proving the applicability of the [] exception should thus fall on the party asserting

26   it"); *Javierre v. Cent. Altagracia*, 217 U.S. 502, 508 (1910) ("When a proviso like

27   this carves an exception out of the body of a statute or contract, those who set up such

28   exception must prove it.") (collecting cases); *accord Dixon v. United States*, 548 U.S.

4

1    1, 8 (2006).

2      Defendants attempt to avoid this well-settled rule by erroneously referring to

3 the actual delivery exception as an "exclusion" throughout their motion, and trying to

4 shift the burden to the CFTC to establish that actual delivery has *not* occurred.

5 (Defs.' Mem. 23.)  This attempt fails.

6      The statutory language on which Defendants rely falls within Section

7 2(c)(2)(D)(ii) of the CEA, which is titled "EXCEPTIONS."  (Capitalization in original).[2]

8 Indeed, multiple courts have recognized that the actual delivery exception is just

9 that—an exception—which the defendant must assert and prove.  *Southern  Trust*,

10 880 F.3d at 1262 (actual delivery exception "is an affirmative defense on which the

11 commodities trader bears the burden of proof") (citing cases); *CFTC v. Southern*

12 *Trust Metals*, 180 F. Supp. 3d 1124, 1130 (S.D. Fla. 2016) (same); *CFTC v. Hunter*

13 *Wise Commodities, LLC*, Order Denying Motions to Dismiss at 16-17, No. 12-cv-

14 81311 (S.D. Fla. June 21, 2013), ECF No. 155 (burden on defendants to establish

15 entitlement to the "actual delivery exception"), attached as Ex. A.  The CFTC has no

16 "burden" to allege anything about Defendants' failure to meet the exception.

17      The only case Defendants cite for the proposition that the CFTC has the burden

18 of pleading and proving that Monex does not actually deliver metals cannot bear the

19 weight that Defendants attempt to place on it.  In *EEOC v. The Chicago Club*, 86

20 F.3d 1423, 1429-30 (7th Cir. 1996), the Seventh Circuit affirmed the traditional

21 "canon" that the party claiming the benefit of an exception has the burden of proof.

22 *Id.* at 1429 (collecting cases).  But it found that the plaintiff has the burden when a

23 statutory "exclusion" is "incorporated into the definition" of a "class of entities

24 defined as within the reach of a statutory regime."  *Id.* at 1430 (discussing 42 U.S.C.

25 § 2000e(b), where "private membership clubs" were excluded from definition of

26

27    [2] Section headings are tools available for statutory construction.  *Valerio-Ochoa v.*
*I.N.S.*, 241 F.3d 1092, 1096 (9th Cir. 2001); *accord Fla. Dept. of Rev. v. Piccadilly*

28 *Cafeterias, Inc.*, 554 U.S. 33, 47 (2008).

"employer" under Title VII).  Here, Section 2(c)(2)(D) does not exclude a "class of entities" from the CEA.  Rather, it excepts specific contracts that "result[] in actual delivery" within a time period set by the CFTC.  Indeed, the District Court in *Hunter Wise* agreed that *The Chicago Club* stood for the opposite proposition than what Monex cites it for, relying on the case in ruling that the defendants had the burden to establish their entitlement to the actual delivery exception.  *Hunter Wise*, Order Denying Motions to Dismiss at 17, 12-cv-81311 (S.D. Fla. June 21, 2013), ECF No. 155 (quoting *The Chicago Club*, 86 F.3d at 1429 ("It is a commonly accepted canon that '[o]ne who claims the benefit of an exception from the prohibition of a statute has the burden of proving that his claim comes within the exception.'")).

## C.     The Complaint Sufficiently Alleges Facts Showing that Monex Does Not Actually Deliver Commodities in Leveraged Atlas Transactions.

Defendants' next argument is that the CFTC pled itself out of court by "affirmatively alleg[ing] facts showing that actual delivery did occur under the operative definition."  (Defs.' Mem. 20.)  This is demonstrably false.  An entire section of the Complaint is devoted to facts showing that Monex is operating a leveraged commodity trading platform that does not involve the actual delivery of metals.  (Compl. Section I. "Monex's Off-Exchange 'Atlas' Commodities Trading Platform" ¶¶ 24-44.)  This section of the Complaint explicitly alleges facts showing that Monex does not transfer possession of or control over metals to customers in leveraged Atlas transactions.  (*Id.*)

Actual delivery in Section 2(c)(2)(D) of the CEA requires the transfer of possession of and control over commodities.  *Hunter Wise*, 749 F.3d 967.  In the *Hunter Wise* case, the Eleventh Circuit addressed the meaning of "actual delivery" in Section 2(c)(2)(D).  The Court found the language of the statute to be clear on its face:

> Because the Act does not define the term "actual delivery," 7 U.S.C.
> § 1a, we again refer to the ordinary meaning of the term to interpret the

statute. *Polycarpe*, 616 F.3d at 1223. "Delivery" is "[t]he formal act of transferring something"; it denotes a transfer of possession and control. *Black's Law Dictionary* 494 (9th ed. 2009). "Actual delivery" denotes "[t]he act of giving real and immediate possession to the buyer or the buyer's agent." *Id.* "Actual" is that which "exist[s] in fact" and is "real," rather than constructive. *Id.* at 40.

749 F.3d at 978-79 (alteration in original).  The Eleventh Circuit held that the transfer of title, without the underlying physical transfer of commodities, was "at best" constructive delivery, not actual delivery. *Id.* at 979.

The Complaint clearly alleges facts demonstrating that Monex never transfers possession of or control over metals to customers in Atlas transactions.  The Complaint alleges that customer positions can be liquidated any time and in Monex's sole discretion, without notice to customers.  (Compl. ¶¶ 32-33.)  The Complaint alleges that the terms of the Atlas account agreement and Monex's agreements with its depositories deprive customers of all control and authority over any metals that underlie their trading positions.  (*Id.* ¶¶ 38-39.)  And the Complaint alleges that Atlas customers with open trading positions do not possess any precious metals as a result of Atlas transactions.  (*Id.* ¶¶ 39-40.)

