NEIL A. GOTEINER (State Bar No. 083524)
ngoteiner@fbm.com
C. BRANDON WISOFF (State Bar No. 121930)
bwisoff@fbm.com
JESSICA NALL (State Bar No. 215149)
jnall@fbm.com
ELIZABETH A. DORSI (State Bar No. 282285)
edorsi@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## (SOUTHERN DIVISION)

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MONEX DEPOSIT COMPANY, MONEX CREDIT COMPANY, NEWPORT SERVICES CORPORATION, MICHAEL CARABINI and LOUIS CARABINI,<br><br>Defendants. | Case No. 8:17-cv-01868-JVS-DFM<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>The Hon. James V. Selna<br>Dept. 10C<br>Date: March 19, 2018<br>Time: 3:00 p.m. |

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT..........................................1

LEGAL STANDARDS..................................................................6

ARGUMENT ..........................................................................7

    A.    Because Monex Makes "Actual Delivery" Under The CEA, The CFTC Lacks Jurisdiction To Bring These Claims. ................................7

        1.    Monex's Delivery Mechanism Satisfies The Plain Text Of The "Actual Delivery" Exclusion..................................9

        2.    The Statute and Legislative Record Support Monex. ................11

        3.    Congress Rejected the CFTC's "Actual Delivery" Definition. ..................................................13

        4.    Monex's Physical Delivery Follows the CFTC's Public Guidance. ..................................................14

        5.    The CFTC Grossly Mischaracterizes *Hunter Wise*. ..................15

        6.    The CFTC's "Sham" Assertion is Frivolous. ..................18

        7.    The Short/Commodity Loan Is Not a Sham. ..................22

    B.    The CFTC's Newly-Minted Definition Of Actual Delivery Deprives Defendants Of Fair Notice And Violates Their Due Process Rights..................................................23

    C.    The CFTC's § 6(c)(1) Fraud Claim Does Not Create Jurisdiction. ......23

        1.    The CFTC's § 6(c) Theory Is Contradicted By Controlling Law. ..................................................25

        2.    The CFTC's § 6(c)(1) Theory Leads To Absurd Results. ..........27

        3.    Section 6(c)(1) Is Limited To Market Manipulation. ..................28

    D.    There Is No Evidence of Fraud To Support The Requested Relief.......32

        1.    Customers Lost Because of the Market, and Profits Were Far From Virtually Impossible According to the CFTC's Expert. ..................................................32

        2.    There Are No Material Misstatements Or Omissions in the Relevant Documents. ..................................34

            a.    Atlas Marketing Materials and Statements Are Not False and Admittedly Influenced No Customer...............34

Defs.' Opp'n to Motion for Preliminary Injunction -
Case No. 8:17-cv-01868-JVS-DFM

i

| | b. | There is No Duty To Disclose Customer Track Records. | 37 |
| | c. | The Challenged Training Materials Do Not Establish Fraud, And In Any Event Have Been Discontinued. | 39 |
| | d. | The Sales Practices Do Not Suggest Fraud. | 40 |
| | e. | The CFTC Blinded Itself To The Truth. | 41 |

Defs.' Opp'n to Motion for Preliminary Injunction -
Case No. 8:17-cv-01868-JVS-DFM

ii

# **TABLE OF AUTHORITIES**

## **FEDERAL CASES**

*Adams Fruit Co. Inc. v. Barrett,*
  494 U.S. 638 (1990)...................................................................10

*Atchison, Topeka & Santa Fe Railway Co. v. Pena,*
  44 F.3d 437 (7th Cir. 1994) ......................................................10

*CFTC v. 20/20 Trading Co., Inc.,*
  2011 WL 2221177 (C.D. Cal. June 7, 2011) ......................... 6, 7, 25, 26

*CFTC v. Am. Precious Metals,*
  845 F. Supp. 2d 1279 (S.D. Fla. 2011) ....................................10

*CFTC v. Commonwealth Fin. Grp., Inc.,*
  874 F. Supp. 1345 (S.D. Fla. 1994).........................................38

*CFTC v. Comvest Trading Corp.,*
  481 F. Supp. 438 (D. Mass. 1979) ............................................7

*CFTC v. Frankwell Bullion Ltd.,*
  1994 WL 449071 (N.D. Cal. Aug. 12, 1994) ............................7

*CFTC v. Hunter Wise Commodities, LLC,*
  21 F. Supp. 3d 1317 (S.D. Fla. 2014).......................................24

*CFTC v. Hunter Wise Commodities, LLC,*
  749 F.3d 967 (11th Cir. 2014) ........................................... passim

*CFTC v. J. S. Love & Assocs. Options, Ltd.,*
  422 F. Supp. 652 (S.D.N.Y. 1976)..........................................36

*CFTC v. Kraft Foods Grp., Inc.,*
  153 F. Supp. 3d 996 (N.D. Ill. 2015) .......................................31

*CFTC v. Monex Deposit Co.,*
  824 F.3d 690 (7th Cir. 2016)....................................................17

*CFTC v. R.J. Fitzgerald & Co.,*
  310 F.3d 1321 (11th Cir. 2002)............................................38, 39

*CFTC v. Reed,*
  481 F. Supp. 2d 1190 (D. Colo. 2007)......................................29

*CFTC v. Sterling Trading Grp., Inc.,*
  605 F. Supp. 2d 1245 (S.D. Fla. 2009) ......................................9

*CFTC v. White Pine Trust Corp.,*
  574 F.3d 1219 (9th Cir. 2009)...............................................9, 25

*CFTC v. Worth,*
  2014 WL 11350233 (S.D. Fla. Oct. 27, 2014).......................17, 18

*CFTC v. Zelener,*
    373 F.3d 861 (7th Cir. 2004) .......................................................................... passim

*Chodos v. W. Publ'g Co.,*
    292 F.3d 992 (9th Cir. 2002) ..............................................................................21

*Colautti v. Franklin,*
    439 U.S. 379 (1979)..............................................................................................27

*Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.,*
    99 F. Supp. 2d 1123 (E.D. Cal. 2000).................................................................30

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)..............................................................................................31

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)..............................................................................................27

*FTC v. Invention Submission Corp.,*
    965 F.2d 1086 (D.C. Cir. 1992) ..........................................................................10

*Glen Holly Entm't, Inc. v. Tektronix, Inc.,*
    100 F. Supp. 2d 1086 (C.D. Cal. 1999)...............................................................36

*Grede v. FCStone, LLC,*
    867 F.3d 767 (7th Cir. 2017) ..............................................................................21

*I.N.S. v. Cardoza-Fonseca,*
    480 U.S. 421 (1987)..............................................................................................14

*Iappini v. Silverleaf Resorts, Inc.,*
    116 F. Supp. 3d 932 (E.D. Mo. 2015).................................................................41

*In re Search Warrant for [REDACTED].com,*
    248 F. Supp. 3d 970 (C.D. Cal. 2017).................................................................11

*In re Zhejiang Topoint Photovoltaic Co., Ltd.,*
    No. 14-24549 (Bankr. D.N.J. May 12, 2015) .....................................................21

*Indep. Ins. Agents of Am., Inc. v. Bd. of Governors of Fed. Reserve Sys.,*
    838 F.2d 627 (2d Cir. 1988) ...........................................................................10, 32

*Johnson v. Couturier,*
    572 F.3d 1067 (9th Cir. 2009) ...............................................................................7

*Johnson v. Don Charles & Co.,*
    1991 WL 83511, Comm. Fut. L. Rep. (CCH) ¶ 24,986, 1991 WL 83511
    (Jan. 16, 1991)................................................................................................. 39-40

*Karpov v. Insight Enters., Inc.,*
    2010 WL 2105448 (D. Ariz. Apr. 30, 2010) .......................................................40

*Kohler v. Inter-Tel Techs.,*
    244 F.3d 1167 (9th Cir. 2001) ...............................................................................7

*Linkenhoger v. Monex Int'l Ltd.,*
  Comm. Fut. L. Rep. (CCH) ¶ 24,161(Feb. 17, 1988)...............................................8

*Ma v. Ashcroft,*
  361 F.3d 553 (9th Cir. 2004) ...............................................28

*Motzek v. Monex,*
  1993 WL 176296, Comm. Fut. L. Rep. (CCH) P25, 728
  (CFTC May 24, 1993) ...............................................8

*Puckett v. Rufenacht, Bromagen & Hertz, Inc.,*
  903 F.2d 1014 (5th Cir. 1990) ...............................................37

*Searls v. Glasser,*
  64 F.3d 1061 (7th Cir. 1995) ...............................................36

*SEC v. Fehn,*
  97 F.3d 1276 (9th Cir. 1996) ...............................................6

*SEC v. Unifund SAL,*
  910 F.2d 1028 (2d Cir. 1990) ...............................................6

*Shroyer v. New Cingular Wireless Servs., Inc.,*
  622 F.3d 1035 (9th Cir. 2010) ...............................................36

*Smiley v. Citibank (South Dakota), N.A.,*
  517 U.S. 735 (1996)...............................................10

*United States v. Amlani,*
  111 F.3d 705 (9th Cir. 1997) ...............................................40

*United States v. Maciel-Alcala,*
  612 F.3d 1092 (9th Cir. 2010) ...............................................10

*United States v. Nutri-Cology, Inc.,*
  982 F.2d 394 (9th Cir. 1992)...............................................7

*United States v. TRW Rifle 7.62x51mm Caliber, One Model 14 Serial 593006,*
  447 F.3d 686, 689 (9th Cir. 2006) ...............................................11

## FEDERAL STATUTES

7 U.S.C. § 2(a)(1)...............................................25, 26

7 U.S.C. § 2(c) ............................................... passim

7 U.S.C. § 6c(b)...............................................25

7 U.S.C. § 9(1) ...............................................24, 28, 30

7 U.S.C. § 9(3) ...............................................28, 30

7 U.S.C. § 23 ...............................................25

CEA § 1a(27) ...........................................................................................26

CEA § 2 ............................................................................................... passim

CEA § 4b ...........................................................................................27, 28

CEA § 6(c)(1) ..................................................................................... passim

CEA § 6(c)(3) ..........................................................................................30

CEA § 9(a)(2) ..........................................................................................29

## STATE STATUTES

Cal. Corp. Code § 29531(b) ..................................................................8, 14

Cal. Comm. Code § 2-401(2)(b) ................................................................19

## FEDERAL RULES AND REGULATIONS

17 C.F.R. § 180 ........................................................................................30

17 C.F.R. §180.1 ...............................................................................24, 29

17 C.F.R § 5.18(i) .....................................................................................38

76 Fed. Reg. 41398 ...................................................................................29

76 Fed. Reg. 41400 .......................................................................... 29, 30, 31

## OTHER AUTHORITIES

CFTC Final Guidance 52428 ............................................................ 9, 11, 15

CFTC Final Guidance 77671 .....................................................................11

CFTC's Office of General Counsel Interpretive Letter 85-2 ........................7

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 .......... passim

Model State Commodity Code § 1.04 ....................................................8, 14

## INTRODUCTION AND SUMMARY OF ARGUMENT

**Monex Atlas Transactions are Exempt from CFTC Jurisdiction:** The CFTC's fraud allegations are baseless, but the CFTC has no jurisdiction over Monex Atlas transactions regardless. Congress in the Dodd-Frank amendments expressly exempted from Commodity Exchange Act ("CEA") coverage all financed retail precious metals transactions that result in actual delivery within 28 days. Congress specifically discussed Monex Atlas (with Monex, the CFTC Enforcement Chief, and the National Futures Association President all present) as delivering and storing metal the right way to eliminate the particular risk about which Congress was concerned. That risk was bucket-shop and Ponzi-scheme operators who had no metals to deliver. Congress also identified Monex's operation as being consistent with the Model State Commodity Code under which the CFTC had twice exempted Monex since its 1987-1988 investigation. Then, following Dodd-Frank, the CFTC in 2013 reconfirmed in its published Final Guidance that compliance with the Model Code would generally suffice for actual delivery. That Guidance expressly directed the public to the Congressional record endorsing Monex's actual delivery model. That Guidance even provided an on-point example stating that delivery of metals in fungible bulk form, including any metals purchased using leverage, margin or financing, to a depository other than the seller or its affiliates, coupled with transfer of title, constitutes "actual delivery" within the exemption's meaning.

The CFTC, through its Rule 30(b)(6) witness, concedes that Monex has delivered to third-party depositories in fungible bulk form every ounce of financed metal sold to each customer. The CFTC concedes that the depositories used by Monex are acceptable depositories not affiliated with Monex. The CFTC concedes that all customer documentation on its face transfers title of the metals to the customers subject to Monex's purchase-money liens. The CFTC concedes that Monex accounts to the depositories on a daily basis for each customer's ownership interest in all metals and that the CFTC knows of no errors in that accounting. The

CFTC also knows of no Atlas customer who did not promptly receive personal possession of his/her metals on demand after loan repayment. These admissions alone establish that Monex Atlas transactions are exempt from CFTC jurisdiction.

