Carlin Metzger *(pro hac vice)*
cmetzger@cftc.gov
Michael Frisch *(pro hac vice)*
mfrisch@cftc.gov
Joseph Konizeski *(pro hac vice)*
jkonizeski@cftc.gov
Jon Kramer *(pro hac vice)*
jkramer@cftc.gov
Attorneys for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe, Suite 1100
Chicago, Illinois 60661
Tel. 312-596-0700; Fax 312-596-0714

Kent Kawakami, California Bar #149803
Assistant United States Attorney
United States Attorney's Office, Civil Division
Central District of California
kent.kawakami@usdoj.gov
300 North Los Angeles St., Room 7516
Los Angeles, California 90012
Tel.: 213-894-4858; Fax: 231-894-2380
Local Counsel

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| _____ )<br><br>COMMODITY FUTURES )<br>TRADING COMMISSION )<br>           )<br>     Plaintiff, )<br>           )<br>     vs. )<br>           )<br>MONEX DEPOSIT COMPANY, et )<br>al. )<br>           )<br>     Defendants. ) | Case No: 8:17-cv-01868-JVS-DFM<br><br>Hon. James V. Selna<br>Dept. 10C<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

I.   Monex Does Not Make Actual Delivery of Metals. ....................................2

   A.  *The "Ability" To Deliver Commodities Is Not "Actual Delivery."* ......................2

   B.  *Monex Acknowledges It Does Not Transfer Possession or Control.* ...................3

   C.  *Section 2(c)(2)(D) Was Not Passed To Exempt Monex from Regulation.* ..........4

II.   Discovery Confirmed the Key Omission that 90% of Atlas Accounts Lose. ......8

III.  Discovery Confirmed Monex's Misrepresentations and Omissions ................10

   A.  *The Evidence Shows a Pattern of Fraud.* ................................................10

   B.  *Victims Relied on Monex's Misstatements and Omissions.* ...........................13

   C.  *Monex Held Itself Out as a Fiduciary Despite*

   *Written Policies to the Contrary.* ..................................................................13

   D.  *Monex's Boilerplate Risk Disclosures and Contracts Cannot Excuse Fraud.* .15

   E.  *Many Monex's Victims Are Unsophisticated.* ........................................17

IV.  Section 6(c)(1)'s Fraud Prohibition Applies to Monex's Atlas Transactions...18

V.   The CFTC Has Met the Standard and an Injunction Is Necessary. .................20

VI.  Conclusion ......................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*CFTC v. 20/20 Trading Co.*, 2011 WL 2221177 (C.D. Cal. June 7, 2011) ..................19

*CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d  (9th Cir. 1982) ......................5, 20

*CFTC v. Hunter Wise*, 749 F.3d 967 (11th Cir. 2014) ....................................................2, 3

*CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Il. 2015) ..........................18

*CFTC v. McDonnell*, No. 18-cv-361 (E.D.N.Y Mar. 6, 2018) ........................................18

*CFTC v. Monex Deposit Co.*, Case No. 14-cv-6131, 2014 WL 7213190

   (Dec. 17, 2014) (7th Cir. 2016) ..........................................................................................7

*CFTC v. Noble Metals Int'l*, 67 F.3d 766 (9th Cir. 1995) ......................................2, 3, 5

*CFTC v. P.I.E., Inc.*, 853 F.2d 721 (9th Cir. 1988) ..........................................................5, 6

*CFTC v. R.J. Fitzgerald.*, 310 F.3d 3121 (11th Cir. 2002)............................10, 13, 14

*CFTC v. S. Trust Metals*, 880 F.3d 1252 (11th Cir. 2018) ............................................8

*CFTC v. Weinberg*, 287 F. Supp. 2d 1100 (C.D. Cal. 2003) ......................................13

*CFTC v. White Pine Trust Corp.*, 574 F.3d 1219 (9th Cir. 2009)..........................18, 19

*CFTC v. Zelener*, 373 F.3d 861 (7th Cir. 2004)............................................................5

*Marx  v. Gen. Revenue Corp.*, 568 U.S. 371 (2013) ....................................................19

*SEC v. Todd*, 642 F.3d 12-07 (9th Cir. 2011)..............................................................18

*U.S. v. Nutri-Cology, Inc.*, 982 F.2d 394 (9th Cir. 1992) ..........................................20

*United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043 (N.D. Cal. 2006)..20

**Statutes**

7 U.S.C. § 13(a)(2) (2012)............................................................................................20

7 U.S.C. § 2(c)(2)(C) ......................................................................................................5

7 U.S.C. § 2(c)(2)(D) ......................................................................................................5

7 U.S.C. § 6c(b) (2006) ................................................................................................19

7 U.S.C. § 7(d) (2012) ....................................................................................................6

7 U.S.C. § 9(1) (2012) ..................................................................................................18

**Other Authorities**

**Food, Conservation, and Energy Act of 2008, Pub. L. 110–246, 122 Stat. 1651 (2008)**
.................................................................................................................5

**Model State Commodity Code**...........................................................................7

**Retail Commodity Transactions Under Commodity Exchange Act,**
    **78 Fed Reg. 52426** .................................................. (Aug. 23, 2013).
    .................................................................................................................7


**Regulations**

**17 C.F.R. §§ 1.20-69 (2017)** ...............................................................................6

Monex continues to operate a massive, nationwide fraud that has cost retail customers more than $290 million since 2011 as described in the CFTC's Motion for a Preliminary Injunction (D.E. 7-1). Monex's marketing, training materials, and testimony from victims and former employees all paint a consistent picture: Monex sells the Atlas program as a safe, secure, and profitable investment despite knowing that 90% of its customers lose money. Monex tricks thousands of retail customers into highly risky leveraged trades without disclosing that profits are exceedingly rare, all the while lying to customers that their money will be safe and that Monex acts in their best interest.

The CFTC has jurisdiction over Monex's leveraged Atlas transactions and the authority to address Monex's fraud. Monex pays lip service to the law, but provides no evidence that Atlas customers have possession of or control over metals from trading in the Atlas program. Monex has therefore failed to meet *its burden* to prove its transactions fall within the actual delivery exception. Monex does not contest the CFTC's description of the Atlas program: it concedes that it is a speculative trading platform that allows long and short positions; that it can liquidate customer positions in its sole discretion; that its depository agreements give Monex total control over all the Atlas metal; that its financing arrangements put metal that supposedly has been "delivered" to customers at risk; that Atlas transactions do not result in customers possessing or controlling physical metal; and that its "title transfer" documents transfer no real rights to customers. Monex's purported delivery is at best "constructive," not "actual." It is a sham designed to convey the impression that customers receive delivery of metals when they do not.