Defendants claim that actual delivery is satisfied when "Monex transfers physical possession of leveraged precious metals to a depository and passes title to its customers," (Defs.' Mem. 2, 22-23) and claims that the Complaint admitted that this occurs (*id.*).  Defendants are wrong on both counts.  As stated above, the transfer of title alone, without possession and control going to the customer, is constructive and not "actual" delivery. *Hunter Wise*, 749 F.3d at 978-79.  Further, the Complaint explicitly pleads that Monex's "Commodity Title Transfer Notice," the document Monex uses to purportedly transfer metals to customers, is a sham.  (*See* Compl. ¶ 41 (Monex's claimed transfer of ownership "is in reality just a book-entry in Monex's records"); *id.* ¶ 42 (same, referencing Monex's "purported transfer of metals")).

7

These are all facts set out in the Complaint that show that Monex never makes actual delivery of any precious metals to Atlas customers, but instead at all times retains possession and control over any metals associated with Atlas transactions. The gist of Monex's argument is that because the Complaint does not use the exact words "actual delivery," the Complaint must be dismissed.  But whether Monex makes "actual delivery" within the meaning of the statute is a question for the Court to decide based on the evidence and its application of the law.  *See, e.g., Hunter Wise*, 749 F.3d 967 (affirming preliminary injunction order and finding no actual delivery in leveraged metals transactions); *Southern Trust Metals*, 180 F. Supp. 3d at 1130 (granting CFTC summary judgment and finding no actual delivery in leveraged metals transactions); *CFTC v. Hunter Wise Commodities, LLC*, No. 12-81311-CIV, 2013 WL 718503, at *9 (S.D. Fla. Feb. 26, 2013) (finding no actual delivery in leveraged metals transactions and granting CFTC motion for preliminary injunction).

Defendants' other arguments are red herrings.

Defendants note that the Atlas program "launched in 1987 and has operated in essentially the same way for 30 years" (Defs.' Mem. 2) as a justification of their current business model.  But, as they also acknowledge, the law changed in 2011 and "Dodd-Frank expanded the CFTC's authority."  (Defs.' Mem. 3.)  After July 16, 2011, Monex's leveraged commodity transactions with retail customers were illegal unless they were conducted on a regulated commodity exchange (they were not). Whether Monex complied with laws in effect prior to July of 2011 is irrelevant, and Monex's reliance on case law addressing leveraged commodity transactions prior to the effective date of the Dodd-Frank Act is misplaced.

Defendants' citation to and reliance on model state laws is also misplaced and misleading.  (Defs.' Mem. 2-3.)  Congress did not "essentially adopt[]" a model state code when enacting Section 2(C)(2)(D) as Defendants claim.  In fact, the model code Defendants cite does not even contain the phrase "actual delivery" as Defendants suggest.  More importantly, to the extent there is any conflict between a particular

1   state law and the CEA, the federal CEA preempts state law.  Under the Supremacy

2   Clause, when the federal government acts within the sphere of its authority, federal

3   law is paramount over, and preempts, inconsistent state law.  *See, e.g., McCulloch v.*

4   *Maryland*, 17 U.S. (4 Wheat) 316 (1819); *see also PLIVA, Inc. v. Mensing*, 131 S. Ct.

5   2567, 2577 (2011) ("The Supremacy Clause establishes that federal law 'shall be the

6   supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to

7   the Contrary notwithstanding.'").

8       **D.   Defendants Have Had Fair Notice at all Relevant Times that the**

9       **Atlas Program Is Unlawful Under the CEA.**

10      Defendants next argue that their due process rights would be violated if the

11  Court were to adopt the purportedly "new" definition of actual delivery articulated by

12  the CFTC in its Complaint.  There is no new definition in the Complaint, and even if

13  there were it would not provide a reason to dismiss the CFTC's Complaint.

14      **1.   Fair Notice Here Is Provided by the Plain Language of the**

15      **Statute.**

16      In the case of an unambiguous regulation (or statute), fair notice is provided by

17  the text itself.  *See, e.g.*, *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).

18  Here, the meaning of "actual delivery" as used in Section 2(c)(2)(D) is not

19  ambiguous, as evidenced by the decision of the Eleventh Circuit in *Hunter Wise*, 749

20  F.3d at 979, and so Defendants have had fair notice since the passage of the Dodd-

21  Frank Act in 2010.

22      **2.   The CFTC Provided Fair Notice Through Its Interpretative**

23      **Guidance.**

24      Where the statutory language is ambiguous, the question then becomes (i)

25  whether the agency has provided fair notice of (ii) its permissible interpretation

26  thereof.  *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-58 (2012)

27  (finding that the FCC had failed to give fair notice of its changed interpretation of the

28  indecency statute, without reaching the question of whether such interpretation was

9

1   permissible); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (holding that

2   laws are unconstitutionally vague where they fail to give a person of ordinary

3   intelligence a reasonable opportunity to know what is prohibited (i.e., "fair

4   warning")).  Even if this Court were to find the statutory language ambiguous, Monex

5   received fair notice of the meaning of actual delivery when the CFTC provided its

6   proposed interpretation of the meaning of term in 2011 and finalized its interpretive

7   guidance in 2013.  *See* Retail Commodity Transactions Under Commodity Exchange

8   Act, 76 Fed. Reg. 77670-62 (Dec. 14, 2011) (the "2011 Proposed Guidance"); and

9   Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed. Reg.

10  52426 (Aug. 23, 2013) (the "2013 Guidance"); *Cf. Hunter Wise*, 749 F.3d at 980

11  (observing that the CFTC's guidance is consistent with the Eleventh Circuit's plain

12  language interpretation of "actual delivery").  The CFTC's guidance on the meaning

13  of "actual delivery" has not changed.