The CFTC has nevertheless invented solely for litigation purposes a new definition of "actual delivery" that is untethered from the statute, its history, and from the CFTC's Guidance. The CFTC's 30(b)(6) witness testified that the CFTC's litigation-specific definition of actual delivery: requires delivery directly to the customer (even before loans are repaid) or to a depository of the customer's choosing (and that the customer be allowed to inspect the metal at the depository), and precludes margin calls. These supposed requirements are entirely made up and patently contradict the CFTC Final Guidance which ***expressly permits***: (1) margin financing, and (2) delivery to a third-party depository unaffiliated with the seller, (3) in fungible bulk form. Fungible bulk delivery on behalf of ***all*** Monex customers is impossible if ***each*** customer gets to designate his/her own depository. No depository storing large quantities of precious metals in fungible bulk form would reasonably permit vault access by individual customers having small partial ownerships. Nor could the CFTC explain how the customer risk that Congress was concerned about— that there be actual metals to back each transaction—is increased at all by storage at Monex's admittedly acceptable depositories. No reasonable seller would extend financing if customers could take unfettered control of the metals before any loans were repaid, and were not subject to minimum loan-equity requirements and margin calls. Far from Monex's delivery being a "sham," as the CFTC contends, it is the CFTC's "actual delivery" definition invented for this litigation that is a sham since it eliminates the express statutory exemption at issue. It is telling that the CFTC's 30(b)(6) witness could not identify a single retail metals dealer that complies with its new "actual delivery" definition.

The CFTC seeks to justify this departure from the statute, its own public Guidance and the legislative record (which its Guidance incorporates) by grossly

1   mischaracterizing the Eleventh Circuit's explanation of actual delivery in *CFTC v.*

2   *Hunter Wise*, 749 F.3d 967 (11th Cir. 2014).  The *Hunter Wise* defendants had no

3   metals in a depository or otherwise to deliver to customers who repaid their loans.

4   When the *Hunter Wise* court discussed a lack of possession and control as defeating

5   actual delivery, it was observing that the ***defendants*** possessed and controlled ***no***

6   metals to deliver in the first place.  When the court said that the delivery in *Hunter*

7   *Wise* was "constructive" and not "actual," it was rejecting the defendants' naked

8   book-entry accounting system that was not backed by any real metals.  Nothing in

9   *Hunter Wise* suggests that "actual delivery" requires physical possession and control

10  of metals ***by individual customers*** who have not yet paid off their loans.  Nor could it

11  reasonably do so given the explicit CFTC Guidance permitting margin-financed

12  delivery to third-party depositories in fungible bulk form.  Indeed, *Hunter Wise*

13  quoted with approval the CFTC's own Final Guidance providing that: "'actual

14  delivery' would be satisfied, among other things, by 'physical delivery [of] the entire

15  quantity of the commodity purchased by the buyer, *including any portion of the*

16  *purchase made using leverage, margin, or financing'* into possession of the buyer *or*

17  *a depository other than the seller*."  *Id.* at 980 (emphasis added).  That is precisely

18  what Monex does, as the CFTC's own 30(b)(6) witness admits.

19      **The CFTC Has No General Fraud Jurisdiction Over "Actual Delivery"**

20  **Transactions:**  To mask its lack of jurisdiction, and to inflame the Court, the CFTC

21  fabricates a fraud theory.  It then asserts with no authority that even if Monex meets

22  the "actual delivery" exemption, the CFTC still has general anti-fraud authority over

23  Monex under CEA § 6(c)(1) which prohibits deceptively manipulative devices in

24  connection with commodity contracts in interstate commerce.  But Ninth Circuit

25  precedent makes clear that ***substantive*** CEA provisions, such as § 6(c)(1), do not

26  trump ***jurisdictional*** limitations in CEA § 2, which defines the CFTC's jurisdiction

27  and which expressly exempts "actual delivery" transactions.  Indeed, under the

28  CFTC's unprecedented construction, it would have general anti-fraud jurisdiction

over *every* retail "commodity" transaction in interstate commerce, including those at

grocery stores and pawn shops.  Moreover, Congress explicitly directed § 6(c)(1)  at

fraudulent "manipulation" of markets that the CFTC regulates, not sales fraud by

non-regulated entities.  That the CFTC Division of Enforcement floats this assertion,

demonstrates further its rogue derogation of Congressional intent.

**There is No Fraud:**  While the CFTC has no jurisdiction over any supposed

retail fraud at Monex, there is no fraud in any event.  The CFTC self-described

"heart" of its fraud case is the allegation that Monex hypes the safety, security and

profit potential of metals investment *generally* without disclosing that ***Monex-

specific*** transaction costs and fees make it virtually impossible to make a profit.

Monex's extensive risk disclosures repeated with each trade, which the CFTC

witnesses, including its 30(b)(6) witness, now admit are clear and understandable,

expressly set forth all fees and costs, discuss their impact on a break-even analysis

and invite customers to comparison shop.  More importantly, the CFTC's own expert

admitted that the CFTC's core theory—the hidden virtual impossibility of profits

with Atlas—is wrong:  he saw "no reason why an investor couldn't earn a profit

using, you know, in the Atlas account."  When asked about the CFTC's allegation

that Atlas was almost a "certain loser," his candid response was that "in legal

proceedings, hyperbole is common."

The CFTC misleadingly blames Atlas costs for customer losses (claiming that

90% of customers lose), but chose as its "review period" a time of dramatically

declining metals prices.  The CFTC's own expert agrees that even with ***no

transaction costs*** eight of the ten "sample" accounts that the CFTC selected for his

analysis would have lost money during the CFTC's chosen review period based on

market declines alone.  While this fact disposes of the CFTC's entire premise, the ten

accounts that the CFTC chose to analyze were not randomly selected, but were

cherry-picked because those customers made significantly more trades, and thus

incurred exponentially more transaction costs, than the average customer.  As a

1   matter of statistical science, no conclusions can be extrapolated from this non-
2   random, biased sample to the entire population of 12,000 Monex Atlas accounts.
3   And, as Monex's expert has now demonstrated, the CFTC's assertion of the amount
4   of Monex customer losses in a rising market is wrong and based only on their now
5   admitted math error.

6     Further, the CFTC's 30(b)(6) witness admitted error in the CFTC's core
7   misrepresentation theory that an Atlas brochure's discussion of the "safety and
8   security" *of depository storage* could somehow be read as de-emphasizing ***trading***
9   ***risks***.  He was aware of no one who had ever misinterpreted the depository storage
10  statement that way, and could point to no firm-wide de-emphasis of risk, assurances
11  of profits or promotion of successful Atlas results.  Thus, there is no basis for the
12  CFTC to claim that Monex was required to disclose customer track records for non-
13  discretionary accounts.  And not one of the CFTC declarants claims even to have
14  seen or relied upon the challenged marketing materials or statements that the CFTC
15  asserts "lured" customers.  No CFTC witness claims that Monex represented itself to
16  be a fiduciary and the Monex account agreements expressly disclaim any such
17  relationship.  All deposed declarants have either rejected significant CFTC assertions
18  and portions of their own CFTC-drafted declarations or have been discredited.  One
19  deposed customer upon reading his declaration asked "who wrote this thing?"  Two
20  of the CFTC's eight customer declarants were highly sophisticated investors who
21  speculated with futures and ETFs prior to Monex, further discrediting the CFTC's
22  notion that no rational investor would choose Monex over those other alternatives.
23  Even these CFTC cherry-picked declarants understood the risk disclosure statements,
24  monthly account statements, and transaction confirmation statements when they read
25  them at deposition and understood that they had decision-making authority over their
26  own accounts.

27    Ultimately, the CFTC is challenging a business model that it dislikes because
28  it believes that its regulated markets provide a lower cost way to invest in precious

metals.  The CFTC has thus alleged a scheme for which there is no evidentiary support, and invented new requirements to assert jurisdiction that Congress intentionally and explicitly rejected.  The Court should deny the CFTC's requested preliminary injunction and dismiss the case for lack of jurisdiction.[1]

## **LEGAL STANDARDS**

Monex Atlas has been operating in plain view at the same Orange County location for over 30 years.  Yet, the CFTC improperly seeks the most extreme form of the already extreme preliminary injunction remedy:  Instead of "preserv[ing] the relative positions . . . until a trial on the merits,"[2] the CFTC would shut down Monex's Atlas accounts, seize all its assets, and impose a monitor to "assume control" of whatever remains of Monex's business.  *See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. ("PI Mem.") at 33-34 (ECF Dkt. 7.1).  This would have the same effect as a jury verdict in its favor, plus the most onerous penalties a Court could impose.  Any such order would irreparably destroy Monex's business, even if Monex ultimately prevailed at trial.  Because the CFTC seeks an order that "accomplishes significantly more than preservation of the status quo," it must make a "substantial showing of likelihood of success as to both a current violation and the risk of repetition."  *SEC v. Unifund SAL*, 910 F.2d 1028, 1040 (2d Cir. 1990).[3]

Nor is the CFTC excused from making a showing of irreparable injury.  In statutory enforcement cases, the Court must apply a "sliding scale in which the required degree of irreparable harm increases as the probability of success

---

[1] Given space limitations, this Introduction must serve as a factual statement supported by the accompanying Declarations of Louis Carabini, Gregory Walker, Neil Goteiner, and John Enyart, and the Declaration of David Ross, filed previously with Monex's *Daubert* motion (ECF Dkt. 154-3).  Unless noted, exhibits are to the concurrently filed Declaration of Neil Goteiner ("Goteiner Decl.").

[2] *CFTC v. 20/20 Trading Co., Inc.*, 2011 WL 2221177, at *2 (C.D. Cal. June 7, 2011) (denying CFTC request for preliminary injunction against precious metals dealer).

[3] Contrary to the CFTC's suggestion, there is "[n]o per se rule requiring the issuance of an injunction upon the showing of [a] past violation."  *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996) (citation omitted).

1   decreases." *United States v. Nutri-Cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992)

2   (citation omitted).[4]  The irreparable injury requirement is not eliminated where, as

3   here, there is no "undisputed statutory violation." *Id.* at 398.

4            Finally, asset freezes and/or monitor appointments require additional

5   showings, including: (i) a likelihood of asset dissipation; (ii) inadequacy of available

6   legal remedies; and (iii) the probability that harm to plaintiff by denying the

7   appointment would be greater than the injury to the defendant.[5]  The CFTC's brief,

8   however, contains no arguments in support of such relief, which are thus abandoned.

9   *Cf. Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1182 (9th Cir. 2001).

10                              **ARGUMENT**

11  **A.   Because Monex Makes "Actual Delivery" Under The CEA, The CFTC**

12            **Lacks Jurisdiction To Bring These Claims.**

13           Even prior to express authorization in the Dodd-Frank Wall Street Reform and

14  Consumer Protection Act of 2010 ("Dodd-Frank"), the CFTC regulated certain

15  financed or leveraged retail commodity transactions.  The CFTC took a functional

16  approach to whether such transactions, masquerading as cash transactions, were

17  actually futures contracts.  In 1985, the CFTC's Office of General Counsel issued

18  Interpretive Letter 85-2, which found that financed precious metals transactions

19  resulting in prompt delivery to a third-party depository would ***not*** be subject to

20  CFTC jurisdiction.[6]  In addition, the CFTC did not assert jurisdiction over dealers

21  who complied with the Model State Commodity Code ("Model Code"), which was

22  drafted by state regulators with input from the CFTC and National Futures

23  Association ("NFA").  *See* Ex. 36 at 580 (Feigin).  The Model Code exempts from

24  _____

25  [4] *See also 20/20 Trading*, 2011 WL 2221177, at *3 (recognizing sliding scale);
    *CFTC v. Frankwell Bullion Ltd.*, 1994 WL 449071, at *4 (N.D. Cal. Aug. 12, 1994)

26  (denying CFTC preliminary injunction) .
    [5] *See Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009) (asset freeze);

27  *CFTC v. Comvest Trading Corp.*, 481 F. Supp. 438, 441 (D. Mass. 1979) (receiver
    only) .

28  [6] Request for Judicial Notice ("RJN"), Ex. 7 (Interpretive Letter 85-2).

regulation financed retail precious metals transactions if, within a specified period of time, the purchased metals are: (i) physically delivered (ii) in specifically segregated or "fungible bulk form" (iii) to the customer or an independent depository to be held on the purchaser's behalf (iv) with the "document of title" delivered to the customer (v) even if the metals remain subject to "liens and encumbrances." *See* Cal. Corp. Code § 29531(b) (California enactment of Model Code); *see also* RJN Ex. 8 (Model Code) § 1.04(a)(2).