Monex asks the Court to ignore the wording of the statute ("*actual* delivery"), and rule that because Monex has operated its trading platform the same way for many years, it is forever exempt from regulation. The Dodd-Frank Act changed the law. As of July 16, 2011, Monex's leveraged retail commodity transactions must occur on a regulated exchange. Monex disregards this mandate and violates the law with every leveraged Atlas trade it executes. The Court should immediately enjoin this conduct.

## I.   Monex Does Not Make Actual Delivery of Metals.

### A. *The "Ability" To Deliver Commodities Is Not "Actual Delivery."*

Monex asks this Court to craft a different definition of actual delivery from the Eleventh Circuit, which held that actual delivery requires a transfer of possession of and control over a commodity to a buyer or a buyer's agent. *CFTC v. Hunter Wise*, 749 F.3d 967, 979-980 (11th Cir. 2014). Monex says that because it has an inventory of metals that it *can* deliver, it therefore "actually delivers" metals. Monex says it does so when it issues a title transfer notice to customers. The Eleventh Circuit rejected the same argument in *Hunter Wise*, noting that such an interpretation would deprive the word "actual" in the statute of meaning. *Id.* The ability to deliver is not sufficient, and neither is the mere purported transfer of title to metals held at a third-party depository. *Id.*; *see also CFTC v. Noble Metals Int'l*, 67 F.3d 766, 772-773 (9th Cir. 1995) (rejecting argument that transfer of title to metals held by a third-party depository constituted delivery). There must be *actual*—not constructive—delivery of a commodity for a transaction to fall within the actual delivery exception.[1] Monex argues that constructive delivery and actual delivery are the same. The Court should reject Monex's attempt to craft a new definition of "actual delivery" that would eviscerate the plain language and purpose of the statute.

Monex is wrong that the Eleventh Circuit's interpretation of "actual delivery" in *Hunter Wise* is limited to cases where there is no metals inventory. It is true that if there are no metals to deliver, there can be no actual, or even constructive, delivery. *Id.* at 979. But the court separately distinguished the very type of constructive delivery that Monex makes on its Atlas platform from the actual delivery required to meet the exception. The court rejected an argument that the issuance of a title transfer document alone amounted to actual delivery of commodities. The court held that the "transfer of documents indicating control or possession . . . without physical transfer of the commodity – is by

---

[1] Monex misleadingly refers to an "actual delivery *exclusion*" or "exemption" in its brief. There is no such exclusion or exemption, but rather a statutory *exception* which Monex has the burden to establish. *See* Opp'n to Def's Mot.to Dismiss, D.E. 164 at 5-6.

2

any definition constructive, rather than actual" delivery. *Id.* Like Monex's "Commodity Title Transfer Notice," the Hunter Wise "Transfer of Commodity Notice" "purported to transfer precious metals into or out of customers' accounts but . . . did not give the customers any right to possess or control actual metals." 749 F.3d 967 at 972. Maintaining metals in a warehouse in Monex accounts and issuing title documents that confer no rights in that metal is constructive, not actual, delivery.

The Ninth Circuit took a similar approach in *Noble Metals* (a pre-Dodd-Frank case), rejecting an argument that delivery to a third-party depository and transfer of title amounted to "delivery." Like Monex, Noble offered retail off-exchange leveraged precious metals trading. The CFTC charged Noble with executing off-exchange futures in violation of Section 4(a) of the CEA and fraud in violation of CEA Section 4b. Noble argued that the CFTC did not have jurisdiction because its transactions were not "futures" but instead forward contracts excluded from CFTC jurisdiction. The heart of this defense was the claim that Noble delivered metals to customers by "transferring, i.e., 'delivering,' title to the metals to the investor." 67 F.3d at 772. Noble argued that it delivered metals because they were held by a third-party depository and it issued a title document reflecting the investor owned them. *Id.* at 772-773. The Ninth Circuit held that third-party storage and transfer of title did not amount to delivery and therefore the transactions were futures. "Here, there was no legitimate expectation that [Noble's] customers would take actual delivery of the metal they had bought. The [contracts], therefore, were futures contracts subject to [CFTC] jurisdiction, and when [Noble] sold them in off-exchange transactions they violated section 4(a) of the Act." *Id.* at 773.

This Court should decline Monex's request to craft a different definition of actual delivery than the one articulated by the Eleventh Circuit in *Hunter Wise*, particularly where it parallels the Ninth Circuit's reasoning in *Noble Metals*.

### B. *Monex Acknowledges It Does Not Transfer Possession or Control.*

Monex does not contest that its Atlas Program is a leveraged commodity trading platform. Monex hired expert consulting firm Compass Lexecon to analyze its Atlas

transaction database. Monex and its experts do not contest that there were 12,185 leveraged trading accounts on the Atlas platform during the relevant period, in which 140,000 leveraged trades were placed. Ross Dec., D.E. 154-3; Gomberg Dec. ¶ 126, D.E. 8-1. Monex and its experts do not contest that more than 30% of accounts received either a margin call, had trading positions force-liquidated, or both. Monex does not contest that Atlas customers almost never receive metal: of 59,724 long positions, only 6.11% ultimately led to a separate delivery order; and *no* short trade resulted in delivery. *Id.*

Monex also does not contest the CFTC's description of its financing structure. Indeed, Monex's brief does not even mention its financing vehicles or bank loans, which are crucial to Monex's ability to procure the inventory of metals on which it rests its arguments. It is these financing arrangements that make it impossible for Monex to actually deliver metals to its customers. On this front, all Monex says is its "lenders only have whatever rights in customers' metals that Monex has." (Opp'n (D.E. 166) at 19.) This means that Monex's lenders, like Monex itself, have control over Atlas customer metals, including the right to liquidate trading positions in their discretion. Monex says that its Atlas customers have a "right to any surplus proceeds from liquidation of their metals," but this is cold comfort to a customer who thought they owned metals.