14          As in previous cases (and as set out in the guidance) the CFTC in bringing this

15  enforcement action employed a "functional approach" to assess Monex's Atlas

16  trading platform and transactions.  *See* 2011 Proposed Guidance, 76 Fed. Reg. at

17  77672 (noting the "Commission will employ a functional approach and examine how

18  the agreement, contract, or transaction is marketed, managed and performed, instead

19  of relying solely on language used by the parties . . ."); *see also* 2013 Guidance, 78

20  Fed. Reg. at 52427 and 52428 (same).  Likewise, the CFTC assessed relevant factors

21  including "ownership, possession, title, and physical location of the commodity

22  purchased or sold, both before and after execution of the agreement, contract, or

23  transaction; the nature of the relationship between the buyer, seller, and possessor of

24  the commodity purchased or sold; and the manner in which the purchase or sale is

25  recorded and completed."  *See* 2011 Proposed Guidance, 76 Fed. Reg. at 77672 ; *see*

26  *also* 2013 Guidance at 78 Fed. Reg. at 52427 and 52428.  The result of this

27  assessment by the CFTC is the enforcement action in this case.  The facts showing

28  Monex's failure to actually deliver metals in leveraged Atlas platform trades are

alleged in the Complaint, and addressed in even further detail in the CFTC's Motion for a Preliminary Injunction and its supporting appendices (at Docket Entries 6-9). Monex's Atlas program is a leveraged commodity trading platform masquerading as a coin shop.

Defendants argue that they meet the CFTC's interpretation of actual delivery outlined in Example 2 of the guidance, but they ignore the factors outlined in the guidance itself, as well as the explicit caveat to Example 2 stating that the CFTC will assess "*other evidence indicating that the purported delivery is a sham*." *See* 2011 Proposed Guidance, 76 Fed. Reg. at 77672 n.25 ; *see also* 2013 Guidance at 78 Fed. Reg. at 52428 n.25 (emphasis added).  The Complaint alleges numerous facts establishing that Monex's purported delivery is a sham, for example that customer positions can be liquidated any time and in Monex's sole discretion, without notice to customers (Compl. ¶¶ 32-33); more than 3,000 leveraged Atlas accounts were subject to a margin call and at least 1,850 had trading positions force-liquidated between July 2011 and March 2017 (*id.* ¶ 33); the terms of the Atlas account agreement and Monex's agreements with its depositories deprive customers of all control and authority over any metals that underlie their trading positions (*id.* ¶¶ 38-39); and Atlas customers with open trading positions do not possess any precious metals as a result of Atlas transactions (*id.* ¶¶ 39-40).

### 3. Monex Received Notice of the CFTC's Interpretation of Actual Delivery Through the CFTC's Investigation Here.

Courts have held that agencies may provide fair notice to regulated parties through pre-enforcement interactions. *See, e.g.*, *Gen. Elec. Co.*, 53 F.3d at 1329. Here, Defendants, in addition to the notice discussed above, had direct interactions with the CFTC's Enforcement Division after the CFTC issued a subpoena to Monex on March 20, 2014 in connection with the investigation that led to the filing of this case.  Defendants could not possibly misunderstand the Commission's interpretation of actual delivery because when Monex refused to produce documents in response to

the subpoena, the CFTC filed an action in federal court to enforce the subpoena.  In litigating that case, the CFTC expressed the very same position as set out in the Complaint in this case – that actual delivery required the transfer of possession and control.  Ultimately, the CFTC prevailed in its subpoena enforcement action against Monex, including on appeal.  *See CFTC v. Monex Deposit Co.*, 2014 WL 7213190 (N.D. Ill. Dec. 17, 2014), *aff'd*, 824 F.3d 690, 693 (7th Cir. 2016).

### 4.   A Settlement Order Against Another Metals Firm—Worth Bullion—Is Irrelevant.

Monex asks this Court to dismiss the CFTC's complaint based on a consent order entered in a completely different case against a completely different company.  Defendants appear to argue that the CFTC's charges against Worth Bullion must dictate the charges and legal theory here.  But a federal agency's decision to charge one violation rather than another should not be interpreted as an expression regarding the agency's view of the legality of certain conduct it may determine not to charge at the time, since federal agencies decide when and what violations to charge for any number of reasons.  *See Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (describing the complicated balancing that agency enforcement decisions are subject to).

Statements concerning a legal theory made in a different case are irrelevant and cannot support a motion to dismiss.  Even if the CFTC had approved the business model of Worth Bullion (which it did not), such a legal determination would not be admissible in this case.  A party may only be bound by admissions as to matters of fact and not legal conclusions.  *See McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 681 (7th Cir. 2001); *see also New Amsterdam Casualty Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963) ("When counsel speaks of legal principles, as he conceives them and which he thinks applicable, he makes no judicial admission.").  And in any event, the CFTC's position in this case is consistent with the consent order that resolved the case against Worth Bullion, which required Worth Bullion to "bring its business in compliance with the law of this Circuit regarding actual delivery as articulated in

*CFTC v. Hunter Wise Commodities LLC*, 749 F. 3d 967 (11th Cir. 2014)." *CFTC v. Worth Group, Inc.*, No. 13-80796 (S.D. Fla. Feb. 1, 2016), ECF No. 194 at ¶ 28 (attached to the Declaration of Benjamin Sauter at ECF No. 41-10). Whether Worth Bullion is currently in violation of the consent order is irrelevant to Monex's liability, or the viability of the CFTC's Complaint against Monex, in this case.

### E.   Counts 2 and 3 of the Complaint State Claims for Fraud In Violation of Sections 4b and 6(c)(1) of the CEA, and Regulation 180.1.