The CFTC confirmed through two investigations that Monex was delivering and storing metals to avoid CEA jurisdiction and liability, and that as Mr. Schwartz admitted, the CFTC is unaware of any increased "actual delivery" risks at Monex since those investigations.[7]  Walker Decl. ¶¶ 5-8; Goteiner Decl. Ex. 4 (Schwartz) at 56:23-57:20.  That, then, was the record as of the 2009 Dodd-Frank hearings when Congress, the NFA and the CFTC modeled "actual delivery" on the Monex Atlas program. *See* below, pp. 11-13.

The CFTC now wrongly claims that all of this changed with Dodd-Frank.  But Congress in the Dodd-Frank amendments in fact used Monex Atlas as the model for "actual delivery" that would be exempt from CFTC jurisdiction.  Those amendments were in reaction to *CFTC v. Zelener*, 373 F.3d 861 (7th Cir. 2004), which in the related foreign currency field rejected the CFTC's long-standing functional approach to jurisdiction.  *Zelener* instead cabined the futures determination to the four corners of a contract.  Dodd-Frank merely reversed *Zelener* and restored the CFTC's functional approach.  The CFTC's own 30(b)(6) witness on actual delivery, CFTC Deputy General Counsel Mr. Schwartz, confirmed this very point. Ex. 4 at 16:24-17:21.  So does the legislative history discussed below.

---

[7] Courts have repeatedly found that Monex complies with the Model Code. *E.g.*, *Linkenhoger v. Monex Int'l Ltd.*, Comm. Fut. L. Rep. (CCH) ¶ 24,161, at *3 (Feb. 17, 1988); *Motzek v. Monex*, 1993 WL 176296, Comm. Fut. L. Rep. (CCH) P25, 728 (CFTC May 24, 1993).  Authorities not available on Westlaw are attached to the concurrently filed Appendix.

1   To this end, Congress gave the CFTC *express* authority over retail transactions

2   involving "any agreement, contract, or transaction in any commodity that is . . .

3   entered into . . . on a leveraged or margined basis," 7 U.S.C. § 2(c)(2)(D)(i); *while*

4   *simultaneously excluding* from the CFTC's authority leveraged or margined

5   transactions, "that result[] in actual delivery within 28 days." *Id.*

6   § 2(c)(2)(D)(ii)(III)(aa).  Following Dodd-Frank, the CFTC issued Final Guidance on

7   this new provision, re-confirming that compliance with the Model Code would

8   constitute "actual delivery," absent a sham.  RJN Ex. 5 at 52428 n.25.  Far from

9   constituting a "sham," the factors the CFTC advances here describe exempted

10  transactions precluding its jurisdiction, regardless of any supposed (but non-existent)

11  fraud.[8]

12        **1.    Monex's Delivery Mechanism Satisfies The Plain Text Of The**

13               **"Actual Delivery" Exclusion.**

14        The plain text of Dodd-Frank's actual delivery exception does not require that

15  delivery be made to a particular person, in any particular way, or free from

16  encumbrances—it simply requires that delivery be "actual."  7 U.S.C.

17  § 2(c)(2)(D)(ii)(III)(aa).  Black's Law Dictionary defines "actual" as "[e]xisting in

18  fact; real."  Goteiner Decl. Ex. 34; *see also* Ex. 35 (Merriam Webster's) (similar).  It

19  defines "delivery" as "[t]he formal act of voluntarily transferring something; esp., the

20  act of bringing goods, letters, etc. to a particular person or place."  Ex. 34.  Monex

21  makes "actual delivery" because the precious metals exist in fact and, upon sale, are

22  voluntarily transferred to independent depositories for the buyer's benefit, subject to

23  typical secured financing restrictions.  The CFTC disputes none of these Atlas

24  delivery and storage facts.  *E.g.*, Goteiner Decl. Ex. 4 (Schwartz) 61:17-63:8, 72:15-

25

26  [8] *CFTC v. White Pine Trust Corp.*, 574 F.3d 1219, 1227 (9th Cir. 2009) (dismissing
    claims involving undisputed fraud because CEA § 2 precluded jurisdiction); *CFTC*

27  *v. Sterling Trading Grp., Inc.*, 605 F. Supp. 2d 1245, 1267 (S.D. Fla. 2009)
    (holding the CFTC's jurisdiction "is not at all affected by whether Defendants

28  committed the fraudulent practices").

73:1, 86:4-21.

The crux of the CFTC's "plain-text" argument appears to be a third definition in Black's Law Dictionary of the combined term "actual delivery" in a non-financing context.  Namely: "[t]he act of giving real and immediate possession to the buyer or the buyer's agent."  *See* PI Mem. 7.  But the CFTC's argument ignores both the statute, which applies to financed products, and its 2013 Final Guidance that expressly approves of Model Code delivery, including the seller holding the precious metals (fungible and bulk) in the depository as collateral for the loan.  Moreover, Congress limited the CFTC's rulemaking authority only to lengthen the 28-day period, not for determining the meaning of "actual delivery."[9]  No agency deference exists when a court must resolve the issue in litigation[10] and where, as here, the agency's litigation-specific position contradicts its prior policy and positions,[11] and is without any legitimate explanation of relevance to the statute. *CFTC v. Am. Precious Metals*, 845 F. Supp. 2d 1279, 1286-87 (S.D. Fla. 2011) (rejecting CFTC's convenient litigation jurisdiction position as inconsistent with its interim final rule version ); s*ee also FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992) (a court need not accept an "agency's own appraisal of relevancy" where it is "obviously wrong").

The Court must look to the statutory "context" and the CFTC's prior positions. *United States v. Maciel-Alcala*, 612 F.3d 1092, 1098 (9th Cir. 2010); *In re Search*

---

[9] Absent delegation of rulemaking authority, an agency's interpretive statements regarding statutes are "undeserving of substantial deference under *Chevron*." *Atchison, Topeka & Santa Fe Ry. Co. v. Pena*, 44 F.3d 437, 442 (7th Cir. 1994). Instead, courts test "the thoroughness, validity, and consistency of the agency's reasoning." *Id.* (citation omitted).

[10] *Zelener*, 373 F.3d at 867 (citing *Adams Fruit Co. Inc. v. Barrett*, 494 U.S. 638, 649-50 (1990)).

[11] *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (noting failure to take account of legitimate reliance on prior interpretation may be arbitrary and capricious);  *Indep. Ins. Agents of Am., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 838 F.2d 627, 632 (2d Cir. 1988) (noting courts should be "especially careful not to allow dubious [agency] arguments" when construing prohibitory statutes).

1   *Warrant for [REDACTED].com*, 248 F. Supp. 3d 970, 976 (C.D. Cal. 2017).  This

2   includes examining, "how the terms were defined at the time the statute was

3   adopted."  *United States v. TRW Rifle 7.62x51mm Caliber, One Model 14 Serial*

4   *593006*, 447 F.3d 686, 689 (9th Cir. 2006) (internal punctuation omitted).  The

5   legislative context disproves the CFTC's newly minted assertions.

6        **2.        The Statute and Legislative Record Support Monex.**

7        The CFTC would read the plain words "margined basis" out of the express

8   statutory exemption.  7 U.S.C. § 2(c)(2)(D)(i) and (ii)(III)(aa); *see also* Black's Law

9   Dict. Online 2d Ed. ("Margin" is "[a] speculator's cash or securities deposited ***as***

10  ***collateral*** with a stockbroker." (emphasis added)).  That Congress passed legislation

11  directed specifically at ***leveraged and margined*** retail commodities transactions

12  presupposes that any such transactions would be secured by liens and collateral, and

13  subject to margin and liquidation contingencies in the event of diminution of the

14  value of that collateral—just like all margined trading.  It is nonsensical for the

15  CFTC now to claim that these ordinary elements of secured financing are evidence

16  that Monex's delivery mechanism is a "sham."  *E.g.*, Goteiner Decl. Ex. 4 (Schwartz)

17  at 77:22-79:4.

18        The CFTC's motion and 30(b)(6) witness also evaded Dodd-Frank's

19  legislative history even though its own 2013 Formal Guidance and 2011 Request for

20  Comments expressly directed sellers to the legislative history of the actual delivery

21  exemption to understand its meaning.  RJN Ex. 5 (Final Guidance) at 52428; RJN

22  Ex. 6 (Request for Comments), at 77671 n.12 (quoting Congressman Marshall that

23  Congress was only "correcting" *Zelener*); Goteiner Decl. Ex. 4 (Schwartz) at 9:13-

24  10:11.  The only public legislative discussion of the exemption (to which the CFTC

25  twice pointed) was a June 2009 Congressional Subcommittee Hearing at which

26  Congress heard testimony from the President of the NFA (Dan Roth), a Monex

27  representative and former state regulator (Philip Feigin), and the Acting Director of

28  the CFTC Enforcement Division (Steven Obie).  RJN Ex. 1.  The NFA and CFTC

1    work hand in hand to protect commodities investors from increased risk.  Goteiner

2    Decl. Ex. 4 (Schwartz) 15:10-21; RJN Ex. 1 at 17-18.  The Subcommittee Hearing's

3    purpose was to address the scope of potential CFTC jurisdiction over financed retail

4    commodities transactions in the wake of *Zelener.*  RJN Ex. 1 at 21-28.  All testimony

5    was uniform: Congress' objective was to eliminate customer risk posed by precious

6    metals bucket shops and Ponzi schemers who had no metals to sell.  *See id.* at 8, 13,

7    38.  Mr. Schwartz for the CFTC finally agreed that this was the stated objective.

8    Goteiner Decl. Ex. 4 (Schwartz) 16:12-14, 19:10-24, 20:5-20, 21:1-8, 107:1-11.  All

9    agreed in that hearing that Monex's Model Code–compliant delivery eliminated that

10   risk and would be exempt from CFTC reach.

11          First, Mr. Roth testified about the NFA's proposed response to *Zelener*, stating

12   that it should preserve the "1985 interpretative letter issued by the CFTC Office of

13   General Counsel, ***which Monex International and similar entities rely on***."  RJN

14   Ex. 1 at 10 (emphasis added).  Mr. Roth specifically stated that the proposed

15   legislation ***"would not affect Monex."***  *Id*. (emphasis added).  It was Roth who

16   proposed the actual delivery exemption that Congress ultimately adopted.  *See id.* at

17   17-18.

18          Second, there was considerable testimony and documentation from Mr. Feigin

19   regarding Monex's Model Code delivery that prevented bucket shops.  *Id.* at 11, 13-

20   14 (describing Monex's delivery mechanism), 11-12, 15-17 (describing Model

21   Code).  The Model Code (precisely like the Congressional response to *Zelener*) was

22   intended to prevent: "two fundamental fraudulent patterns of conduct that showed up

23   most frequently: (i) . . . delivery was not required for many months (there were no

24   commodities and the company vanished with the money the customer had paid); and

25   (ii) consumers were buying precious metals from out-of-state companies promising

26   to store the metal for them, but the companies never bought the metal and

27   squandered the cash."  *Id*. at 15.

28          Third, CFTC Enforcement Director Obie testified about the scope of the

regulatory authority the CFTC was seeking following *Zelener*.  He confirmed that the CFTC was "not looking at where tangible products are delivered." *Id.* at 31.  Instead, he explained that the CFTC was trying to reach "fraudsters and Ponzi schemers" and "swindlers" who had recently left the foreign exchange markets and entered the precious metals markets following *Zelener*.  *Id.* at 4-5, 19, 26.  Mr. Obie never once took issue with Monex's delivery as it was being presented to Congress as the very model for the exemption.  Indeed, the CFTC had already twice thoroughly examined Monex to confirm that it properly delivered metals.  *See* Walker Decl. ¶ 5-7.

After hearing the above testimony, Congressman Marshall expressed his view that if retailers complied with the Model Code, the CFTC and NFA should be able "to go after the Ponzi schemes that are now popping up . . . and ***Monex and others who are . . . actually delivering would be okay and they wouldn't have to fool with you guys***."  RJN Ex. 1 at 23 (emphasis added).

That the CFTC would now claim that Monex fails to meet Congress' definition of "actual delivery" when: (1) Congress and the NFA used Monex as the example of proper delivery, (2) with the CFTC Enforcement Chief present, and (3) the CFTC then twice over two years directed sellers to that very legislative history to understand the meaning "actual delivery," tells all.