### C. *Section 2(c)(2)(D) Was Not Passed To Exempt Monex from Regulation.*

Monex asks this Court to believe that Section 742 of the Dodd-Frank Act was passed in order to exempt Monex from federal regulation. This is absurd. Section 2(c)(2)(D) of the CEA was added by the Dodd-Frank Act as a part of a sweeping overhaul of the U.S. financial system, the goals of which included increased transparency and stability in financial markets as well as consumer protection. Congress did not base this amendment on a state commodity code or use Monex as a model for actual delivery.

In fact, Section 742 of the Dodd-Frank Act was modeled after (and mirrors the structure and language) of Section 2(c)(2)(C) of the CEA, a provision added to the CEA in 2008[2] to give the CFTC authority over leveraged foreign exchange trading platforms

---

[2] This authority was added to the CEA as a part of the Food, Conservation, and Energy

4

offered to retail customers (retail forex). The language of the two provisions is identical in all material respects relevant to this case, including their application to leveraged trading by retail customers, as well as the exception for "a contract of sale that . . . results in actual delivery." *Compare* 7 U.S.C. § 2(c)(2)(C), *with* 7 U.S.C. § 2(c)(2)(D). *See also* Reply Appendix, Ex. 1. The key "actual delivery" language came from a parallel provision in the CEA, not Monex or a model state law.

Monex's view of the legislative history is wrong. Dating back to the 1980's, the CFTC regularly charged firms offering off-exchange leveraged commodity trading to retail investors with violating Section 4(a) of the CEA. *Noble Metals* is one example of this type of case.[3] But operators of off-exchange trading platforms frequently argued that their transactions were not "futures" subject to CFTC jurisdiction, but instead "spot" or "deferred delivery" transactions. The CEA does not define a "futures contract," so courts looked at evidence of "intent" or "expectation" to take delivery. *See, e.g. Co Petro*, 680 F.2d at 578; *Noble Metals*, 67 F.3d at 772-73. While many courts found these types of trading platforms involved "futures," others did not. For example, in *CFTC v. Zelener*, 373 F.3d 861 (7th Cir. 2004), the Seventh Circuit held that the retail forex contracts at issue were not "futures" within the scope of the CEA. Decisions like *Zelener* left a gap in regulation over leveraged commodity trading offered to retail customers. Congress filled the gap by providing the CFTC with additional authority over retail forex transactions in 2008. The CFTC's authority was expanded in 2010 to cover leveraged commodity trading with retail customers. The approach with both provisions was to make it unnecessary for the CFTC to prove that a transaction was a "futures contract" in order to police it. Now, leveraged forex and commodity transactions with retail customers are treated "as if" they are futures unless those offering such transactions establish that they

---

Act of 2008, Pub. L. 110–246, 122 Stat. 1651, 2189–201.
[3] Another is *CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573 (9th Cir. 1982), upholding an injunction against a firm offering off-exchange gasoline transactions; or *CFTC v. P.I.E., Inc.*, 853 F.2d 721 (9th Cir. 1988), holding that leveraged metals transactions similar to Atlas trades were "futures" required to be executed on a regulated exchange.

5

actually deliver the currency or commodity to the customer.

Monex claims that in passing Section 742, the sole risk Congress had in mind was commodity Ponzi schemes. This is wrong. If Monex's view were correct, and Congress thought all firms offering retail commodity transactions (that did not qualify for the actual delivery exception) were Ponzi schemes, Congress would have banned such firms outright rather than mandating that their transactions be conducted on a regulated exchange. Further, if Ponzi schemes and bucket shops were the only concern, Section 2(c)(2)(D) would not have been necessary because Congress also amended Section 6(c)(1) of the CEA to give the CFTC broad anti-fraud authority over interstate commodity transactions, making Section 2(c)(2)(D) superfluous (in Monex's reading). Section 2(c)(2)(D) has different goals and means of achieving those goals entirely.

Section 2(c)(2)(D) was added to require that platforms offering leveraged commodity trading to retail customers register with the CFTC and execute such transactions on regulated exchanges. Certainly these requirements can help address potential fraud, such as the fraud perpetrated by Monex here. But the reasons for and benefits of CFTC oversight of commodity trading platforms go far beyond preventing fraud. *See, e.g. P.I.E., Inc.*, 853 F.2d at 725 ("The Act requires futures sales to be made on a designated market in order to protect investors."). On regulated exchanges, customers have the full gamut of protections offered by the CEA. These protections eliminate the risk of counterparty default by placing a regulated clearinghouse on the opposite side of customer transactions, make pricing transparent and competitive, segregate customer funds and give them priority in bankruptcy, and require participants to register with a self-regulatory organization so that compliance can be monitored. *See, e.g.,* 7 U.S.C. § 7(d)(1), (d)(8), (d)(12)(A) (2012); 17 C.F.R. §§ 1.20-69 (2017), *id.* pt. 8, 150, 155, 180 (2017). The unregulated Atlas platform offers none of these protections.

Monex is wrong that Section 2(c)(2)(D) simply codified a model state commodity code. First, Congress used different language in passing Section 2(c)(2)(D)—the Model Code does not use the phrase "actual delivery." *See* Model State Commodity Code,

Comm. Fut. L. Rep. (CCH) ¶ 22,568 (1985). Further, if Congress felt that the laws adopted by states following the Model Code were sufficient to protect consumers, Congress simply would have declined to pass Section 2(c)(2)(D). Indeed, this was the approach Monex advocated to Congress. *See* RJN (D.E. 172) Ex. 1, at 20-29 (June 1, 2009 Hearing) (Monex representative arguing against federal action because "current regulatory standards [the Model Code] provide all necessary customer protections").

Monex claims that Congress rejected the CFTC's interpretation of actual delivery. (Opp'n 13.) This is also false. The language that CFTC Chairman Gensler proposed would have precluded delivery to depositories in *all cases*, which is a position the CFTC has never taken since the law was passed. Rather, the CFTC's 2013 guidance recognized that under some circumstances (not met here) delivery to a depository could constitute actual delivery if, among other factors, the delivery was not otherwise a sham. *See* Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed Reg. 52426, 52428 (Aug. 23, 2013). Here, Monex's claimed delivery is a sham, accomplished through title transfer documents that transfer no real rights to commodities.[4]

Finally, Monex claims that the CFTC and the entire U.S. Congress knew exactly how Monex operated, and modeled the actual delivery exception on Monex's Atlas platform. (Opp'n 8-9). Monex is wrong. Indeed, it took a multi-year investigation, complete with a subpoena enforcement action appealed to the Seventh Circuit,[5] for the CFTC to uncover the truth about Monex's Atlas trading platform. Monex's short statement to Congress did not disclose key facts about its Atlas platform such as its metals inventory financing structure and its auto-forced liquidation system. Atlas is really just a leveraged commodity trading platform where customers do not obtain actual delivery of metals.