Count 2 of the Complaint charges Monex with fraud in violation of Section 4b(a) of the CEA, 7 U.S.C. § 6b(a) (2012). Count 3 of the Complaint charges Monex with fraud in violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (2012), and CFTC Regulation 180.1, 17 C.F.R. § 180.1 (2017). Defendants make the same basic argument with respect to both—that the Complaint does not identify sufficient misrepresentations to support the fraud charges. Defendants mischaracterize the deceptive statements catalogued in the Complaint, and completely ignore that the Complaint alleges fundamental omissions of critical facts about Monex's Atlas program that make Monex's affirmative sales pitch deceptive. Put simply, Monex hides the massive losses suffered by its leveraged Atlas customers, obfuscates the dramatic impact of the Atlas fee structure, and misrepresents its relationship to customers, all the while luring victims into its Atlas trap with rosy portrayals of a safe, secure and profitable investment. Section II of the Complaint, "Monex's Fraudulent Scheme," paragraphs 45-69, is devoted to describing this scheme, as well as the omissions of material fact and deceptive statements Monex makes to customers.

### 1.   Sections 4b and 6(c)(1) of the CEA, and Regulation 180.1 Are Broad Antifraud Provisions.

Section 4b(a) of the CEA provides, in pertinent part, that it is unlawful for any person to defraud or attempt to defraud another person in connection with retail

commodity transactions.  Section 4b of the CEA applies to retail commodity transactions such as Monex's leveraged Atlas transactions "as if" they are futures contracts pursuant to Section 2(c)(2)(D) of the CEA.  Similar to the exchange trading requirement discussed above, this anti-fraud authority is the result of the Dodd-Frank Act's expansion of the CEA to reach retail commodity transactions as set out in Section 2(c)(2)(D).

Count 2 of the Complaint charges Monex with violating Sections 4b(a)(2)(A) and (C) of the CEA.  These subsections make it unlawful for any person to: "(A) cheat or defraud or attempt to cheat or defraud the other person" or "(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract."  Monex mistakenly argues that by not charging subsection (B) in the Complaint, the CFTC is acknowledging that Monex's "misstatements" are not false.  (Defs Mem., p. 11 n. 10.)  That is a misreading of the Complaint and the statute.  While the Complaint does not charge Monex with making false reports (such as reports registrants are required to file with the CFTC) or the issuance of false account statements in violation of subsection (B), the Complaint clearly alleges that Monex fraudulently solicited its customers through a scheme employing material omissions and deceptive statements in violation of subsections (A) and (C).

Section 6(c)(1) of the CEA was added to the CEA by the Dodd-Frank Act in 2010.  It provides the CFTC with authority to prohibit the use of "any manipulative or deceptive device or contrivance" in connection with "any contract of sale of any commodity in interstate commerce, in contravention of such rules and regulations as the Commission shall promulgate." 7 U.S.C. § 9.  Under this authority the CFTC enacted Regulation 180.1, making it unlawful for "any person, directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce, to intentionally or recklessly:  (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make,

14

any untrue or misleading statement of a material fact or to omit to state a material fact
necessary in order to make the statements made not untrue or misleading; (3) Engage,
or attempt to engage, in any act, practice, or course of business, which operates or
would operate as a fraud or deceit upon any person."

In the context of this case (and as Defendants' acknowledge in their motion),
the elements generally needed to show fraud in violation of Section 4b of the Act, or
Section 6(c)(1) and Regulation 180.1, are:  (1) that a misrepresentation, misleading
statement, or omission was made; (2) with scienter; and (3) that the
misrepresentation, statement or omission was material.  *See, e.g., Southern Trust*, 880
F.3d at 1263; *Hunter Wise*, 21 F. Supp. 3d at 1338, 1346-48; s*ee also SEC v.
Currency Trading Int'l, Inc.*, No. CV 02-05143PA, 2004 WL 2753128, at *6–7 (C.D.
Cal. Feb. 2, 2004), citing *SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1361 (9th
Cir.1993).[3]

Whether a misrepresentation has been made depends upon the "overall
message" and the "common understanding of the information conveyed." *CFTC v.
R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002) (internal quotations
omitted).  It is fraudulent for a firm to pitch an investment as safe, secure and
profitable, while omitting to disclose that nearly everyone who invests loses money.
*Id.* at 1332-33 (defendants liable for fraud under § 4b for portraying an "extremely
rosy picture for profit potential" and "limited risk" while failing to disclose that 95%
of investors lost money); *CFTC v. Carnegie Trading Grp., Ltd.*, 450 F. Supp. 2d 788,
799 (N.D. Ohio 2006) (defendants liable for fraud under § 4b for touting an
investment's "enormous profit potential" with minimal risk while failing to inform
customers that most investors lost money); *Currency Trading Int'l, Inc.*, No. CV 02-

---

[3] Because Regulation 180.1 was modeled after the SEC's Rule 10b-5, courts can be
guided by SEC precedent in construing the new CFTC rule.  Prohibition on the
Employment, or Attempted Employment, of Manipulative and Deceptive Devices
and Prohibition on Price Manipulation, 76 Fed. Reg. 41398, 41399 (July 14, 2011).

05143PA, 2004 WL 2753128, at *6–7 (brokers "misled investors concerning the potential profitability of trading foreign currency options" by telling investors that there was a "very high likelihood of making very large profits in a very short time with little risk" and failing to disclose that the investments were "extremely risky" and [o]ver 80% of CTI investors lost substantial amounts of money and paid very large commissions to the company.").

### 2.  Monex Fails To Disclose Material Facts to Its Victims.

Monex affirmatively tells Atlas customers that they are making a safe, secure and profitable investment.  Defendants claim that these representations *could theoretically* be true.  But the Complaint alleges (and the evidence laid out in the CFTC's Motion for a Preliminary Injunction shows) that these representations are deceptive.  Monex structures its Atlas platform to ensure its own profits, while its customers almost all lose money.  Given the information at Defendants' disposal showing massive losses suffered by leveraged Atlas customers, it is misleading to pitch customers with a rosy outlook of the safety, security and profitability of leveraged Atlas trading with Monex.  The CFTC's fraud claims against Monex are as much about omissions—what Monex is *not* telling its customers—as they are about the affirmative statements Monex makes to lure its customers into the Atlas trap.  Defendants ignore the Complaint's factual allegations describing the material facts Monex fails to disclose, all of which are necessary context for Monex's deceptive sales pitch.  Defendants pretend that these affirmative statements exist in a vacuum.