### 3. Congress Rejected the CFTC's "Actual Delivery" Definition.

Indeed, Congress declined the CFTC's request to define "actual delivery" the very way the CFTC asserts here.  On August 17, 2009, two months after the Hearing, then-CFTC Chairman Gensler sent to Congress a "memo with recommendations to improve the [Dodd-Frank] legislation."[12]  The Gensler memo included a markup showing proposed revisions that would define "actual delivery" ***to preclude*** "delivery to a third party in a financed transaction where the commodity is held as collateral."  RJN Ex. 2 (Gensler Analysis) at 6.  The Gensler proposal also reduced the delivery

---

[12] RJN Ex. 2 ("Gensler Letter" with attached "Gensler Analysis," collectively "Gensler Memo").

time from 28 days to 3 days.  A subsequent draft of the legislation came before the Senate on May 20, 2010 and incorporated this CFTC proposed language.  RJN Ex. 3, § 742 (bb)(v).

Congress, however, ultimately rejected the CFTC's proposed no depository / no collateral / three-day limitation on "actual delivery."  *See* 7 U.S.C. § 2(c)(2)(D)(ii)(III).  Because Congress expressly considered the CFTC's proposed limitation, the Court should find that Congress did ***not*** intend to remove from the exemption financed transactions delivered to a third-party depository ***as collateral***. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." (citation omitted)).

### 4.     Monex's Physical Delivery Follows the CFTC's Public Guidance.

In addition to subverting Congress' intent, the CFTC's litigation position also contradicts its express public Guidance which states that "an agreement, contract, or transaction that results in 'physical delivery' within the meaning of section 1.04(a)(2)(i)-(iii) of the Model State Commodity Code would ordinarily result in 'actual delivery'" absent a sham.[13]  That delivery—physical delivery in fungible bulk form to an independent depository with transfer of title even if encumbered by liens—is the same as Monex's delivery mechanism.  RJN Ex. 8, § 1.04(a)(2); Cal. Corp. Code § 29531(b).  Indeed, in its ***on-point*** Final Guidance "Example 2," the CFTC confirms that "Actual delivery ***will have occurred*** if, within 28 days, the seller has: (1) Physically delivered the entire quantity of the commodity purchased by the buyer, including any portion of the purchase made using leverage, margin, or financing, whether in specifically segregated or fungible bulk form, into the

---

[13] *Compare* Goteiner Decl. Ex. 4 (Schwartz) 22:25-23:8 (resisting Guidance), *with* RJN Ex. 5 (Final Guidance) at 52428 n.25.  The CFTC tellingly buries reference to its Final Guidance, Example 2, in a footnote and even then does not mention its adoption of the Model Code.  *See* PI Mem. at 8 n.22.

possession of a depository . . . ; and (2) has transferred title to that quantity of the commodity to the buyer."  RJN Ex. 5 at 52428.

Further, the CFTC now admits that nothing in the Model Code's definition of physical delivery, Congressional history, or the CFTC's Final Guidance refers to, let alone requires, unrestricted customer "possession and control"—the CFTC's litigation *ipse dixit* that Monex's Model Code delivery is a sham.[14]  Indeed, the CFTC's Final Guidance contemplates exactly the opposite.  It expressly refers to delivery of metal on a financed or margined basis to a third-party depository in fungible bulk form.  Financing contemplates collateral, and margin contemplates margin calls.  Delivery of multiple customers' metal in fungible form ***is not possible*** if each customer gets to designate his/her own depository and have unfettered possession and control of his/her own non-segregated metals stored in bulk.  Yet the CFTC is still pushing that misdirection.  *E.g.*, Goteiner Decl. Ex. 4 (Schwartz) 84:21-85:15 (analogizing collateralized gold coins to cars with liens).  Further, the CFTC now finally admits that it has nothing other than the statute, devoid of legislative history (to which the CFTC directed the world), and *Hunter Wise* to support the CFTC's litigation-specific "possession and control" notion.[15]

### 5.   The CFTC Grossly Mischaracterizes *Hunter Wise*.

The CFTC, however, distorts and misapplies the Eleventh Circuit's decision in *CFTC v. Hunter Wise Commodities*, *LLC*, 749 F.3d 967 (11th Cir. 2014), to justify casting aside its own Final Guidance and the legislative history.  It falsely claims that the *Hunter Wise* transactions are "almost identical to Monex's transactions," PI Mem. 7, even though the *Hunter Wise* defendants—unlike Monex here—"had no

---

[14] *Compare* PI Mem. 8, 12-14, *with* Goteiner Decl. Ex. 4 (Schwartz) 5:25-7:9,39:4-8 (30(b)(6) admission there was no control or possession notion either in legislative history or Guidance although the Guidance defines "actual delivery"), *and* RJN Ex. 5 (Final Guidance).

[15] Goteiner Decl. Ex. 4 (Schwartz) at 51:20-52:9. Mr. Schwartz at first added the December 2017 crypto currency regulations *id*. (8:24-9:7, 54:22-25), which he then admitted are not relevant here. *Id*. 55:1-56:6.

metals to deliver." 749 F.3d at 978.  Instead, the *Hunter Wise* defendants simply engaged in naked accounting book-entries purporting to transfer to customers title to metals they never possessed.  *Id*. at 980.  The Eleventh Circuit found in these circumstances that delivery was "constructive," and not "actual" because **defendants** did not possess and control the metals they were purporting to sell customers.  *Id*. ("Accordingly, the district court found that Hunter Wise did not possess or control an inventory of metals from which it could deliver to retail customers.").  Nothing in *Hunter Wise* supports the CFTC notion that **the customers** must have unfettered possession and control *before* repaying their loans.  Even the CFTC finally admitted these factual differences on January 18, 2018 (Goteiner Decl. Ex. 4 (Schwartz) 42:8-43:6), in addition to admitting that *Hunter Wise* is  "straightforward" and "not controlling here." *Id*. 40:21.  *Hunter Wise* is instead the paradigm of what Congress intended to stop with Dodd-Frank, a bucket shop or Ponzi scheme backed by no actual metals.

　　　Here, by sharp contrast, the CFTC has conceded through its actual delivery/risk 30(b)(6) witness that: (1) Monex always has sufficient metals inventories to satisfy every customer position with no risk of non-delivery (Goteiner Decl. Ex. 4 (Schwartz) 30:15-17, 86:4-21); (2) Monex accounts on a daily basis to the depositories allocating the ownership positions of each customer kept in fungible form and the CFTC is aware of no errors in such accounting (*id*. 76:19-77:11, 94:5-8); (3) there are no risk or other issues with passage of title and ownership of the actual metals to the customers (the CFTC has no reason to doubt that the customer has ownership interests) (*id*. 60:15-61:3, 61:17-62:1,72:1-6); (4) there is no increased risk associated with Monex having a security interest or from the customer-Monex documentation (*id*. 77:12-19, 84:2-4, 94:5-8); (5) the CFTC is unaware of any customer being unable to obtain metals fully paid for (*id*. 86:4-21); (6) the depositories used by Monex are recognized depositories having no affiliation with Monex (*id*. 72:15-73:1); and (7) there is no increased risk arising from the Monex-

depository arrangements (*id.* 89:18-90:12).  The CFTC has thus effectively admitted that Monex is the paradigm example of "actual delivery" that Congress intended to exempt.  *See also CFTC v. Monex Deposit Co.*, 824 F.3d 690, 694 (7th Cir. 2016) (*Hunter Wise* is "considerably different" from this case because it involved "a metals-trading program in which no metals change hands").

Indeed in *CFTC v. Worth*, 2014 WL 11350233 (S.D. Fla. Oct. 27, 2014), the court rejected a similar CFTC attempt to misuse *Hunter Wise*, even without the instant CFTC 30(b)(6) admissions.  The CFTC there claimed, ***prior*** to *Hunter Wise*, that on certain occasions the *Worth* defendants delivered metals late, after 28 days, and in those instances lost their exemption for the transactions to be off-exchange.  The Complaint, however, did not allege a failure of delivery when real metal was delivered within 28 days to a depository in the manner Monex does.  In response to Worth's motion to dismiss, the CFTC refuted the defendants' argument that the actual delivery exemption was "vague and requires further guidance" by declaring "It is not and does not."  Ex. 39 at 13 (CFTC Resp. to Mot. to Dismiss).  The CFTC further argued that its enforcement action was not a due process violation because it "does not allege that there is anything violative with Worth's practice of making 'actual delivery' by physically **delivering metal to a depository** and allocating it to an account held in the customer's name."  *Id.* at 16 (emphasis added).  The CFTC affirmatively stated that "ownership of metals is transferred directly from Worth to its customers" by delivery of the metals to the depository and title transfer.  Ex. 40 at 11 (CFTC Mot. for Prelim. Inj.).

But ***after*** *Hunter Wise* was decided, the CFTC changed course and argued there, as here, that under *Hunter Wise* the defendant's delivery of precious metals, even within 28 days, did not constitute "actual delivery" because the metals were not transferred into the customers' actual physical possession before loan repayment.  In denying the CFTC's motion to amend, the district court rebuked the CFTC for this about-face, noting it, "would mean that, regardless of Worth's allocation procedures,

1   recordkeeping, and whether it purchased physical metals at all, each and every

2   financed transaction would violate Dodd-Frank." *Worth*, 2014 WL 11350233 at

3   *2.[16]  Nothing has changed here since *Worth*. The CFTC 30(b)(6) witness, "can't

4   point to one company," which makes "actual delivery" under its post-*Hunter Wise*

5   definition.  Goteiner Decl. Ex. 4 (Schwartz) 108:22-109:14.

6          *Worth* also noted that the CFTC's position violated the defendant's

7   constitutional right to fair notice. *See id.* at *3.  That is true here as well; Monex

8   follows the CFTC's Guidance, which the CFTC cannot change *to reject*

9   *Congressional intent*.  *See* Defs.' Mot. to Dismiss ("MTD") at 27-33 (Dkt. 41-1).

10         **6.       The CFTC's "Sham" Assertion is Frivolous.**

11         Because Monex's delivery complies precisely with the CFTC Final Guidance,

12   the Model Code, and Congressional intent, the CFTC cynically mislabels it a

13   "sham;" for that is the only failure of Model Code delivery the Guidance recognizes.

14   RJN Ex. 5 at 52428 & n.25.  But the main factors on which the CFTC relies to cry

15   sham—delivery in fungible bulk form to an independent depository; issuance of a

16   document of title; continuing liens and expected financing—are the very criteria

17   which the Final Guidance and the Model Code adopt as constituting actual delivery.

18   Even the CFTC's 30(b)(6) witness recognized that keeping the metal in fungible bulk

19   form with daily accounting adds no risk to the customer and complies with the

20   Guidance.  Goteiner Decl. Ex. 4 (Schwartz) 76:19-77:11.

21         Struggling to identify any "sham" factors increasing customer risk, the CFTC

22   makes up actual delivery requirements. *See* PI Mem. 6-18.  They are litigation-

23   specific technical points which the CFTC fabricates to address, or to create, risks that

24   are irrelevant to Congress's bucket shop/Ponzi scheme concerns.  For instance, while

25   the CFTC complains that customers have no depository control, Mr. Schwartz

26

27   _____

    [16] Judge Easterbrook patiently tried to make the same point to CFTC counsel in the
28   earlier Seventh Circuit oral argument during the investigatory stage of this case.
     Ex. 41 at 14-16.

admitted there is no increased customer risk from Monex's use of unaffiliated depositories. Goteiner Decl. Ex. 4 (Schwartz) 89:12-90:12. He nonetheless insisted nonsensically that a sham factor to consider is that Atlas customers cannot designate or contract with their own depositories. *Id.* 94:17-96:1.

While the CFTC describes Monex's title transfer documents as a "sham" (PI Mem. 12-14), Mr. Schwartz rejected that argument and contradicted his predecessor 30(b)(6) witness, Mr. Gomberg, noting that Monex passes title to the customer and provides proper notice to the customer as discussed in the Atlas Account Agreement ("AAA"), at no increased risk to the customer.[17] Goteiner Decl. Ex. 4 (Schwartz) 60:15-61:3, 76:19-77:21 (confirming no increased risk from the transaction documentation between Monex and the customer).

The CFTC next *falsely* claims that actual delivery does not occur because "a substantial portion of the metals ultimately secure Monex's own financing." *See* PI Mem. 16, 17-18. Monex's lenders only have whatever rights in customers' metals that Monex has. All documentation, both with Monex's customers, its depositories and its lenders, recognizes the customer's interest in stored metals. Indeed, § 5.03 of the Servicing Agreement with Monex's lenders respects each customer's right to any surplus proceeds from liquidation of their metals collateral as a result of failure to timely repay their loan or otherwise comply with their agreements. Moreover, even in the remote confluence of: (i) Monex's default on its debt financing, (ii) the inadequacy of the Monex-owned (not customer-owned) metals inventory to satisfy such debt, and (iii) the failure of Monex's customers' to timely repay their loan debts to Monex for metals they own, § 5.04 of the Service Agreement makes clear that the net liquidation proceeds belong to the customers, rather than to Monex's lenders.