---

[4] Monex mischaracterizes and selectively quotes the deposition testimony of Robert Schwartz, claiming the CFTC "concedes" Monex makes actual delivery. Obviously this is not true. In fact, Mr. Schwartz explained why Monex does not actually deliver metals in leveraged Atlas trades. *See, e.g*, Schwartz Tr., 6-8, 22-24, 28-29, 38. All citations to deposition excerpts and exhibits herein are contained in the CFTC's **"Reply Appendix."**

[5] *See CFTC v. Monex Deposit Co.*, Case No. 14-cv-6131, 2014 WL 7213190 (Dec. 17, 2014), *aff'd* 824 F.3d 690 (7th Cir. 2016).

7

**II.      Discovery Confirmed the Key Omission that 90% of Atlas Accounts Lose.**

Neither Monex nor its experts challenge the CFTC's figures showing the abysmal results of the Atlas platform trading. It is now undisputed that between July 16, 2011 and March 31, 2017, over **90%** of 12,835 leveraged Atlas accounts suffered losses, collectively losing about **$290 million**. PI Mem. (D.E. 7-1) 20-21; Gomberg Supp. Dec. Ex. 63. Monex presents no evidence to counter the CFTC's proof that its executives had access to records showing how poorly Atlas customers performed,[6] yet Monex continues pitching leveraged Atlas trading as a safe, secure and profitable investment.

Monex claims that a "down-trending" market drove the losses, not the structure of the Atlas Account. (Opp'n 33.)[7] Monex ignores that these investors were duped into trading in the first place. Even if price declines contributed to the losses, it is still fraudulent for Monex to promote Atlas trading as "safe and secure" or as a "hedge against inflation." PI Mem. (D.E. 7-1) 25. Further, Monex's expert's calculations of how many customers would have lost even if charged no fees are flawed: he doesn't account for the effect of commissions and ignores the significant effect of margin calls and forced liquidations. Gomberg Supp. ¶¶ 9-11; *see also CFTC v. S. Trust Metals*, 880 F.3d 1252, 1270 (11th Cir. 2018) (finding that price declines were not the proximate cause of customer losses in leveraged precious metals scheme because, among other reasons, investors cannot ride out unfavorable market moves). Further, Monex's statistics ignore the ***magnitude*** of the harm its fees cause. During the relevant period, the median Atlas customer's PNL was a loss of $3,000. Monex fees and costs accounted for $2,234, or ***74.5%***, of the median customer's loss. Gomberg Supp. ¶ 11. In total, customers lost $330,690,594 during the period under one metric. *Id.* Just under half of the losses, $154,078,200, went into

---

[6] Indeed, former employee Ginger McNamee testified that a Monex executive told her that "[o]nly 3 percent of our customers ever win," that "[e]verybody loses," and that "[t]he only people winning are the customers that are dead and their accounts are frozen." McNamee Tr. 75:4-2; 77:10-21.

[7] While prices did trend down between July 2011 and March 2017, it was not a smooth descent: gold, for example, finished the month higher than where it started almost half the time (32 of 69 months). Gomberg Supp. n. 6.

Monex's pocket as fees and costs. *Id.* Ex. 65. In light of how customers actually performed, it is not surprising that the CFTC's expert was able to prove mathematically that no informed rational person would trade on the Atlas platform given available alternatives.[8] Monex cannot blame a down-trending market; the problem is the structure of its Atlas transactions.

Monex's arguments to the contrary are either irrelevant or wrong. It is telling that Monex's expert developed a theoretical construct of how Monex's Atlas customers *could have* profited on a single trade during the relevant period rather than addressing how Atlas traders *actually* fared. After an error in the formula Mr. Ross used for his calculations is corrected (*see* Gomberg Supp. ¶¶ 4-5), all Mr. Ross's analysis says is that based on the *historical* performance of the market, a trader had a 33.5% chance to **break even** on a gold trade if he held the position for **six months**. (*Id.* ¶ 5.) Further, most Atlas customers hold positions for two months, not six. (*Id.* ¶ 7-8.) Correcting Mr. Ross's formula and using a two-month holding period reduces the chance to **break even** on a gold position to **21.2%**. *Id.*[9] Put another way, even Monex's expert would agree that under his theoretical construct, the average customer has at least a **78.8%** chance of losing on a gold trade. This is consistent with the CFTC's calculations of the actual performance of leveraged Atlas trading accounts, and is a far cry from being a safe, secure, and profitable investment as Monex pitches it.

Neither the CFTC's investigator nor its expert agreed that market prices dictated the Atlas customers' losses, as Monex claims. Mr. Gomberg testified that he disagreed that the losses were "driven" by the falling markets (Gomberg Day III 43:20-44:2); rather, he believed that Monex's exorbitant trading costs, forced liquidations, and sales practices were the reason. Gomberg Day III, 31:9-32:7; 35:3-36:3; 58:17-59:20. Dr. Selvaggio

---

[8] *See* CFTC Opposition to Monex's *Daubert* Motion, D.E. 165, for a full explanation of Dr. Selvaggio's opinion, and why Monex's complaints about the report are misplaced.
[9] And even these chances to profit are inflated, as Ross's calculation does not account for the significant impact of margin calls and forced liquidations, which prevent customers from riding out dips in the market. *See* Gomberg Supp. ¶ 6.

testified that his analysis shows an investor would always do better in functionally

equivalent futures or ETFs transactions due to the Atlas's extreme costs.

Last, Monex tries to justify the 90% loss rate for Atlas Accounts by claiming "80-95%

of commodity traders lose money" in regulated markets. (Opp'n 33 n.30). There is no

competent evidence to support this. For this statistic, Monex cites two blogs pulled off

the internet, to which the Court should give no weight.[10]

### III.   Discovery Confirmed Monex's Misrepresentations and Omissions

Monex claims that testimony from victims and former employees was inconsistent

with the CFTC's case. This is false. In their brief and their attorney's "Declaration,"[11]

Monex mischaracterizes and quotes witnesses out of context. In reality, all reaffirmed

their declarations, and in the face of abusive tactics by Monex's attorney, gave credible

testimony about how Monex defrauded them. *See* CFTC Reply Appendix Ex. 4, Chart of

Counter-Designations.