As set out in the Complaint, the truth is that approximately 12,000 leveraged Atlas accounts collectively realized more than $290 million in losses between July 16, 2011 and March 31, 2017—an average of more than $4 million a month.  (Compl. ¶¶ 2, 43.)  Approximately 90% of leveraged Atlas accounts lost money between July 16, 2011 and March 31, 2017.  (*Id.* ¶ 2.)  Defendants have data and reports readily available that show these significant losses suffered by Atlas customers.  (*Id.* ¶ 65.)  Defendants can and do track and analyze Atlas customers'

1  performance, and they can clearly see the massive losses Monex Atlas customers are

2  suffering.  (*Id.* ¶¶ 53-55.)  Monex has built a sophisticated database that constantly

3  tracks customer trading activity and performance.  (*Id.* ¶ 55.)

4        What must be accepted as true for purposes of this motion is that the vast

5  majority of leveraged Atlas customers lose money, and many on a catastrophic scale.

6  (*See, e.g., id.* ¶ 68 (describing the impact of Monex's deceptive tactics on five

7  victims).)  Monex never discloses the massive and pervasive losses suffered by its

8  customers.  (*Id.* ¶¶ 2, 44.)

9        Defendants attempt to blame declines in market prices for these losses, but it is

10  the structure of Monex's Atlas transaction itself, coupled with the manner in which

11  Monex incentivizes its sales staff to encourage leveraged Atlas trading, that drives the

12  losses.  (*Id.* ¶¶ 4, 65-67.)  Monex has structured its Atlas platform, and incentivized

13  its employees to lure customers to place highly leveraged Atlas trades, in such a way

14  that customer losses are all but inevitable—and failed to disclose this crucial

15  information to its customers.  (*Id.* ¶ 4.)

16        **3.**    **Monex's Affirmative Statements Are Misleading.**

17        It is against this backdrop of massive and pervasive losses, caused by the

18  structure of the leveraged Atlas transaction itself and exacerbated by the incentives to

19  sales representatives, that Monex makes its rosy pitch of safety, security and

20  profitability to lure victims into its Atlas trap.  Monex springs the trap with a basic

21  formula:  (1) lure in prospects by touting physical precious metals as an investment

22  opportunity (*Id.* ¶ 47); (2) pitch prospects on the safety, security and profitability of

23  leveraged Atlas trading (while hiding the massive losses suffered by past and existing

24  customers) (*Id.* ¶¶ 47-49); and (3) train and incentivize sales staff to lie to customers

25  (*Id.* ¶¶ 49-52; 61-67).

26        For example, Monex describes the Atlas program as a way to shield wealth

27  from inflation, but fails to disclose the significant number of customers who have had

28  trading positions force-liquidated at a loss.  (*Id.* ¶ 3.)  Monex claims that because

metals "will always have value . . . [a customer] can't lose [his or her] investment," when, in fact, the customers can—and often do—suffer substantial losses.  (*Id.* ¶ 3.) Monex sales representatives portray themselves as fiduciaries that look out for the best interests of their customers.  (*Id.* ¶ 3; 64.)[4]  Monex and its sales representatives engage in high-pressure sales tactics designed to push customers into leveraged precious metals trading in the Atlas program.  (*Id.* ¶ 3.)  As part of their pitch, they misrepresent the likelihood of profit, systematically downplay the risks of leveraged Atlas trading, and falsely promise that Monex will serve as customers' fiduciaries. (*Id.* ¶ 5.)

The purpose of federal anti-fraud provisions is "to substitute a philosophy of full disclosure for the philosophy of caveat emptor," and thus to ensure that investors obtain disclosure of material facts in connection with their investment decisions. *Currency Trading Int'l*, 2004 WL 2753128, at *6 (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963); and citing *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992) and *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972)).  Context is important.  "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."  *In re Convergent Techs. Sec. Lit.,* 948 F.2d 507, 512 (9th Cir. 1991) (citations omitted).  Thus, the required disclosure is measured "not by literal truth, but by the ability of material to accurately inform rather than mislead [investors]."  *Id.; see, e.g., SEC v. C.R. Richmond & Co.,* 565 F.2d 1101, 1106–07 (9th Cir. 1977) (finding advertisements "deceptive and misleading in their overall effect even though when narrowly and literally read, no single statement of material fact was false").

---

[4] Monex argues that the CFTC failed to allege that its sales representatives were trained to lie to customers that they were their fiduciary. (Defs.' Mem. 18.)  This is false.  The Complaint alleges that "[t]raining videos used with sales representatives" contained this lie, and that "[s]ales representatives follow their training and make these claims to prospects and Atlas Customers."  (Compl. ¶ 64.)

For example, a statement concerning a projection, belief, or opinion can be a "factual" misstatement if the speaker is aware of undisclosed facts tending to seriously undermine the statement's accuracy. *Currency Trading Int'l*, 2004 WL 2753128, at *7-8 (finding affirmative duty to disclose where brokers held themselves out as professionals and made recommendations to current and prospective customers) (citing *Kaplan v. Rose,* 49 F.3d 1363, 1375 (9th Cir.1994)). Put another way, whether a misrepresentation has been made depends upon the "overall message" and the "common understanding of the information conveyed." *R.J. Fitzgerald*, 310 F.3d at 1328 (internal quotations omitted).

Monex has defrauded and is continuing to defraud customers by promoting the Atlas program as a safe, secure and profitable investment vehicle with limited risk without disclosing that nearly all Atlas customers lose money.