---

[17] Moreover under the UCC, Monex's documentation is legally effective to transfer title, notwithstanding any liens that may continue to attach, as long as they are "explicitly agreed on by the parties." *See* Cal. Comm. Code § 2-401(2)(b). Here, the Atlas Agreement expressly provides for transfer of title upon issuance of the CTTNs. *See* Walker Decl. Ex. C at 3-4, ¶¶ 7.3-7.4 (Purchase and Sale Agreement).

Thus, the customers' metal is not an asset of Monex and is not available as collateral for loans to Monex.  Enyart Decl. ¶ 4; Carabini Decl. ¶¶ 26-27.  Monex uses only its own *receivables* from customers' outstanding loan obligations as collateral, just as a bank or mortgage company may do with respect to its secured loan receivables.  Carabini Decl. ¶ 26.

In the face of this documentation, Mr. Schwartz didn't know if any Monex lender rights increased customer risks beyond those disclosed in the AAA.  Goteiner Decl. Ex. 4 (Schwartz) at 90:20-91:16.  But he admitted that the documentation provides that it is each customer, rather than Monex's lender, who is entitled to the surplus from any liquidation of such customer's metal to repay such customer's loan.  *Id.* 110:24-111:20.  That should have ended the CFTC's search for a sham.

Mr. Schwartz however, speculated without information, that in the event of a Monex bankruptcy, Monex customers might be treated as unsecured creditors with contractual rights against Monex, rather than as owners of the stored metals (which he also contradictorily admitted that they were).  *Id.* 60:22-62:1, 65:8-66:12, 99:23-100:17.  But he conceded that this risk stems not from any Monex lender agreements, but from the fact of no customer physical possession (*id.* 65:8-20) which of course follows from bulk fungible storage.[18]  Fungible bulk depository delivery, however, is Model Code compliant and CFTC Guidance-endorsed.  And so whatever risk the CFTC conjures from its Guidance, which Guidance Monex followed, is not any fault of Monex's.  Thus the CFTC cannot use such remote hypothetical scenarios to trump Congressional intent and enjoin Monex.

Relatedly, Congress was obviously comfortable with this firm enterprise risk that the CFTC now labels sham, since Congress: (1) rejected Gensler's proposed amendment and stuck to the 28-day delivery period in which a firm could

---

[18] Mr. Schwartz simultaneously acknowledged, however, that he didn't see a difference between the customer's legal and physical possession, which suggests that the CFTC is again attempting to sow confusion.  Goteiner Decl. Ex. 4 (Schwartz) at 7:17-8:2.

1    theoretically go bankrupt and leave the customer with having paid but without the

2    metal, and (2) did not give CFTC authority to shorten the 28-day period.  Moreover,

3    the CFTC's witness has the law wrong and any decision by a bankruptcy court

4    failing to recognize customer ownership of their metals would likely be error.  *E.g.*,

5    *Grede v. FCStone, LLC*, 867 F.3d 767, 788-89 (7th Cir. 2017) (securities beneficially

6    held for customers by bankrupt futures commission merchant in an undivided

7    fungible lot but accounted for daily with detailed ledgers were property of customers,

8    not bankruptcy estate, even though debtor used such trust property as collateral for its

9    own borrowing).[19]

10        The CFTC also wrongly contends as a sham factor that Monex "can (and does)

11    liquidate customer trading positions at any time and for any reason."  PI Mem. 11.

12    While margin calls are a normal attribute of margin transactions, and Monex broadly

13    reserves rights as would any lender, Monex does not liquidate customer positions

14    "for any reason."  Carabini Decl. ¶¶ 28, 44.  Despite the CFTC's assertion, there is

15    no evidence in the record that Monex ever liquidated a customer's account "at any

16    time and for any reason."[20]  And whatever discretion Monex has, it must act

17    reasonably and in good faith just like any contracting party.  *See Chodos v. W. Publ'g*

18    *Co.*, 292 F.3d 992, 996 (9th Cir. 2002) (covenant of good faith and fair dealing is

19    implied in every contract).  Indeed, the CFTC's 30(b)(6) witness acknowledged that

20    it was understandable that Monex would take a lien so that it could foreclose metals

21    if they needed to collect what was owed.  Goteiner Decl. Ex. 4 (Schwartz) 62:17-

22    63:1.  He also admitted that there was no greater risk of margin calls with Atlas than

23    with other investments and that he had no information of Monex ever issuing a

24    margin call for no reason.  *Id.* 78:21-79:21.  He also conceded that a liquidation

25    _____

26    [19] *Accord*, *In re Zhejiang Topoint Photovoltaic Co., Ltd.*, No. 14-24549, at 9
     (Bankr. D.N.J. May 12, 2015) (solar panels purchased from debtors and stored at
27    warehouse on undivided basis as part of fungible lot held to be property of
     purchaser rather than debtor's bankruptcy estate).

28    [20] Also, as a practical matter, the majority of Monex customers never receive a
     margin call, much less a liquidation.  Carabini Decl. ¶44.

could limit the customer's damage in a falling market by preventing additional losses (*id.* 111:17-112:6) and that the customer could return to the market with a phone call post-liquidation (*id.* 80:1-81:9).

Unable to identify any of the risks *about which Congress was concerned* in the "actual delivery" exemption, the CFTC pleadings resort repeatedly to mischaracterizing Monex as a "speculative trading platform" even though its own 30(b)(6) witness effectively admits that term tends to denote a bucket shop without metals. Goteiner Decl. Ex. 4 (Schwartz) 103:16-105:20, 21:1-8, 8:24-9:17.[21] Because Monex: (1) undeniably has metals to back every transaction—the very focus of Congress' Dodd-Frank exemption—and (2) was in fact the Congressional exemption model, the CFTC's 30(b)(6) "actual delivery" witness was left with nothing but implausible speculation that Monex hid supposedly relevant facts from Congress with the CFTC, Monex's investigator, in the hearing room. *Id.* 21:9-24. Worse, Mr. Schwartz accused Monex of withholding from Congress in *2009* its "control" of metals before the CFTC in *2013* even invented its *Hunter Wise* "possession and control" notion. *Id.* 23:19-24:19.

### 7.     The Short/Commodity Loan Is Not a Sham.

The CFTC reviewed Monex's commodity loan/short product in its 1987 and 1998 investigations and declined to bring an enforcement action. Walker Decl. ¶¶ 12-13. Thus, the short product was necessarily before the CFTC and Congress during the 2009 Subcommittee Hearing. The CFTC also can articulate no increased delivery or storage risk specifically from the short. *See* PI Mem. 14-15; Goteiner Decl. Ex. 4 (Schwartz) 86:25-88:22. Instead the CFTC offers the same strawmen of: (1) no customer control and possession; and (2) attacking the commodity transfer

---

[21]  Mr. Schwartz called Atlas a speculative trading platform because the customer pays off the loan before taking possession, the risk of margin calls, and customer speculation on leveraged positions. Goteiner Decl. Ex. 4 (Schwartz) 103:16-105:20, 108:14-21. But the Model Code, Congress, and CFTC Final Guidance, all view these as exemption factors.

notice, which attack Mr. Schwartz rejected in connection with the long Atlas product, noting that there was no increased risk with Atlas' passage of title and notice of transferred ownership. *Compare* PI Mem 14-15, *with* Goteiner Decl. Ex. 4 (Schwartz) 61:17-63:8, 72:1-6. Just as the CFTC argues that there is no difference between the Atlas long and the short in its analysis, the CFTC's secondary attack on the short as being speculative suffers from the same contumacy as the CFTC's ongoing rejection of Congress' actual delivery exemption. *See* PI Mem. 15; *see* Carabini Decl. ¶¶30-32 (explaining short).

**B.   The CFTC's Newly-Minted Definition Of Actual Delivery Deprives Defendants Of Fair Notice And Violates Their Due Process Rights.**

The CFTC's Complaint violates Defendants' due process right to adequate warning of the legal consequences of their actions. *See* MTD 27-33. Indeed, ***after*** its initiation of this enforcement action, the CFTC issued a new "proposed interpretation" of the actual delivery exception in the context of virtual currency. The CFTC 30(b)(6) witness first testified that that proposed interpretation was a source of the CFTC's actual delivery interpretation. Goteiner Decl. Ex. 4 (Schwartz) 8:24-9:7. This admission strongly supports Defendants' due process claim. The proposed Interpretation introduces for the first time many of the same "sham" factors that the Enforcement Division is advancing here, for instance that actual delivery will not have occurred unless the virtual currency is delivered to a depository "that has entered into an agreement with the purchaser," and the virtual currency is free from "liens . . . resulting from the use of margin, leverage, or financing." RJN Ex. 9. Due Process prohibits the deployment of these proposed theories against Monex, in contravention of the CFTC's prior Guidance and Congressional intent.

**C.   The CFTC's § 6(c)(1) Fraud Claim Does Not Create Jurisdiction.**

After spending the majority of its brief arguing that it has jurisdiction over Monex *because* Atlas transactions do *not* result in actual delivery, the CFTC abruptly pivots—asserting *ipse dixit* that it has jurisdiction for its fraud claims *even if* actual

1   delivery occurs.  PI Mem. 20 (relying on CEA § 6(c)(1) and Rule 180.1 promulgated

2   thereunder at 17 C.F.R. § 180.1).  CEA § 6(c)(1), amended as part of Dodd-Frank,

3   makes it: "unlawful for any person, directly or indirectly, to use or employ, or

4   attempt to use or employ, in connection with any swap, or a contract of sale of any

5   commodity in interstate commerce, or for future delivery on or subject to the rules of

6   any registered entity, any manipulative or deceptive device or contrivance, in

7   contravention of such rules and regulations as the Commission shall promulgate[.]"

8   7 U.S.C. § 9(1).  The CFTC's fraud allegations are factually baseless as explained in

9   Section D.  But they are also legally irrelevant because the *substantive* prohibitions

10  of § 6(c)(1) do not override the *jurisdictional* limitations of § 2 that expressly exempt

11  transactions resulting in 28-day actual delivery.  The CFTC's contumacious reading

12  of § 6(c)(1) would nullify the "actual delivery" exemption in CEA

13  § 2(c)(2)(D)(ii)(aa) and give the CFTC anti-fraud authority over all cash

14  "commodity" transactions "in interstate commerce" including purchases at grocery

15  stores or pawn shops.

16       It is telling that the Commission cites no case supporting this breathtaking

17  jurisdictional grab; it instead cites only to the district court opinion in *CFTC v.*

18  *Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317 (S.D. Fla. 2014), to list the

19  elements of a fraud case *assuming it has jurisdiction in the first place*.  PI Mem. 21.

20  But, as noted, the *Hunter Wise* defendants had no metals to deliver.  21 F. Supp. 3d at

21  1327-28, 1330-33.  That court reached the fraud allegations only after finding that the

22  defendants made no actual delivery under the section 2(c)(2)(D) exemptions.

23  Nothing in *Hunter Wise* suggests the CFTC has jurisdiction under § 6(c)(1) for

24  transactions expressly exempted under § 2(c)(2)(D).[22]

25

26

27  ─────────────────

[22] Indeed, in the Eleventh Circuit *Hunter Wise* opinion the court expressly declined

28  to consider the CFTC's argument that section 6(c)(1) provides jurisdiction
    independent of the section 2 exemptions.  749 F.3d at 981.

### 1.    The CFTC's § 6(c) Theory Is Contradicted By Controlling Law.

The CFTC's jurisdiction is defined and limited by CEA § 2 which is unambiguously entitled "Jurisdiction of Commission."  7 U.S.C. § 2(a)(1).  The Ninth Circuit has rejected prior CFTC reliance on substantive prohibitions contained in, and associated regulations promulgated under, *other* sections of the CEA (as with the CFTC's reliance on § 6(c)(1) and Rule 180.1 here) to avoid the express *jurisdictional* exemptions in § 2.  In *CFTC v. White Pine Trust Corp.*, a pre-Dodd Frank case, the CFTC brought an anti-fraud action against a foreign currency options trader claiming that it had jurisdiction under both CEA § 2 and a substantive prohibition contained in 7 U.S.C. § 6c(b) prohibiting "fraud and misrepresentation in the solicitation or offering of options."[23]  574 F.3d 1219, 1223 (9th Cir. 2009).  The Ninth Circuit held that the CFTC failed to establish its jurisdiction and remanded the case for dismissal, stating that "all roads lead back to section 2 of the Act" and that other substantive provisions of the commodities laws "***do not confer jurisdiction on the CFTC by themselves***."  *Id.* at 1223, 1227.[24]

This District subsequently applied *White Pine* in *CFTC v. 20/20 Trading Co., Inc.*, a fraud case brought by some of these same CFTC counsel involving a precious metals dealer accused of selling financed metals that it did not actually possess or deliver.  Judge Tucker recognized that: "[t]he jurisdiction of the CFTC derives from section 2 of the Act," which in that case limited the CFTC's authority to "leveraged contracts" within the meaning of 7 U.S.C. § 2(a)(1)(A) and, by express reference, 7 U.S.C. § 23.  2011 WL 2221177, at *4 (C.D. Cal. 2011).  The court found that the

---

[23] The CFTC also claimed independent jurisdiction under § 13a-1, which provides that courts "shall have jurisdiction to entertain" actions seeking to enjoin violations of the commodities laws.  The Ninth Circuit held that Section 13a-1 is not a jurisdictional grant but rather a statement of "the relief available to the CFTC regarding the claims it is permitted to bring."  574 F.3d at 1223 & n.3.