### A. *The Evidence Shows a Pattern of Fraud.*

The declarations and depositions of numerous Monex victims contradict Monex's

assertion that the CFTC failed to show "firm-wide de-emphasis of risk, assurances of

profits or promotion of successful Atlas results." (Opp'n 5). Victims reaffirmed that they

invested after Monex promised their money would be safe, and that Atlas was a low risk,

yet profitable investment. For example, Elisa Pugliese testified:

> "I explained to him that I was out of work, I wasn't employed. That I had
>
> my savings and I had nothing else and no other income or way of making

---

[10] One blog post (Goteiner Dec. Ex. 37) is written by Chuck Kowalski, a defendant in the
*R.J. Fitzgerald* case, in which he defrauded customers by failing to disclose that "the
overwhelming bulk of firm customers lose money." 310 F.3d 1321, 1333 (11th Cir.
2002). The other (Ex. 38) is from a blogger hawking penny stocks, who asks "ARE YOU
READY TO BE A MILLIONAIRE?" *See* https://www.timothysykes.com/.

[11] The "Declaration of Neil Goteiner" (D.E. 170) contains argument in contravention of
the order limiting Monex to a 42-page brief, L.R. 7-7, and L.R. 11-7. The Court should
disregard the argument in the declaration, and consider only the testimony and evidence.
The CFTC has filed its own appendix of testimony in response.

income. And that I explained very clearly I do not want to make any risky investments of any kind. And that if this was risky I was not going to do it. And he said this is as safe as a savings account. And that I will represent you and take care of you, and it is my job to make sure that your money is safe and what you are doing is safe. […] [He said] you will be investing in something that is solid, you're investing in tangible gold, which will never lose value because it's a solid piece of gold, you're not investing in an idea of gold. And everything that you invest will be as safe as a savings account."

Pugliese Tr. 22:16-24:7; *see also id.* 54:2-55:10 (same). Her Monex "account representative" ("AR") also promised Pugliese would earn at 10-20% interest in the account. *Id.*; 30:5-24; 105:5-22; 106:4-9.

On a recorded call, Christine Mustazza worried whether she would ever recover the thousands she'd already lost, asking:

MUSTAZZA: "And you think we are going to build back up again?"

AR: "Absolutely, absolutely, yeah, I sure do."

MUSTAZZA: "To where we were?"

AR: "Beyond where we were. The object isn't to break even, it's to make a profit." Mustazza Dec., D.E. 9-9, Ex. G-2 at 5; *see also* Mustazza Tr. 108:18-109:24; 110:20-117:1 (Monex promised Mustazza would "absolutely" make back her losses, that he had a "special set of skills" he would use for her, and that she was "the only client who is not letting me do anything for you on your account"). Similarly, after a loss, Susan Hadden stayed in the market after her ARs promised they would earn her money back.[12]

Indeed, the victims testified that Monex downplayed the risks of the Atlas Program and promised that it was a profitable investment. *E.g.* Bar Tr. 176:6-177:10; 209:17-211:4; Staub Tr. 49:16-50:15. Ms. McNamee, a former Monex employee, confirmed that she "focused on the upside" and de-emphasized the risk "by way of omission." McNamee Tr. 152:10-15; 230:24-231:5. She testified that customers "didn't appreciate the amount

---

[12] Hadden Tr. 53:9-57:17; 65:1-66:16; 71:14-73:15; 388:7-390:2.

they could lose." *Id.* 312:12-16. Both Ms. McNamee and former employee Marc
Rosenbaum testified that Monex's marketing claims were "misleading." Rosenbaum Tr.
323:1 (discussing brochure); McNamee Tr. 270:19-272:18 (marketing projected "a false
sense of security").

No witness "disavowed" his or her declaration.[13] Rather, the CFTC's Chart of
Counter-Designations (see CFTC Reply Appendix, Ex. 4) shows that this claim is easily
disproven. (While Person Cotton, a 78-year-old who had suffered recent health issues,[14]
did have difficulty recalling the circumstances around the drafting of his declaration, he
also reaffirmed that his declaration was accurate. Cotton Tr. 151:19:24.

Reviewing the cited portions of the transcripts is enough to dispel the claim that the
CFTC's investigator "admitted" Monex's marketing statements were not fraud. (Opp'n
34.)[15] Similarly, no testimony supports Monex's argument that the "safety and security"
it advertises are limited to the strength of the locks in the vaults at Brinks.

Finally, Monex suggests that the CFTC's fraud case is limited to the testimony of
eight isolated victims and two former employees. (Opp'n, p. 32.)[16] This argument ignores
(a) the firm-wide marketing of the Atlas Program as safe, secure, and profitable; (b) the
firm-wide pattern of omissions; and (c) a pattern of complaints with similar themes
stretching back years. *See* Gomberg Dec., D.E. 8-1, ¶ 28. For example, Exhibit 1 to Mr.

---

[13] *C.f.* Hadden Tr. 136:14-20; Pugliese Tr. 14:17-15:10; Mustazza Tr. 129:14-130:7;
373:13-374:11; Staub Tr. 16:17-17:4; McNamee Tr. 67:15-24; McLaughlin Tr. 62:3-8;
Rosenbaum Tr. 61:6-62:8 (all testifying their declarations were accurate).

[14] Monex omits that during the 14 months between signing his declaration and his
deposition, Cotton had "pneumonia in both lungs," his "heart stopped and [he] fell and
busted [his] head and got a concussion," followed by a two-week hospital stay. Tr.
101:17-23. Cotton's private attorney, Bruce Oakes, has submitted a declaration attesting
to the process of how Cotton signed his declaration. Reply App'x Ex. 3.

[15] For instance, Monex claims that Mr. Gomberg admitted that "Monex's marketing
materials do not … limit or de-emphasize risk." *Id.* In fact, Mr. Gomberg said only that
the materials do not say there is "**no** risk and you couldn't lose money" at Monex – a
huge difference. *See* Gomberg Day I, 355:1-7; 357:20-25 (same).

[16] The CFTC stipulated it would not rely on four customer declarations for purposes of
the P.I. due to time constraints and their unavailability for a deposition.

Gomberg's deposition is a binder containing approximately seventy Monex customer complaints during the relevant period in this case alone.