### 4.   Section 6(c)(1) of the CEA Provides the CFTC with Authority To Prosecute Monex's Fraud Independent from Its Authority over Retail Commodity Transactions.

Defendants argue that if the actual delivery exception applies to their transactions, then even count three, which charges Defendants with fraud in violation of Section 6(c)(1) of the CEA and Regulation 180.1, should be dismissed. But the CFTC has anti-fraud enforcement authority, independent of Section 2(c), over Defendants' deceptive conduct in connection with a contract of sale of a commodity in interstate commerce, whether or not actual delivery is made within twenty-eight days.

Section 6(c)(l) prohibits fraud "in connection with any . . . contract of sale of any commodity in interstate commerce." Regulation 180.1 broadly prohibits attempted or completed fraud, deceptive conduct, and manipulative devices, schemes, or artifices to defraud employed "directly or indirectly, in connection with any . . . contract of sale of any commodity in interstate commerce . . . ." Defendants do not dispute that their transactions involve contracts of sale of a commodity in interstate

19

commerce.[5]  Therefore, under the plain language of the statute and regulation, Section 6(c)(1) and Regulation 180.1 apply to Monex's fraudulent Atlas transactions.

"The cardinal canon of statutory interpretation is that the Court looks first to the text of the statute," and ends the exercise if the statute is unambiguous.  *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1008 (N.D. Ill. 2015) (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)).  The text of section 6(c)(1) of the CEA prohibits the use or attempted use of "any manipulative or deceptive device or contrivance" "in connection with . . . a contract of sale of any commodity in interstate commerce."  As this language lends itself to no other meaning, it must be given its plain meaning, which is that the CFTC has the authority to bring an enforcement action against the perpetrator of a fraud in connection with the sale of a commodity in interstate commerce, including the sale of precious metals to retail customers, regardless of whether actual delivery occurs within 28 days.

Monex's argument that if it meets the actual delivery exception, the CEA gives the CFTC no authority over it or its fraudulent conduct thus fails based on the plain language of Section 6(c)(1).. (*See, e.g.*, Defs.' Mem. 27 arguing that actual delivery exception requires that the Complaint be dismissed in its entirety.)  Monex's faulty argument reflects its fundamental misunderstanding of Section 2(c)(2)(D)(ii) itself.  Section 2(c)(2)(D)(ii) makes clear that the actual delivery exception, if satisfied, means only that a transaction is excepted from Section 2(c)(2)(D) and is not a "retail commodity transaction" as defined, subject to certain regulation by the CFTC  Put another way, the statute reads "***[t]his subparagraph*** [Section 2(c)(2)(D)] shall not apply to . . . a contract of sale that . . . results in actual delivery within 28 days . . . ."  7 U.S.C. § 2(c)(2)(D)(ii) (emphasis supplied).  The statute simply *does not* say that a defendant is excluded from ***the entire CEA*** if the exception is met.  Section

---

[5] Monex offers its Atlas transactions, which involve commodities like gold and silver, from its headquarters in California to customers throughout the United States. (Compl. ¶¶ 1; 14; 68.)

2(c)(2)(D) thus operates to treat all retail commodity transactions as if they were futures, subjecting them to the applicable comprehensive regulatory regime (including that they be traded on a designated contract market). *Id.* § 2(c)(2)(D)(iii). Section 6(c)(1) ensures the CFTC can combat fraud through enforcement action in connection with a commodity in interstate commerce.

Monex's reliance on Section 2(a)(1)(A) of the CEA is similarly misplaced. That section (titled "JURISDICTION OF COMMISSION") lists items over which the CFTC has "*exclusive* jurisdiction"—meaning its jurisdiction is not shared with another regulator. *Compare* CEA § 2(a)(1) (emphasis supplied), *with* CEA § 2(a)(1)(C) (discussing delineation of CFTC and SEC jurisdiction). The reference to Section 2(c) simply states that the CFTC's exclusive jurisdiction over "Retail Commodity Transactions" is limited as provided in that section, including by the actual delivery exception in Section 2(c)(2)(D)(ii)(III)(aa). Nowhere does the statute say that a contract that meets the actual delivery exception is excluded from other sections of the CEA, like Section 6(c).[6]

Monex makes passing reference to the "rule of lenity," (Defs.' Mem. 26-27), but that doctrine (usually only applicable to the "construction of *criminal statute[s]*," *United States v. Lanier*, 520 U.S. 259, 266 (1997)) has no application when, as here, the statute in question is clear on its face. *Burgess v. United States,* 553 U.S. 124, 135 (2008) (noting that the rule of lenity "applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute") (internal quotations omitted). There is nothing ambiguous about the language of Section 6(c) and Regulation 180.1's prohibition on fraud in connection with the sale

---

[6] Recent CFTC proposed interpretative guidance also supports this interpretation. *See* Retail Commodity Transactions Involving Virtual Currency, 82 Fed. Reg. 60335, 60336 n.6 (proposed Dec. 20, 2017) ("[T]he authority granted under CEA section 2(c)(2)(D) is in addition to, and independent of, the Commission's ability to bring enforcement actions for fraud or manipulation [under Sections 6(c) and 9(a)(2) and Regulations 180.1 and 180.2].").

of commodities in interstate commerce, and Monex does not even attempt to identify any such ambiguity.

Finally, Monex argues that enforcing Section 6(c) and Regulation 180.1 against it would lead to "absurd and unintended results," by extending the reach of the CFTC to "virtually the entire economy." (Defs.' Mem. 27.)  However, the results of a literal reading of section 6(c)(1) are not absurd.  Indeed, the CFTC rejected identical arguments when it promulgated Regulation 180.1.  *See* Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398, 41401 (July 14, 2011) (noting that the CFTC intends to interpret Section 6(c)(1) "not technically and restrictively, but flexibly to effectuate its remedial purposes," but explaining that it did *not* understand the Dodd-Frank amendments to give the CFTC power over "'virtually every commercial transaction in the economy,'" but only contracts of sale for a commodity in interstate commerce involving fraud or manipulation).  And, as opposed to the comprehensive futures regulatory regime imposed by operation of Section 2(c)(2)(D) (assuming that the actual delivery exception does not apply), application of Section 6(c) and Regulation 180.1 is limited to anti-fraud and anti-manipulation authority.