[24] *White Pine* also noted that Commission regulations (such as Rule 180.1 invoked here) are irrelevant without independent jurisdiction: "regulations, of course, cannot go beyond the jurisdictional limits of the statute."  574 F.3d at 1223.

CFTC had "failed to provide any evidence that the [at-issue contracts between the defendant and its customers] qualify as leverage contracts." *Id.* at *5, 7. The court thus denied the CFTC's application for a preliminary injunction for lack of CFTC jurisdiction.

It makes no difference, as the CFTC is likely to argue, that *White Pine* and *20/20* were decided before the CEA Dodd-Frank amendments. Indeed, it was the Dodd-Frank amendments to § 2 (the jurisdictional portion of the statute) that expressly gave the CFTC jurisdiction over *certain* retail commodity transactions in the first place (those involving leverage, margin or financing), 7 U.S.C. § 2(c)(2)(D)(i)(II), *while expressly exempting* any such retail transactions that result in actual delivery within 28 days. *Id.* § 2(c)(2)(D)(ii)(III)(aa). Both provisions are entitled to equal weight. The obvious purpose of the jurisdictional amendments in § 2 was to give the CFTC jurisdiction over only those retail transactions masquerading as cash delivery transactions but which are in reality futures-type transactions because they result in no actual delivery within a reasonable period of time (28 days) following sale. The Congressional sub-committee was explicit on this point (RJN Ex. 1 at 31, 38, 43), consistent with the CFTC's Mission Statement to prevent abusive practices, "related to derivatives and other products that are subject to the [CEA]."[25] As *White Pine* instructs, *substantive* CEA prohibitions (such as anti-fraud prohibitions in § 6(c)(1)) must be read in conjunction with, not as overriding, the express *jurisdictional* limitations of section 2.[26] And, following the Dodd-Frank amendments, § 2 remains captioned "Jurisdiction of Commission."

---

[25] U.S. CFTC Mission & Responsibilities, www.cftc.gov/About/MissionResponsibilities. CEA § 2(a)(1)(A) grants jurisdiction over certain accounts, agreements, and transactions "involving swaps or contracts of sale of a commodity for future delivery." CEA § 1a(27) provides, "the term 'future delivery' does ***not*** include any sale of any cash commodity for deferred shipment or delivery." (emphasis added).

[26] Subsection 2(a)(1)(A) limits CFTC jurisdiction: "The Commission shall have exclusive jurisdiction, ***except to the extent otherwise provided in . . . subsections (c)*** and (f)[.]" "Subsection (c)" refers to CEA § 2(c), which defines and limits CFTC jurisdiction.

### 2.    The CFTC's § 6(c)(1) Theory Leads To Absurd Results.

That Congress did not intend for the CFTC to wield CEA § 6(c)(1) anti-fraud authority over every "commodity" sale in interstate commerce is further confirmed by both the statutory structure and common sense.

First, the Court must read the relevant statutory provisions as a coherent whole, particularly because they were all amended by Dodd-Frank at the same time. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). There is no dispute that the CFTC can bring anti-fraud actions under CEA § 4b with respect to retail commodities transactions ***only*** if the actual delivery exception does not apply. 7 U.S.C. § 2(c)(2)(D)(iii). It would be nonsensical for Congress to exempt in § 2 retail financed transactions with 28-day delivery from the Commission's broad CEA § 4b anti-fraud jurisdiction (consistent with the Model Code and all prior CFTC precedent), while in the same Dodd-Frank amendments to allow the CFTC to circumvent that framework by asserting claims under § 6(c)(1). *See Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (recognizing "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative"). Such a reading would make the exception's specific application to § 4b superfluous and should be rejected. That the CFTC is suing Monex under § 6(c)(1), given Congress' endorsement of Monex's actual delivery model for the § 2(c) exemption, highlights and worsens the CFTC's derogation.

Second, The CFTC's reading leads to an absurd expansion of its jurisdiction that Congress never would have adopted without explicit discussion. If the 28-day delivery exemption in § 2 did not apply to the anti-fraud prohibitions in § 6(c)(1), then the CFTC—the Commodity Futures Trading Commission—would have limitless anti-fraud jurisdiction over the sale of *any* defined "commodity" in interstate commerce. That would be true whether the sale involved a futures, leverage or financed contract, or a pure cash sale, even one with immediate delivery such as sales of grains and potatoes at a grocery store or sales of gold coins at a pawn

1   shop.  *Ma v. Ashcroft*, 361 F.3d 553, 559 (9th Cir. 2004) (noting that "statutory

2   interpretations that lead to absurd results are to be avoided").  The CFTC can cite

3   nothing in the history of the amendments supporting Congressional intent for such a

4   radical change.

5          **3.     Section 6(c)(1) Is Limited To Market Manipulation.**

6          Even if the Commission could avoid the express actual delivery exemption in

7   § 2, Congress meant § 6(c)(1)  only to address fraudulent manipulation or potential

8   manipulation of the markets that the CFTC regulates.  Nothing supports the notion

9   that Congress gave the CFTC jurisdiction over ordinary retail sales

10  misrepresentations by non-regulated entities, as the CFTC muses in its brief.

11         A comparison of the structure and language of §§ 4b and 6(c)(1) demonstrates

12  the point.  The CEA had already addressed run-of-the-mill retail fraud in CEA

13  § 4b.  CEA § 4b, which Dodd Frank made applicable to financed metals transactions

14  not resulting in actual delivery, makes it unlawful *inter alia* "to cheat or defraud"

15  customers both in exchange traded futures contracts and illegal off-exchange

16  contracts.  In contrast, CEA § 6(c)(1) discusses disclosure in broad market terms

17  without focus on individual players, consistent with the section's anti-market

18  manipulation objective:  "no [Commission] rule or regulation . . . shall require any

19  person to disclose to another person nonpublic information that may be material to

20  *the market price, rate, or level of the commodity transaction*[.]"  7 U.S.C. § 9(1)

21  (emphasis added).  Also, § 6(c)(1) repeatedly refers to manipulation, whereas § 4b

22  focuses on bad players cheating customers and in that context cabins the CFTC's

23  anti-fraud jurisdiction to transactions on regulated markets.

24         Even before Dodd-Frank, the CEA already made it a felony to knowingly

25  "manipulate or attempt to manipulate the price . . . of any commodity in interstate

26  commerce."  7 U.S.C. § 9(3).  But this provision required proof of specific intent to

27  affect market prices, making CFTC enforcement all but impossible.  RJN Ex. 10 at

28  40-41 (CFTC Chairman Gensler); RJN Ex. 4 at S3348 (Sen. Cantwell introducing

§ 753).  Congress' purpose in CEA § 6(c)(1) was to strengthen the CFTC's weak tools for bringing manipulation cases to protect businessmen relying on the integrity of commodities markets, not to address retail consumer fraud: "This amendment is about protecting the integrity of markets for people who rely on them for their business."  RJN Ex. 4 at S3348 (Sen. Cantwell)).  The § 6(c)(1) amendments and the Commission's Rule 180.1 were thus not meant to make the CFTC a nationwide sales fraud policeman, but merely to "augment the Commission's *existing* authority to prohibit fraud and manipulation."  76 Fed. Reg. 41398, 41401 (July 14, 2011) (emphasis added).[27]  This augmentation was necessary since, as Senator Cantwell pointed out, "In the 35 years of its history, the CFTC has only successfully prosecuted one single case of manipulation."  RJN Ex. 4 at S3348.  With the section 6(c) amendments, Congress permitted a general civil manipulation or recklessness standard under CEA § 6(c) as an alternative to the criminal manipulation scienter element under CEA § 9(a)(2), and jettisoned the causation element of having to prove a manipulation's actual impact on prices.  76 Fed. Reg. at 41401, 41404; 17 C.F.R. § 180.1.

Section 6(c) did not, however, give the CFTC general retail fraud authority over all cash markets absent potential manipulation.  Indeed, the CFTC expressly rejected as "misplaced" any concerns that the use of the term "commodity" in Rule 180.1 would apply "to virtually every commercial transaction in the economy."  76 Fed. Reg. at 41,401.  It instead assured market participants that it, "expects to exercise its authority under § 6(c)(1) to cover transactions related to the futures or swaps markets, or prices of commodities in interstate commerce, or where the fraud or manipulation *has the potential to affect cash commodity, futures, or swaps markets*

---

[27] Before Dodd-Frank, the CFTC already had cash market manipulation jurisdiction *when it affected futures prices* even though it did not have then, and does not have now, the power to regulate the cash market.  *See CFTC v. Reed*, 481 F. Supp. 2d 1190, 1196-97 (D. Colo. 2007) (finding allegations that cash market manipulations affected natural gas futures prices to be within the CEA's jurisdiction).

*or participants in these markets*." *Id.* (to be codified at 17 C.F.R. § 180) (emphasis added). The Commission also referred to subsection G of the rules, which said that "in connection with" means in connection with futures contracts. *Id.* at 41,405-06.

The CFTC's misinterpretation here also ignores the CFTC Director of Enforcement David Meister's contemporaneous presentation to the Commissioners leading to adoption of Rule 180, a presentation which focused on fraudulent market manipulation and never mentioned run-of-the-mill consumer fraud, consistent with Chairman Gensler's comments. RJN Ex. 10 at 34-35, 38, 52 (David Meister, Enforcement Division), 40 (Gensler). Indeed, Meister could not think of a hypothetical that "suggested a distinction or difference between fraud and fraud based manipulation." *Id.* at 52. If section 6(c)(1) and Rule 180.1 were meant to cover every routine sales misrepresentation, those hypotheticals would abound.

Moreover, Dodd-Frank § 753, which added these amendments, was entitled "Anti-Manipulation Authority," and five of the statute's next eight subheadings mentioned "manipulation," including § 6(c)(1) entitled "PROHIBITION AGAINST MANIPULATION." CEA § 6(c)(1) prohibits the use of "any manipulative or deceptive device or contrivance" in connection with, among other things, cash commodity sales. 7 U.S.C. § 9(1). Section 6(c)(3) makes it unlawful "to manipulate or attempt to manipulate" their price. *Id.* § 9(3). And each time that Rule 180.1 mentioned penalties or lowering the scienter standard to recklessness, the CFTC discussed only manipulation of prices and of markets, not penalties or scienter for consumer fraud. *See, e.g.*, 76 Fed. Reg. at 41,404-05 & nn. 72, 77, 79, 80 ("algorithmic market manipulation"), 81 ("automatic trading systems"), 82-85, 86 (Commission Determination referring to manipulation-based comments), 90.

"Congress is presumed to understand the legal import of words it uses in light of existing case law." *Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 99 F. Supp. 2d 1123, 1133 (E.D. Cal. 2000). The word "manipulative" is "especially significant" because it "is and was virtually a term of art" that "connotes

intentional or willful conduct designed to deceive or defraud investors ***by controlling
or artificially affecting the price of securities***." *Ernst & Ernst v. Hochfelder*, 425
U.S. 185, 199 (1976).  The CFTC acknowledges that this specialized meaning
applies to the CEA.  *See* 76 Fed. Reg. at 41,400 & n.13.