**B. *Victims Relied on Monex's Misstatements and Omissions.***

Monex claims that none of the victims who submitted declarations "[saw] or relied upon" Monex's marketing materials and promises of profitability, safety, and security. (Opp'n 5, 35). The argument is a red herring—the CFTC does not have to prove reliance. "[I]n an enforcement proceeding under Section 4b(a) of the Act, reliance by customers is irrelevant." *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1105 (C.D. Cal. 2003); *CFTC v. R.J. Fitzgerald.,* 310 F.3d 3121, 1328 n.6 (11th Cir. 2002) (CFTC need not prove reliance in antifraud action).

Their argument is also wrong factually. Mr. Staub testified that his Monex AR directed him to the Atlas Account brochure to convince him to invest in the Atlas Program; Staub saw it and thought "[T]his sounds really good." Staub Tr. 148:15-150:10; 165:16-166:18. Ms. Mustazza relied on Monex's advertisements and website. Mustazza Tr. 134:25-135:1; 199:24-200:22. In every deposition, Monex victims testified that they relied on the oral promises of safety, security, and profitability that their ARs made to them on Monex's unrecorded sales lines. *See* CFTC Chart of Counter-Declarations.

Crucially, no witness testified that Monex told them that over 90% of customers lost money, that receiving an "impressive investment return" is exceedingly rare, or that the cost structure of Monex's Atlas transactions makes it exceedingly difficult to profit. Instead, customers confirmed that they would not have invested had they known this material information. *E.g.* Hadden Tr. 153:13-25; 155:24-157:12 ("I feel that it would have been highly relevant if I had known [other customers] were losing money"); Staub Tr. 53:4-13; 87:23-88:13 (same).

Monex argues that it had no duty to disclose its track record of poor performance. (Opp'n 33). Wrong: their duty of disclosure was triggered when they promoted the Atlas Program as safe, secure, and profitable. *E.g. R.J. Fitzgerald*, 310 F.3d at 1328.

**C. *Monex Held Itself Out as a Fiduciary Despite Written Policies to the Contrary.***

13

Discovery has confirmed that (1) Monex trains its ARs to lure customers to trade by falsely telling them that they are acting in their "best interests" or are their "fiduciary," and (2) ARs actually make these misrepresentations to customers.

First, Monex admits that a video used to train ARs "contained an incorrect analogy to fiduciary relationships." Walker Dec., D.E. 169, ¶ 27; *see also* Gomberg Dec. ¶¶ 76-79, Ex. 29 (Monex Training Transcript), at 14-16 (training ARs to say "[w]e have that same kind of fiduciary relationship, a relationship of trust"). Monex only stopped using the video in September 2017 after the CFTC sued. Walker Dec. ¶ 27. Monex admits that it used its "Blueprint for Success" until 2014 (*id.* ¶ 29), which trained ARs to build trust with customers and pitch them using phrases like "if … you had a 30% to 40% net gain, you'd feel pretty good, wouldn't you?" *See* Gomberg Dec. ¶¶ 72-75. Monex only stopped using this document after the CFTC deposed Defendants Michael Carabini and Louis Carabini during the investigation of Monex.

Several victims declared that their Monex ARs said they would closely monitor and manage their accounts and act in their best interests—false statements since Monex does no such thing. Depositions confirmed these statements. D.E. 9-9, Mustazza Dec. Ex. D2 (transcript of recorded call) ("The sole purpose of my work in life, say, to your account, is […] to generate profit for you now"); Mustazza Tr. 107:22-109:24; 111:7-19; 247:1-13; Staub Tr. 58:1-59:5 ("he would be representing me and my interests."); Pugliese Tr.57:4-13 ("[H]e made it very clear that he represents me, and it is his job to take care of me and to protect me and protect my investment."); Bar. Tr. 200:24-201:25 (account was "very minimum risk because I had a representative that will be monitoring [it].").

Susan Hadden's experience is illustrative of how ARs follow their training to mislead customers that they are acting on their behalf so they can generate more trades. In 2011, Ms. Hadden was a newly-single mother with limited financial knowledge. Hadden Dec., D.E. 9-5, ¶¶ 6-9. Over a five-month period, she sent Monex nearly her entire net worth. *Id.* ¶ 17. In September 2011 she took a catastrophic loss. *Id.* ¶ 27. The stress of losing $90,000 all at once put her in a state of severe trauma. *Id.* ¶ 28; Hadden Tr. 52-53. She

could not even look at account statements, log in to the website to view her account, or hear how much she had left. Hadden Tr. 53; 58:16-59:15. For the next 15 months, she turned management of her account to her AR, saying "don't tell me the amount, tell me what to do." Hadden Tr. 53-54; 270:7-14; 258:3-13 ("I was completely reliant on their advice at that point because I had pretty much shut down. I was at their mercy."); 408:20-409:13. She felt that her AR was "going to save me and get me out of this because I was convinced he had my best interests at heart." Hadden Tr. 54:8-9; *id.* 55-57; 125:15-16. Monex promised her that she would absolutely "make [her] money back" if she kept trading. *Id.* 56:7-22; *see also id.* 53:9-10 ("stay in, this will recover"); 65-66; 125-126.

Former employees confirmed they were trained to portray themselves as experts in the markets with specialized knowledge. *See, e.g.* McNamee Tr. 68:6-71:2; 72:20-73:15; Rosenbaum Tr. 65:16-21; 353:20-354:1 ("We were trained to portray ourselves as knowledgeable guys that are knowledgeable market experts"). The former employees described the Monex sales floor as a "pure boiler room," with a relentless pressure to sell. Rosenbaum Tr. 228:16-230:10; McNamee Tr. 243:19-245:10; 286:12-287:2. And the fact that ARs present themselves as trusted fiduciaries makes their high pressure sales tactics all the more egregious.[17]

**D.** *Monex's Boilerplate Risk Disclosures and Contracts Cannot Excuse Fraud.*

In light of the evidence, it is remarkable that Monex still attempts to hide behind its boilerplate risk disclosures and agreements. (Opp'n 5, 36-37.) Monex does not even attempt to distinguish the cases establishing that such disclosures do not permit a defendant to defraud customers. *See* P.I. Memo. 31 n.109 (collecting cases)).