The CFTC's interpretation of Section 6(c)(1), as set forth in this Final Rule, is entitled to deference pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), because the Congress explicitly called on the CFTC to promulgate rules setting forth how Section 6(c)(1) could be violated, *see* 7 U.S.C. § 9(1) (making it unlawful to use, in connection with, *inter alia*, "a contract of sale of any commodity in interstate commerce," a manipulative or deceptive device "in contravention of such rules and regulations as the Commission shall promulgate").  Notably, Congress specifically limited the CFTC's rulemaking, but in

only one way not relevant here.[7]  *Id.*  And the CFTC's interpretation of Regulation 180.1, also in the Final Rule, is similarly entitled to deference pursuant to *Auer v. Robbins*, 519 U.S. 452, 457–58 (1997); *see generally Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 866 (9th Cir. 2017) (noting that "an agency's interpretation of its organic statute, as well as of its own regulations, is entitled to deference" (citing *Chevron* and *Auer*)).  Indeed, this is precisely the type of case the CFTC envisioned as falling within the ambit of Regulation 180.1 when it was announced in 2011:

> By way of non-exclusive example, if an entity employed a deceptive device to sell precious metals to customers as a way for the customers to speculate on the value of such commodities, or if an entity employed a deceptive device to sell an agricultural commodity to persons seeking to hedge price risk in that commodity, depending on the facts and circumstances, the Commission would exercise its authority against the entity under [s]ection 6(c)(1) and final Rule 180.1.

*Id. at* 41401 n.37.

Last, Monex argues that Section 6(c) should be limited to fraud that has an "impact on the derivatives markets traditionally understood to be the CFTC's sole province."  (Defs.' Mem. 27.)  But if Congress had intended to limit Section 6(c)(1) to futures market contracts, it would have been easy for it to do so.  In contrast to Section 6(c)(1), other sections of the CEA, such as Section 4b(a)(2), are limited to prohibiting fraud in connection with any "contract of sale of any commodity for future delivery, or swap."  This difference demonstrates that Congress intended section 6(c)(1) ***not*** to have the more limited scope of sections like 4b(a)(2).  *Russello*

---

[7] Specifically, Section 6(c)(1) provided that "no rule or regulation promulgated by the Commission shall require any person to disclose to another person nonpublic information that may be material to the market price, rate or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect."

1  *v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular

2  language in one section of a statute but omits it in another of the same Act, it is

3  generally presumed that Congress acts intentionally and purposefully in the disparate

4  inclusion or exclusion.").

5      **F.    Louis And Michael Carabini Are "Control Persons" Of Monex**

6            **Pursuant to Section 13(b) of the Commodity Exchange Act.**

7      Section 13(b) of the CEA provides that any person who "directly or indirectly"

8  controls a person or entity that violates any provision of the CEA or any rules or

9  orders promulgated thereunder by the CFTC, "may be held liable for such violation in

10  any action brought by the CFTC to the same extent as such controlled person" upon

11  proof that the controlling person "did not act in good faith or knowingly induced,

12  directly or indirectly, the act or acts constituting the violation." 7 U.S.C. § 13c(b)

13  (2012). Section 13(b) is "about power and imposing liability for those who fail to

14  exercise it to prevent illegal conduct." *Hunter Wise*, 21 F. Supp. 3d at 1322-24

15  (entering summary judgment for CFTC under Section 13(b) for liability of principals

16  as controlling persons for violations by corporations they controlled of Sections 4(a)

17  and 4d of the Act) (quoting *R.J. Fitzgerald*, 310 F.3d at 1334). The "fundamental

18  purpose" of Section 13(b) is "to reach behind the corporate entity to the controlling

19  individuals of the corporation and to impose liability for violations of the [CEA]

20  directly on such individuals as well as on the corporation itself." *Id.* (quoting *JCC,*

21  *Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995) (affirming CFTC administrative

22  order)).

23      The elements of control person liability are (1) the exercise of "general

24  control" over the liable person or entity; and (2) a lack of good faith, or knowing

25  inducement of the acts constituting the violation. *S. Trust Metals*, 180 F. Supp. 3d at

26  1131 (citing *R.J. Fitzgerald*, 310 F.3d at 1334; and *Hunter Wise*, 21 F.Supp.3d at

27  1322-24).

28

### 1.    The Complaint Alleges that Louis and Michael Carabini Have General Control over Monex.

General control over the operations of a company depends on the totality of the circumstances, including an appraisal of a person's influence on management and the policies of a corporation.  *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002).  General control exists where the defendant is "an officer, founder, principal, or the authorized signatory on the company's bank accounts."  *Southern Trust Metals*, 180 F. Supp. 3d at 1131 (citing *Hunter Wise*, 21 F.Supp.3d at 1322–24).  Other indicia of general control include: entering into contracts, *Hunter Wise*, 21 F. Supp. 3d at 1322-24; being "regularly present" in the office, *CFTC v. Midland Rare Coin Exch.*, 71 F. Supp. 2d 1257, 1265-66 (S.D. Fla. 1999); meeting with employees, *CFTC v. Commonwealth Fin. Grp., Inc.*, 874 F. Supp. 1345, 1357 (S.D. Fla. 1994); and the hiring of personnel, *CFTC v. Gibraltar Monetary Corp.*, No. 04-80132-CIV, 2006 WL 1789018, at *18-19 (S.D. Fla. May 30, 2006), *aff'd*, 575 F.3d 1180 (11th Cir. 2009).  Control may be exercised jointly by more than one person, such that several persons may simultaneously be controlling persons of the same corporation.  *Baragosh*, 278 F.3d at 330.