While there are few decisions interpreting section 6(c)(1), one decision
rejected a similar CFTC attempt, albeit in a different context, to read "manipulative"
and "deceptive" in the disjunctive so as to expand agency jurisdiction.  *CFTC v.
Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015).  *Kraft*, relying on
*Hochfelder*, rejected the CFTC's literal reading of section 6(c)(1)'s use of the
disjunctive "or" between "manipulative" and "deceptive" to mean you could have
one without the other.  There, the CFTC argued that the statute's use of the
disjunctive meant that it could prosecute manipulation without having to show
deception. Notwithstanding the statutory language, *Kraft* rejected this interpretation
as leading to absurd, unintended results.  153 F. Supp. 3d at 1010.  While in *Kraft* the
CFTC was arguing that it could use section 6(c)(1) to prove manipulation without
deception, the result should be the same here where the CFTC argues it can prove
deception without manipulation.  Notwithstanding the statute's disjunctive language,
the points made here demonstrate that neither Congress nor the Commission
envisioned the kind of radical jurisdictional expansion that the Enforcement Division
seeks here.[28]

Against this backdrop, the CFTC wrongly suggests that the Court find that it
now has jurisdiction to regulate every routine sales misrepresentation involving any
retail commodity sale in the country, regardless of whether the transaction was a
futures or cash transaction and regardless of whether the practices had any impact or
even potential impact on markets the CFTC does have jurisdiction to regulate.  The

---

[28] Tellingly, the CFTC itself never mentioned § 6(c)(1) as an independent
jurisdictional grant when it commented to the public concerning its Dodd-Frank
§ 2(c)(2)(D) jurisdictional authority over retail commodity transactions.  RJN Ex. 6
(Request for Comments) at 77671 n.7.

1  Court should reject that invitation.  *See, e.g.*, *Indep. Ins. Agents of Am., Inc. v. Bd. of*

2  *Governors of Fed. Reserve Sys.*, 838 F.2d 627, 632 (2d Cir. 1988) (courts should not

3  defer to "dubious" agency arguments to avoid limits on their jurisdiction).

4  **D.    There Is No Evidence of Fraud To Support The Requested Relief.**

5         Even if the CFTC has proper jurisdiction to pursue its fraud claims, it has

6  failed to present evidence of fraud, much less a "pervasive," "ongoing," and

7  "massive" fraud to justify the extreme injunctive and freeze relief it now seeks.  PI

8  Mem. 2, 19.  It is undisputed that Monex lent real money to customers and that real

9  metal was purchased for each and every Atlas customer.  The crux of the CFTC's

10 theory of "widespread" and "massive" fraud against thousands of customers is that

11 Monex's marketing materials and uniform sales practices purportedly downplay the

12 risk of financed investing and lure customers into risky leveraged trades with the

13 "false promise of a safe, secure and profitable investment," PI Mem. 19, while failing

14 to disclose that 90% of Monex customers lose money because of high costs, *see id.* at

15 22-27.  This failure makes every admittedly benign Monex marketing statement a

16 misrepresentation because it is "virtually impossible" to make a profit at Monex.  *Id.*

17 at 1.  The CFTC's 30(b)(6) witness and expert backed away from all these assertions,

18 leaving the CFTC with an individualized customer-account representative interaction

19 theory (case-by-case per the CFTC's expert) based on 8 customer declarations and 2

20 former account representative declarations, all now discredited.[29]

21         **1.    Customers Lost Because of the Market, and Profits Were Far From**

22              **Virtually Impossible According to the CFTC's Expert.**

23         The CFTC asserts what is largely an omission theory based on its contention

24 that Monex's cost structure makes it virtually impossible to profit and that 90% of

25 Monex customers lost (during a down trending market), thus requiring Monex to

26

27 ─────────────────────
[29] The CFTC initially submitted 12 customer declarations with its PI Motion but has

28 since withdrawn reliance on 4 of them (Susan Cappello, Brian Caulfield, Candice
   Hubert, and Sheena Liu).  *See* Goteiner Decl. Ex. 7 (12/6/2017 Email).

1   inform customers of this supposed "fact" or not sell at all.  *See, e.g.*, PI Mem. 1

2   ("virtually impossible to profit"), 19 (costs are "the heart of the problem"), 21 ("no

3   informed and rational investor" would invest with Atlas), 21 ("the structure of the

4   investment itself" makes Atlas "an almost certain loser", because of fees and margin

5   calls as well as customer lack of "control and possession"); *see also* Goteiner Decl.

6   Ex. 3 (Gomberg III) 31:9-32:17.  The CFTC's position is both legally unsupported

7   and factually false.

8         Legally, the CEA requires no track-record disclosure for non-discretionary

9   accounts.  No law prohibits Monex from setting fees and costs at its discretion. And

10  the CFTC and its expert admit those fees and costs are clearly disclosed.  Goteiner

11  Decl. Ex. 5 (Selvaggio I) 190:19-194:19 (break-even analysis), 251:9-21 (costs and

12  fees); Ex. 1(Gomberg I) 73:1-74:25.  Factually, it was not costs that primarily drove

13  customer account performance; it was market prices, a fact that the CFTC's expert

14  and 30(b)(6) witness were forced to admit despite the CFTC omitting reference to the

15  down-trending market in its pleadings.  Goteiner Decl. Ex. 3 (Gomberg III 43:5-44:2

16  ("of course" market prices caused losses); Ex. 6 (Selvaggio II) 73:17-74:10 (8 of his

17  10 sample customers would have lost without being charged ***any*** fees or costs);

18  *accord*, Monex's expert David Ross Decl.¶¶ 31, 36, 38 & Ex 8.  The CFTC's own

19  expert called the no profit potential claim "hyperbole" (Goteiner Decl. Ex. 5

20  (Selvaggio I) 169:13-24, 172:25-173:12) and conceded he saw no reason why

21  customers could not profit at Monex.  *Id.* 160:22-161:3.  Monex's expert agreed.

22  Ross Decl. ¶¶10, 15-16, 31-35.  The CFTC's expert "study" based on a biased

23  sample is so flawed that Monex has filed a *Daubert* motion.  Monex respectfully

24  directs the Court to that motion for a full accounting of the CFTC's misguided

25  approach to proving a non-existent firm-wide "fraud."[30]  *See* ECF Dkt. 154.

26  _____

27  [30] Ironically, while the CFTC complains without competent evidence that Monex costs drive losses, trading commentators generally agree that 80-95% of commodities traders lose money.  *See* Goteiner Decl. Exs. 36-38.  This further

28  undermines the CFTC's contention that it is Monex-specific costs or the Atlas "structure,"  that drive any commodity trading losses at Monex.

**2.** **There Are No Material Misstatements Or Omissions in the Relevant Documents.**

The CFTC's firm-wide misrepresentation-by-omission case fails based on its own 30(b)(6) witness and declarants' admissions that Monex's marketing materials are only deceptive because of the CFTC's discredited "virtually impossible profit" claim. *E.g.*, PI Mem. 1, 23-25, 26; Goteiner Decl. Ex. 2 (Gomberg II) 541:21-543:18 (losses are "only an omission when the product is marketed and represented as a safe secure investment"). According to the CFTC, even Monex's detailed and admittedly clear risk disclosure, stated verbally and in writing before an account is opened and again with each trade, is deceptive because it does not include the CFTC's demonstrably false assertion than 90% of all Atlas accounts lose money due to costs. Goteiner Decl. Ex. 2 (Gomberg II) 629:8-631:10, 638:21-639:9. This is not the law.

**a.** *Atlas Marketing Materials and Statements Are Not False and Admittedly Influenced No Customer.*

First, the marketing statements are not materially false. Gomberg, as the 30(b)(6) witness, admitted (sometimes with pushback) that Monex's marketing materials do not: a) limit or de-emphasize risk of loss (Goteiner Decl. Ex. 1 (Gomberg I) 355:1-12; Ex. 3 (Gomberg III) 161:18-163:5), b) guarantee profits, or c) state that Atlas would more likely be profitable than not (Ex. 2 (Gomberg II) 574:25-576:16). None of the Monex marketing materials he reviewed suggested "for a heartbeat that there was no risk of loss." Ex. 1 (Gomberg I) 357:20-358:9. Gomberg instead noted that Monex's website collects links to various third-party political and economic articles, including WSJ articles, and argued that some such articles (having nothing to do with Monex Atlas) paint a "rosy picture of shielding wealth and profit opportunities" with metals investing generally. Goteiner Decl. Ex. 2 (Gomberg II) 576:17-577:19. He later acknowledged that even these materials only suggested "possible" profits if prices increased. *Id*. at Ex. 3 (Gomberg III) 194:4-25.

The CFTC's lead misrepresentation point is that Monex marketed Atlas as a

safe and secure investment that would be profitable, notwithstanding Monex's admittedly clear and repeated risk disclosures disclaiming any such guarantee.  PI Mem. 23-26.  The CFTC relies heavily on the Atlas brochure's statement that Atlas is a "unique and powerful way to acquire precious metals with the strength of investment leverage combined with the safekeeping security of independent depository storage."  PI Mem. 24-25 (quoting brochure); *see also* Walker Decl. Ex. D.  However, Gomberg finally conceded that he understood that the safekeeping security language did ***not*** describe secure leveraged investing, but only depository security.  Goteiner Decl. Ex. 3 (Gomberg III) 87:1-5, 89:25-90:7; 91:24-92:7 ("built in security" phrase refers to depository storage); 105:22-106:25 (he doesn't know if anyone at the CFTC shares his disowned interpretation); 101:21-103:16 (he didn't ask customers how they interpreted  marketing material language and has no support that customers shared CFTC interpretation.).

     Second, virtually all of the CFTC's witnesses acknowledge that they approached Monex on their own initiative after making an independent decision to invest in precious metals, and not based on the CFTC's distorted misreading of Monex marketing statements.[31]  Indeed, not one of the CFTC's witnesses testified, either by declaration or in deposition testimony, that they read or relied on the statements in the Atlas Brochure or Monex website that the CFTC asserts are perpetrating a nationwide fraud.[32]  The CFTC's 30(b)(6) witness had no evidence to contest or explain this fact (Goteiner Decl. Ex. 1 (Gomberg I) 336:10-18 ("would have to review notes" to answer); Ex. 2 (Gomberg II) 509:5-510:24 (except for his misstatement of declarant Staub testimony)), and the CFTC made no effort to determine if any misrepresentations caused customer losses (Ex. 1 (Gomberg I)

---

[31] For the convenience of the Court, Defendants have prepared charts comparing various of the CFTC's evidentiary claims with the actual testimony of the CFTC's Declarants.  *See, e.g.*, Goteiner Decl. ¶¶ 16 (Cotton), 23 (Bar), 28 (Rosenbaum), 31 (McNamee), 41 (Hadden), 34 (McLaughlin), 45 (Mustazza), 50 (Pugliese), 37 (Staub), Collectively ("Comparison Charts".)

[32] *See* Comparison Charts, Goteiner Decl. ¶¶ 16, 23, 28, 31, 34, 37, 41, 45, 50.

290:25-291:17).  This makes implausible, gently put, the CFTC's theory of thousands of customers being "lure[d]" by Monex's marketing materials into "risky leveraged Atlas trading with the false promise of a safe, secure and profitable investment."  PI Mem. 19.

Third, such criticisms and the remaining CFTC-challenged marketing statements are either (a) non-actionable opinion, as the CFTC's 30(b)(6) witness admitted (Ex. 2 (Gomberg II) 461:25-462:6, 462:18-463:20); (b) non-actionable description, such as calling margined precious metals trading "powerful,"[33] (c) loose talk of possible profits depending on price direction of metals ("precious metals can produce impressive investment metal returns" (PI Mem. 25), or "If gold were to increase by $100 per ounce in the next year . . .")[34]; or (d) well within the range of immaterial "puffery" in its multiple forms that courts routinely reject as the basis for a fraud claim.  *See, e.g.*, *Glen Holly Entm't, Inc. v. Tektronix, Inc.,* 100 F. Supp. 2d 1086, 1093 (C.D. Cal. 1999) ("assertions that a particular product is the 'best' or speculative statements about possible profits are non-actionable opinions ('puffing') and a party is not entitled to rely upon them"); *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1043 (9th Cir. 2010) (fraud count properly dismissed where alleged statements constituted "mere commercial 'puffery'" providing "nothing concrete upon which [defendant] could reasonably rely").  Monex respectfully refers the Court to its prior briefing on these issues.  *See* MTD 11-18.

Fourth, Monex's repeated oral and written risk disclosures, including with every trade, overwhelm any CFTC alleged misstatements and omissions.[35]  *See* MTD 7-8 (ECF Dkt. 41-1).  All customers wishing to open an Atlas account must sign

---

[33]  *CFTC v. J. S. Love & Assocs. Options, Ltd.*, 422 F. Supp. 652, 655-56 & n.9 (S.D.N.Y. 1976) (taking no issue with statement that options were "powerful" tool).
[34]  *See Searls v. Glasser*, 64 F.3d 1061, 1067 (7th Cir. 1995) (finding that statements about disposition gains are mere "loose predictions" and thus not actionable).
[35]  *Puckett v. Rufenacht, Bromagen & Hertz, Inc.*, 903 F.2d 1014, 1019 (5th Cir. 1990) (no fraud for failing to disclose risks where customers signed risk disclosure statement).