At the time they open their accounts, Monex tapes a phone call with each of its Atlas customers where a standardized risk disclosure is read. McNamee Tr. 292:10-13. Witnesses testified that before they got on the recorded line, the disclosure was presented

---

[17] *See, e.g.* Hadden Tr. 78:6-79:6 ("we've got to move fast, this thing's going up"); Staub Tr. 138:17-139:11 ("urgent calls," with AR saying "we've got to do it now."); Bar. Tr. 170:1-173:1 ("She told me we had to do [the trades] now.").

as a formality, and that it did not apply to the purportedly "safe" investments they were entering into. Ms. Pugliese was told that the language in the disclosure "doesn't apply to you and these aren't things that you have to be concerned about and a lot of the stuff in here are for people making risky investments." Pugliese Tr. 94:16-25; *see also id.* 193-194; 210-212 (disclosures did not apply to her "safe investment" in gold, which was "as safe as investing in a savings account"). Ms. Hadden testified that the risk disclosure language was "trivial compared to the picture [her AR] was painting and the confidence he was building." Hadden Tr. 161:25-162:5; *id.* 43:18-25-44:9. He said: "[B]ecause the risk that he explained was so minimal. [The disclosure] was [for] other people. This does not apply to me." *Id.* 225:18-226:3; 235:13-19 (same); *see also* Staub Tr. 52:11-52:23.[18]

In Ms. Mustazza's case, Monex bullied her into making a taped acknowledgment despite knowing that she did not appreciate the risks of the Atlas Program. Between April 2015 and February 2016, Monex AR Dan Wales made nearly two-dozen leveraged trades (including short trades) in Ms. Mustazza's account, borrowing more than $500,000 to do so. Mustazza Dec. ¶¶ 26-34; Ex. A (account statements). Mustazza had no understanding of what was happening in her account. *Id.;* Mustazza Dec., D.E. 9-9, Ex. D2; Mustazza Tr. 299:15-301:25. In early 2016, Wales realized he had not obtained a recorded risk disclosure, and began pressuring her to make one. Mustazza Dec. ¶¶ 32-37, D.E. 9-9. Observing this, Ms. Mustazza's daughter recorded three calls between her mother and Wales. *Id.*

In the transcript of a February 2016 call, Wales tried to explain the trades he had been placing. Mustazza Dec. Ex. D2, pp. 1-10. She stated: "I don't understand it, you know. I'm so nervous. I didn't want my retirement to go down to nothing." *Id.* p. 10:20-23. Wales responds: "[N]or do I. That's why I do what I do. I mean, think of this this way. The sole purpose of my work in life, say, to your account, is to prevent that from

---

[18] Monex also relies on disclosures in the Account Agreement. (Opp'n 37). This too is presented as a formality. Mustazza Tr. 225:14-226:20; McNamee Tr. 31:8-32:14. Customers sign this at the start of their relationship with Monex, often when they are only buying physical metal, not trading. *E.g.* Mustazza Tr. 172:5-173:7.

happening. The sole purpose is to generate profit for you now." *Id.* p. 11:1-5. Wales attempted to explain the leveraged short positions he had placed, and Ms. Mustazza replied, "Oh, I don't understand any of this." *Id.*, p. 15:17-18. Wales said: "***I know you don't, Christine. But you do trust me, I think, which is why you gave me a hand to – to – to lead you in the direction I have***." *Id.* p. 15:19-22. Despite knowing Mustazza did not understand the risks, Wales pushed Mustazza to make the recording, ultimately threatening to dump her as a client, until she gave in. *Id.* 18-19; Mustazza Dec. ¶¶ 35-37. In light of this evidence, it is absurd for Monex to claim that its accounts are "customer-directed" or that boilerplate disclosures excuse Monex's deception.

Finally, Monex argues that no one could be deceived about being put into a leveraged position, since Monex verbally confirms each trade, and if the customer is spending $10,000 to buy $50,000-worth of silver, she should know she's leveraged. (Opp'n 41). But in reality, the language used in trade confirmations is so convoluted—they use a series of inscrutable codes like "SBV" instead of saying "silver" and do not give the total amount of the transaction— it seems designed to mislead. Gomberg Supp. ¶¶ 20-23.

### E. *Many Monex's Victims Are Unsophisticated.*

Monex focuses on the fact that two of the declarants were "sophisticated" investors prior to coming to Monex. (Opp'n 5). Even if this were true,[19] it proves nothing other than that Monex's fraudulent sales pitch is effective enough to bamboozle people of all backgrounds. And many of Monex's victims are indeed quite financially unsophisticated. Yvonne Golla, for example, is a Polish immigrant with limited English skills who cleans houses and dog-sits for a living. She lost $160,000 she received from the U.S. Military after the death of her son in Iraq. *See* Golla Dec., D.E. 9-4. She was told that her money was "safe and secure" and that she would "definitely make a profit." *Id.* ¶¶ 14, 18. Monex cannot excuse its deceptive conduct by claiming its customers are "sophisticated" traders. It's simply not true.

---

[19] *See* Staub Tr. 26:15-28:11 (showing Staub, although a medical doctor, was not a sophisticated commodities trader).

17

**IV.    Section 6(c)(1)'s Fraud Prohibition Applies to Monex's Atlas Transactions.**

Section 6(c)(1), 7 U.S.C. § 9(1) (2012), by its plain language, provides the CFTC with authority to prosecute Monex's fraud, regardless of whether Monex makes actual delivery. Monex argues that Section 6(c)(1) does not allow the CFTC to pursue fraud, only manipulation. But Monex acknowledges that Section 6(c)(1) was modeled after Section 10(b) of the Securities Exchange Act (*see* MTD Mem. (ECF No. 41-1) at 11 & N.12), which clearly allows fraud actions and is not limited to manipulation. *E.g.*, *SEC v. Todd*, 642 F.3d 12-07, 1215 (9th Cir. 2011). Moreover, *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Il. 2015) was clarified by a subsequent decision—noticeably not cited by Monex—denying Kraft's motion to certify an interlocutory appeal, in which the court recognized that Section 6(c)(1) addresses "*either* deception **or** manipulation." 195 F. Supp. 3d 996, 1055 (N.D. Ill. 2016). The rulemaking for Regulation 180.1—which Monex quotes—also makes clear it applies to fraud in the cash markets. *See* 76 Fed. Reg. 41,398, at 41,401 n. 37 (July 14, 2011); *see also* Reply App. Ex. 17, *CFTC v. McDonnell*, No. 18-cv-361, slip op. 21-23 (E.D.N.Y Mar. 6, 2018) (CFTC has anti-fraud authority over spot markets for commodities in interstate commerce under Section 6(c)(1)).[20]

Monex's reliance on *CFTC v. White Pine Trust Corp.*, 574 F.3d 1219 (9th Cir. 2009) is misplaced because it addresses only foreign currency options transactions and not retail precious metals transactions. These types of foreign exchange options are governed by different sections of the CEA, and are treated differently to account for the authority of the U.S. Treasury over banks and their foreign exchange trading activity.