The Complaint alleges that Louis and Michael Carabini exercise (and exercised during the relevant period) general control over Monex.  Michael Carabini, together with his father Louis Carabini, own Monex (the Monex entity defendants Monex Deposit Company, Monex Credit Company and Newport Service Corporation).  (Compl. ¶ 14.)  Michael Carabini was the primary operational overseer of Monex during the relevant period.  (*Id.* ¶ 16.)  Michael Carabini is:  (1) a signatory on Monex's bank accounts; (2) executes contracts on behalf of Monex and its affiliates; (3) has the authority to hire and fire Monex employees; (4) is primarily responsible for Monex's advertisements and marketing, including the content of the Monex website.  (*Id.* ¶ 16.)

Louis Carabini is the founder of Monex and together with his son Michael is

the owner of Monex.  (*Id*. ¶¶ 14, 16.)  Louis Carabini remains substantially involved in all of Monex's operations and was substantially involved in Monex's operations during the relevant period.  (*Id*. ¶ 16.)  Louis Carabini is:  (1) a signatory on Monex's bank accounts; (2) executes contracts on behalf of Monex and its affiliates; (3) has the authority to hire and fire Monex employees.  (*Id*. ¶ 16.)

> **2.      The Complaint Alleges Facts Showing that Louis and Michael Carabini Lacked Good Faith, and Knowingly Induced Monex's Violations of the CEA and Regulations.**

The Complaint alleges facts showing that Louis and Michael Carabini knowingly induced Monex's violations, and also that they lacked good faith.  To establish knowing inducement, the CFTC may show that "the controlling person had actual or constructive knowledge of the core activities that constitute the violations at issue and allowed them to continue."  *S. Trust Metals*, 180 F. Supp. 3d at 1132; *R.J. Fitzgerald*, 310 F.3d at 1334.  To establish a lack of good faith, the CFTC may show that "the individual failed to maintain a 'reasonably adequate system of internal supervision and control' or did not oversee the system 'with any reasonable diligence.'"  *Hunter Wise*, 21 F. Supp. 3d at 1350 (quoting *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993)); *see also Gibraltar Monetary Corp*., 2006 WL 1789018, at *18-19.

The Complaint clearly alleges knowledge on the part of Louis and Michael Carabini of the core activities that constitute Monex's violations.  Michael Carabini is primarily responsible for Monex's advertisements and marketing, including the content of the Monex website.  (Compl. ¶ 16.)  Michael and Louis Carabini receive regular, detailed information reflecting massive losses suffered by Monex's leveraged Atlas customers (*Id*. ¶ 55) and had a variety of data and reports available to them. (*Id*. ¶¶ 53-55.)  "These reports demonstrate that leveraged Atlas trading is not a 'unique and powerful way to acquire precious metals,' or a way to 'protect' and shield' wealth, or an 'outstanding short-term trading vehicle' with 'outstanding profit

potential.'" (*Id.* ¶ 55.)  Reports from Monex's database provided to Louis and

Michael Carabini also show that customer trading positions frequently are liquidated

without customer consent.  (*Id.* ¶ 58.)  For example, Monex generates "Forced

Liquidations" and "Equity Calls" reports that reflect the number of forced

liquidations and margin calls issued during a month.  (*Id.*)  The reports presumably

were created and existed to inform controlling persons of material information.

Michael and Louis Carabini therefore know better than anyone that the rosy

predictions of safety, security and profitability they coach and incentivize Monex

account representatives to make are false and misleading.  Indeed, the requisite

element of knowledge may be inferred when there is deliberate indifference to, or

willful blindness to, the existence of fact or acts demonstrating a conscious purpose to

avoid enlightenment.  *CFTC v. Sidoti*, 178 F.3d 1132, 1136 (11 Cir. 1999), citing

*Mattingly v. United States*, 924 F.2d 785, 792 (8th Cir. 1991); *accord, Monieson*, 996

F.2d at 861 ("[A] controlling person has a duty to act; he cannot simply avoid

addressing the issue and hope it goes away.")

The factual allegations of the Complaint also show a lack of good faith by

Louis and Michael Carabini.  Defendants' conduct goes well beyond failing to

maintain a "reasonably adequate system of internal supervision and control."  Louis

and Michael Carabini knowingly induced the conduct at issue.  Louis and Michael

Carabini train and incentivize sales representatives to encourage prospects to open

Atlas trading accounts, and to encourage frequent leveraged trading in these accounts.

(Compl. ¶ 65.)  Monex's internal policy documents and brochures make no secret that

the account representatives' fundamental "key to success" is to "build a large book of

clients that trade metals," to "Raise Money!," to "have a sense of URGENCY."  (*Id.* ¶

66.)  Far from designing and overseeing an adequate system of supervision and

control, Louis and Michael Carabini have designed a system to lure retail customers

into a trap where it is highly likely that the customers will lose money, but entirely

certain that Louis and Michael Carabini will profit.

These factual allegations are more than sufficient to put Michael and Louis
Carabini on notice as to the basis for their liability as control persons for Monex's
violations of the CEA.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' motion to
dismiss the complaint.


Dated:  February 20, 2018

*/s/ Carlin R. Metzger*
Carlin R. Metzger
Attorney for Plaintiff
Commodity Futures Trading Commission

# CERTIFICATE OF SERVICE

I, Carlin Metzger, an attorney with the U.S. Commodity Futures Trading Commission, certifies that he filed the below Plaintiff's Opposition to Defendants' Motion to Dismiss electronically, on February 20, 2018, by operation of the Court's electronic filing system (ECF) on all counsel of record for the parties.

Date:  February 20, 2018

Attorney for Plaintiff CFTC

**/s/ Carlin Metzger**

IL ARDC No. 6275516
(Pro Hac Vice)
Commodity Futures Trading
Commission
525 W. Monroe St., Suite 1100
Chicago, IL 60661
(312) 596-0536
cmetzger@cftc.gov