Account Agreements containing these disclosures and represent to a Monex representative, following a separate verbal disclosure and customer affirmation, that they have reviewed, understand and agreed to be bound by, the Account Agreements.[36] The CFTC admits that these risk disclosures are clear to customers. Goteiner Decl. Ex. 1 (Gomberg I) 39:20-24 (he is sure from memory that some parts were clear and easy to understand), 73:1-74:25 (except for his speculation); Ex. 2 (Gomberg II) 634:4-634:8 (risk disclosure "clear" to even the "green" Atlas investor); Ex. 3 (Gomberg III) 116:17-126:17 (reviewing the risk disclosure paragraphs). The disclosures are so clear, "easy to understand," and "detailed" on their face that another CFTC's declarant (a former Monex AR and experienced industry broker) called them a "sales killer" because of the disclosure's deterrent effect on prospective customers. Ex. 17 (Rosenbaum) 115:25-116:10 (disclosures are especially detailed), 116:4-9 (disclosures are easy to understand), 398:14-399:3, 400:19-22 (disclosure of risks is sales killer). Likewise, the CFTC's own expert acknowledged that the disclosures were not "designed to obfuscate" or to be "in any way misleading." Goteiner Decl. Ex. 5 (Selvaggio I) 191:1-193:7. These clear and voluminous disclosures, which Monex never de-emphasized (Ex. 1 (Gomberg I) 355:1-12, 357:20-358:9), eliminate any basis for the CFTC to contend, or for the Court to conclude, that the few marketing statements plucked out of context are evidence of a "systematic" and "massive" fraud (even assuming they were false, which they are not).

Unsurprisingly, the CFTC customer declarants easily understood the full risk disclosures when they read them during trading or during their deposition.[37]

### b.  *There is No Duty To Disclose Customer Track Records.*

Even if the CFTC's false customer track record and profitability probabilities

---

[36] Gomberg admitted that no interviewed Atlas customer ever told him that he/she didn't listen to the oral risk disclosure. Ex. 3 (Gomberg III) 127:13-128:10.

[37] *See* Comparison Charts, Goteiner Decl. ¶¶ 16, 23, 28, 31, 34, 37, 41, 45, 50.

1  were true, nothing in the CEA imposes an obligation to disclose non-discretionary

2  account track records.  *E.g.*, *CFTC v. Commonwealth Fin. Grp., Inc.*, 874 F. Supp.

3  1345, 1353 n.10 (S.D. Fla. 1994) (noting that CFTC did not argue defendants'

4  "salespeople are required to inform customers of losses" and agreeing that they are

5  not, absent emphasis on profits).

6      The CFTC's heavy reliance on *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d

7  1321, 1332 (11th Cir. 2002), is unavailing. There defendants hyped in uniform

8  presentations that the market was "ripe for 'huge' profits of '200-300 percent,'"

9  based on the claimed inevitability of El Nino, with only generic risk disclosure and

10  claims of a "limited risk" option contract, and with plenty of regulatory notice to

11  defendants concerning their unbalanced presentation.  *Id.* at 1333-34.  Even with

12  those extreme facts, the majority decision invoked a vigorous dissent that took the

13  majority to task for inventing track record disclosure requirements.  *Id.* at 1346

14  (Wilson, J., dissenting) ("This is not a case where the APs misrepresented the firm's

15  track record or lied about successes in the past.").  Here, by contrast:  (1) Monex

16  provided detailed and "killer" risk disclosures, including disclosures with every

17  transaction; and (2) Gomberg admitted that: (a) that any references to safety and

18  security (the CFTC's primary alleged misrepresentation) referred only to depository

19  storage and not to trading risks; (b) that Monex did not de-emphasize or limit risk; (c)

20  that Monex neither predicted profitable trading nor discussed other customers'

21  success, let alone suggest "enormous profits," as in *Fitzgerald*; and (d) no one,

22  including Monex, had notice of the CFTC's litigation-specific misinterpretation of

23  Monex's marketing material.

24      Further, Congress and the CFTC know how to impose track record disclosure

25  requirements when they want to.  Congress did so post-*Zelener* with foreign currency

26  dealers.  *See* 17 C.F.R. § 5.18(i).  That they didn't with financed precious metals

27  dealers further compounds the unfair surprise to Monex.

28

### c.     *The Challenged Training Materials Do Not Establish Fraud, And In Any Event Have Been Discontinued.*

The CFTC wrongly asserts that Monex's sales representatives ***were trained*** to present themselves as "fiduciaries" and engage in high-pressure sales tactics.  PI Mem. 29.  First, no CFTC customer witness claims that any Monex AR called themselves a "fiduciary," let alone was trained to do so.  The deposition evidence (from CFTC ex-employee witnesses) is to the contrary.  Goteiner Decl. Ex. 17 (Rosenbaum) 349:25-350:19; Ex. 25 (McNamee) 96:7-9.  And the CFTC's internal documents, pried from the CFTC after motion practice, confirm that after speaking with no less than 13 account representatives, only one AR even mentioned the term "fiduciary" (saying according to hearsay notes that he had heard it "batted" around in unspecified contexts and without saying that ARs ever told customers that ARs owed a fiduciary duty to customers), while at the same time denying that Monex trained ARs to represent themselves to customers as fiduciaries.[38]  This is entirely consistent with the disclosures made by Monex in the Account Agreements that Monex's representatives are ***not*** acting as fiduciaries.  Walker Decl. Ex. C at 12, ¶ 4.2 (PSA); *id.* at 34, ¶ 36k (LSSA).

The CFTC nonetheless asks the Court to draw an inference of widespread fraud based on a few statements buried in over 100 pages of transcribed training videos that, according to the CFTC, are designed to "overcome hesitancy by falsely telling customers that they are their 'fiduciaries' and will act in their best interests." PI Mem. 29.  While Monex agrees that any reference to "fiduciary" should not be used (as its Account Agreements make clear), the CFTC goes too far in contesting other sales training statements and puffery as fraudulent.  *E.g.*, *Johnson v. Don*

---

[38] *See* Goteiner Decl. Ex. 42 (CFTC notes of Sean Kirksey interview): "Don't believe they were instructed to say, 'I'm your fiduciary." Gomberg admitted that Kirksey was the "only" ex-employee interviewee to mention "fiduciary" but could not recall any specifics. Ex. 2 (Gomberg II) 404:8-21. The unsigned draft declaration prepared after Kirksey's interview tellingly makes no mention of "fiduciary." Ex 43.

*Charles & Co.*, 1991 WL 83511, Comm. Fut. L. Rep. (CCH) ¶ 24,986, 1991 WL 83511, at *1, 4 (Jan. 16, 1991), and similar authority (discussed in MTD at 18). Even if the phrase "in your best interests" is somehow pushy, that it is found in several of the CFTC-drafted customer declarations for customers claiming to recall that identical phrase from 2011-2012, is not credible.  If the phrase was occasionally used, that would not suggest any Monex liability in the face of Monex's full and repeated risk disclosures with no Monex firm-wide de-emphasis of risk, as the CFTC has admitted.

In any event, and to remove any suggestion of any ongoing harm to anyone, Monex has made sure that all the CFTC-challenged training has stopped to the limited extent that it was ever either occurring or deployed.  *See* Walker Decl. ¶¶ 27-28.

### d.     *The Sales Practices Do Not Suggest Fraud.*

The CFTC next asks the Court to draw an inference of widespread fraud based on "high pressure sales tactics," pressuring customers to buy and sell frequently.  PI Mem. 29.  First, there is no evidence to support such an ersatz firm-wide churning charge, particularly where the median number of trades in leveraged accounts was only four.  Ross Dec. ¶ 28 & Ex. 6.  And, as discussed above, Selvaggio admitted that the CFTC's sample was "biased"—really skewed—to create the false impression of heavily traded accounts.  Goteiner Decl. Ex. 5 (Selvaggio I) 42:11-43:15, 45:20-24; Ex. 6 (Selvaggio II) 31:9-32:10.  Even CFTC declarant Cotton, whose CFTC-drafted declaration suggested high pressure, admitted in deposition that there was no high pressure.  *Compare* Cotton Decl. ¶ 23, *with* Goteiner Decl. Ex. 9 (Cotton) 56:7-13, 165:7-21.  For good reason, the CFTC admitted it did not even look for firm-wide churning.  Goteiner Decl. Ex. 3 (Gomberg III) 60:5-10.

There is no law against salesmen attempting to be persuasive, and sales tactics are not unlawful unless they are accompanied by something that is itself independently unlawful.  *United States v. Amlani*, 111 F.3d 705, 718 (9th Cir. 1997);

1   *Karpov v. Insight Enters., Inc.*, 2010 WL 2105448, at *6 (D. Ariz. Apr. 30, 2010);

2   *Iappini v. Silverleaf Resorts, Inc.*, 116 F. Supp. 3d 932, 940 (E.D. Mo. 2015).  Mr.

3   Gomberg received no evidence from his customer and ex-employee interviews that

4   account representatives made misrepresentations to clients, except that he recalled

5   ex-employee McNamee saying that she saw an AR berating a customer, but

6   Gomberg could not provide more information without checking his notes, which he

7   never provided.  Goteiner Decl. Ex. 1 (Gomberg I) 341:17-343:8; *see also*

8   McNamee's contradictory testimony at Goteiner Decl. ¶ 41 .

9          The CFTC also asks the Court to infer fraud because Monex's account

10  representatives were compensated by commissions and incentivized to open Atlas

11  accounts.  *See* PI Mem. 32.  But Mr. Gomberg had no evidence that any account

12  representative misrepresented any fact to customers to obtain any $500 bonus.

13  Goteiner Decl. Ex. 1 (Gomberg I) 339:20-340:20.  Furthermore, Monex disclosed

14  commissions to customers so they could not have been part of a scheme to deceive.

15         The CFTC also asserts a firm-wide scheme to trick customers into moving

16  from fully paid purchases into the "leveraged Atlas trap," without the customers

17  knowing about the alleged bait and switch (PI Mem. 25, 27).  But any such firm-wide

18  claim is utterly implausible given the oral and written risk disclosure about leveraged

19  trading, the tapes of each transaction where Monex reads the purchase price to the

20  customer (purchasing $50,000 worth of silver for $10,000 means it's financed

21  (Carabini Dec ¶¶ 33-36), the CFTC-admitted clear transaction confirmation

22  statements stating the amount of the purchase and clear monthly account statements

23  showing the loan balances (Ex. 2 (Gomberg II) 615:1-20, Ex. 5 (Selvaggio) 198:24-

24  201:8), continual access to on line account information and access and to ARs.

25  Carabini Dec.¶36.  *Accord*, Pugliesi's and Bar's discredited testimony. Goteiner

26  Decl. ¶¶ 50, 23

27              **e.    *The CFTC Blinded Itself To The Truth.***

28         The CFTC blindly accepted as true implausible stories from a handful of

disgruntled customers without conducting any reasonable due diligence, including
not reviewing account statements, confirmation statements or risk disclosures with
customers to determine how customers actually interpreted them, even when the
customers' understanding of such documents would make implausible, for instance,
customer claims that they didn't know that they were financed.  *E.g*., Goteiner Decl.
Ex. 1 (Gomberg I) 33:3-34:13, 35:6-12, 70:25-71:15, 305:16-306:8; Ex. 2 (Gomberg
II) 615:1-20.  The CFTC even wrote and submitted a customer declaration (Dr. Bar)
that it should have known was false because it squarely contradicted admissions in
Dr. Bar's prior arbitration claim that she knew from the get-go that she was on
margin, trading, and losing money. *See* Goteiner Decl. Ex. 3 (Gomberg III) 142:23-
144:5 (confirming CFTC staff knowledge of arbitration claim), and Goteiner Decl.
Ex. 12 (Bar). Witness Cotton was so surprised by his CFTC-drafted declaration,
which allegations he repeatedly rejected in deposition, that he exclaimed in his
deposition "who wrote this? Who wrote this thing?"  Goteiner Decl. Ex. 9 (Cotton)
165:7-21.  Space limitations prevent Defendants from providing detailed analysis of
each of the declarants' statements, however the core declaration and PI
Memorandum contradictions are highlighted in the concurrently-filed Comparison
Charts.  *See generally* Goteiner Decl. ¶¶ 16, 23, 28, 31, 34, 37, 41, 45, 50.[39]

Dated:  February 20, 2018         Respectfully submitted,

FARELLA BRAUN + MARTEL LLP


By:  ___/s/ Neil A. Goteiner_____
     Neil A. Goteiner

Attorneys for Defendants

30203\6469645.4

---

[39] Monex notes that for injunctive relief purposes, the declaration events are stale.