In *White Pine*, the CFTC sued the defendants for fraud in connection with options on foreign currency, which is prohibited by a section of the CEA not at issue here, Section 4c(b), 7 U.S.C. § 6c(b) (2006). Section 4c(b) incorporates by reference certain jurisdictional limits set forth in Section 2 of the CEA. *White Pine*, 574 F.3d at 1223–24.

---

[20] Monex also argues that this rulemaking "said that 'in connection with' means in connection with futures contacts," (Opp'n at 30), but the cited language is clear that it also reaches "manipulative or deceptive conduct in connection with" a "contract of sale of any commodity in interstate commerce," 76 Fed. Reg. at 41,405.

Section 2(c)(1) of the CEA, 7 U.S.C. § 2(c)(1) (2012), in turn, provides that "[e]xcept as provided in paragraph (2), nothing in [the CEA] . . . governs or applies to an agreement, contract, or transaction in—(A) foreign currency." Section 2(c)(2)(B) then specifically restores CFTC jurisdiction over certain foreign currency transactions.

Accordingly, the *White Pine* court held that the only basis for the CFTC to assert jurisdiction over the foreign currency option transactions there at issue was Section 2(c)(2). Section 2(c)(1) does not, however, exempt transactions in precious metals as one of the specifically listed items. This renders the decision entirely inapplicable. The "actual delivery" exception only excepts a retail commodity transaction from subparagraph 2(c)(2)(D) and thus from being treated "as if" it was a futures contract under the CEA, not from other provisions of the CEA that would otherwise apply.[21]

Moreover, the operative language of the statute at issue in *White Pine* is materially different from Section 6(c)(1). Section 4c(b) has limiting language: it applies only to "any transaction involving any commodity *regulated under [the CEA]*." By contrast, the anti-fraud prohibition in Section 6(c)(1) applies, *inter alia*, to "any commodity *in interstate commerce*."[22,23] Section 6(c)(1)'s authority to police fraud and manipulation in connection with "any commodity in interstate commerce" echoes the long-standing authority to police manipulation of "the price of any commodity in interstate commerce" contained in Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2) (2012). *See, e.g.*, *United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1061–62 (N.D. Cal. 2006).

---

[21] Unlike Section 2(c)(1), Section 2(c)(2)(D) does not contain the language, "nothing in the Act shall apply…."

[22] Congress easily could have but did not limit Section 6(c)(1) as Monex claims, simply by using the same language from Section 4c. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 384 (2013) (Congress's use of limiting language in some provisions but not others is evidence Congress knows how to impose restrictions when it intends to do so).

[23] *CFTC v. 20/20 Trading Co.*, 2011 WL 2221177 (C.D. Cal. June 7, 2011), cited by Monex, does not support its argument. That case involved "leverage contracts," a section of the CEA not applicable here (Section 19). Although it quoted *White Pines*' reference to Section 2, the decision did not turn on that point.

**V.      The CFTC Has Met the Standard and an Injunction Is Necessary.**

Absent a preliminary injunction, Monex undoubtedly will continue to execute leveraged commodity trades with retail customers without registering with the CFTC or conducting the transactions on a regulated exchange. Monex will also continue to defraud customers. Monex was presented with the bases for the CFTC's fraud claims in 2016, during the *Wells* process. Since then, Monex made no changes to its business practices other than removing some grossly inappropriate training materials. Walker Dec., D.E. 169, ¶¶ 27-29. There is no evidence that Monex implemented any new compliance procedures, re-trained or fired any salespeople or executives, began recording sales calls, or did anything else to address the pattern of fraudulent behavior the CFTC identified. Instead, in the face of consistent evidence from multiple sources, Monex responds that all the witnesses are lying (Opp'n 5), and that the CFTC is simply biased (*id.* 42).

Monex is wrong in arguing that the CFTC must prove "irreparable injury." The very case Monex cites establishes this. *United States v. Nutri-Cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992) (if government establishes likelihood of success on the merits, irreparable injury is presumed).[24] But in any case, the ongoing illegal leveraged transactions, coupled with clear evidence of ongoing fraud, is more than sufficient to warrant the entry of a preliminary injunction. The CFTC requests, pursuant to 7 U.S.C. § 13a-1 (2012) and the Court's equitable authority, that the Court enter a preliminary injunction order requiring Monex to immediately cease the offer of and execution of leveraged transactions on its Atlas platform. The CFTC also requests that the Court appoint a Monitor to assume control over Monex's operations, provide the CFTC with access to Monex's books and records, and, given the massive customer losses at issue, freeze assets of Monex pending a final judgment. The CFTC will separately submit a proposed order.

**VI.    Conclusion**

The Court should grant the CFTC's Motion for a Preliminary Injunction.

---

[24] This Circuit has not adopted the "substantial showing" standard articulated in *SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990). *C.f. Petro Mktg. Grp.*, 680 F.2d at 582 n.16.

Date:  March 6, 2018                    Attorney for Plaintiff CFTC


                                        /s/ Carlin R. Metzger
                                        (*Pro Hac Vice*)
                                        Commodity Futures Trading Commission
                                        525 W. Monroe St., Suite 1100
                                        Chicago, IL 60661
                                        (312) 596-0536
                                        cmetzger@cftc.gov

# CERTIFICATE OF SERVICE

I, Carlin Metzger, an attorney with the U.S. Commodity Futures Trading Commission, certify that I served the forgoing Reply in Support of the CFTC's Motion for a Preliminary Injunction upon counsel of record for Defendants via the Court's ECF system on March 6, 2018.

Date:  March 6, 2018

Attorney for Plaintiff CFTC

/s/ Carlin Metzger
Carlin Metzger
(*Pro Hac Vice*)
Commodity Futures Trading Commission
525 W. Monroe St., Suite 1100
Chicago, IL 60661
(312) 596-0536
cmetzger@cftc.gov