NEIL A. GOTEINER (State Bar No. 083524)
ngoteiner@fbm.com
C. BRANDON WISOFF (State Bar No. 121930)
bwisoff@fbm.com
ELIZABETH A. DORSI (State Bar No. 282285)
edorsi@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### (SOUTHERN DIVISION)

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MONEX DEPOSIT COMPANY, MONEX CREDIT COMPANY, NEWPORT SERVICES CORPORATION, MICHAEL CARABINI and LOUIS CARABINI,<br><br>Defendants. | Case No. 8:17-cv-01868-JVS-DFM<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**<br><br>The Hon.  James V. Selna<br>Courtroom: 10C<br>Date:   March 19, 2018<br>Time: 3:00 p.m. |

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

ARGUMENT ............................................................................................... 2

I.     THE RECORD PROVES BOTH THE CFTC'S LACK OF
       JURISDICTION AND ITS DUE PROCESS VIOLATIONS. ............... 2

       A.     The Statute And On-Point Final Guidance Control. ..................... 2

       B.     The CFTC's Own Complaint And Matters Subject To
              Judicial Notice Establish That Monex Makes "Actual
              Delivery." ............................................................................. 4

       C.     If Necessary To Resolve Jurisdiction, The Court Can
              Consider Matters Outside The Rule 12(b)(6) Record. ................. 8

       D.     The CFTC's Flip-Flop Violates Defendants' Due Process
              Rights. ................................................................................. 11

       E.     Congress Limited CEA §6(c)(1) To Fraudulent
              Manipulation That Potentially Impacts Market Prices But
              Did Not Take Back §2 Limitations On CFTC Authority
              Over Retail Transactions. ...................................................... 11

II.    THE CFTC's FRAUD ALLEGATIONS FAIL TO STATE A
       CLAIM. ...................................................................................... 19

III.   THE CFTC's ALLEGATIONS AGAINST THE INDIVIDUAL
       DEFENDANTS ARE INADEQUATE. ............................................. 20

# TABLE OF AUTHORITIES

**Page**

### Federal Court Cases

*Akhtar v. Burzynski,*
  384 F.3d 1193 (9th Cir. 2004) ................................................................. 19

*Am. Fed'n of Gov't Emps., Local 2782 v. FLRA,*
  702 F.2d 1183 (D.C. Cir. 1983) .............................................................. 16

*Anderson v. Angelone,*
  86 F.3d 932 (9th Cir. 1996) ...................................................................... 9

*CFTC v. American Precious Metals,*
  845 F. Supp. 2d 1279 (S.D. Fla. 2011) ............................................... 8, 18

*CFTC v. Commonwealth Fin. Grp., Inc.,*
  874 F. Supp. 1345 (S.D. Fla. 1994) ........................................................ 20

*CFTC v. Hunter Wise Commodities, LLC,*
  749 F.3d 967 (11th Cir. 2014) ......................................................... *passim*

*CFTC v. Kraft Foods Grp., Inc.,*
  153 F. Supp. 3d 996 (N.D. Ill. 2015) ..................................................... 12

*CFTC v. Monex Deposit Co.,*
  824 F.3d 690 (7th Cir. 2016) .................................................................... 5

*CFTC v. R.J. Fitzgerald & Co.,*
  310 F.3d 1321 (11th Cir. 2002) ......................................................... 19, 20

*CFTC v. White Pine Trust Corp.,*
  574 F.3d 1219, 1227 (9th Cir. 2009) ...................................................... 12

*CFTC v. Worth,*
  2014 WL 11350233 (S.D. Fla. Oct. 27, 2014) ................................. *passim*

*Chevron U.S.A. Inc. v. Nat. Res. Defense Council, Inc.,*
  467 U.S. 837 (1984) ............................................................................ 8, 18

*EEOC v. The Chicago Club,*
  86 F.3d 1423 (7th Cir. 1996) ............................................................. 9, 10

*FDA v. Brown & Williamson Tobacco Corp,*
  529 U.S. 120, 160 (2000) ....................................................................... 15

*Griffin v. Oceanic Contractors, Inc.,*
  458 U.S. 564 (1982) ............................................................................... 18

*I.N.S. v. Cardoza-Fonseca,*
   480 U.S. 421 (1987) ............................................................................18

*King v. Burwell,*
   135 S. Ct. 2480 (2015) ........................................................................18

*Kungys v. United States,*
   485 U.S. 759 (1988) ............................................................................16

*Pub. Citizen v. U.S. Dep't of Justice,*
   491 U.S. 440 (1989) ............................................................................13

*Radzanower v. Touche Ross & Co.,*
   426 U.S. 148 (1976) ............................................................................16

*Trustman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   1985 WL 28 (C.D. Cal. Jan. 24, 1985) ...............................................19

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd.,*
   484 U.S. 365 (1988) ............................................................................13

*Wasnick v. Refco, Inc.,*
   911 F.2d 345 (9th Cir. 1990) ..............................................................19

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ............................................................................15

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.,*
   550 U.S. 81 (2007) ..............................................................................18

### Federal Rules and Regulations

CEA
   CEA §2 ...................................................................................... *passim*
   CEA §2(c) ....................................................................................16, 18
   CEA §2(c)(2)(D)(ii) ...............................................................................12
   CEA §2(c)(2)(D)(ii)(III)(aa) ....................................................................2
   CEA §4 ......................................................................................11, 16
   CEA §6(c) .............................................................................................14
   CEA §6(c)(1) .............................................................................. *passim*

Fed. R. Civ. P.
   12(d) ........................................................................................................9

SEC
   §10(b) ...................................................................................... 1, 12, 14

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

The CFTC's complaint, and its opposition brief arguments, demonstrate a rogue agency effort to expand its jurisdiction through litigation-specific statute, rule and guidance interpretations that both: (1) vitiate clearly expressed Congressional intent, and (2) directly conflict with the CFTC's own prior public Guidance.  Indeed, the CFTC's position on "actual delivery" – that the exemption should not apply to a financed transaction where metals are held as collateral at a third-party depository – is the precise CFTC suggestion that Congress considered and rejected with the Dodd-Frank amendments.  The CFTC's further assertion that it is not trying to change its prior Guidance is false and contradicted by the CFTC's position in the *Worth* litigation.  And the CFTC alleges no increased risk from any "sham" factors.

The CFTC goes even further with its assertion that it has general fraud jurisdiction over Monex under CEA §6(c)(1) even if Monex makes "actual delivery." Congress' Dodd-Frank amendments to §6, entitled the "Derivative Market Manipulation Prevention Act of 2009," merely augmented the CFTC's established authority to combat fraud-based manipulation of markets, including cash commodity markets where such manipulation impacted transactions like futures contracts traditionally within the CFTC's jurisdiction.  Congress was explicit that it intended only to relax standards necessary to prove manipulation by incorporating less demanding SEC §10(b) anti-manipulation scienter and causation elements.  Congress did not, as all legislative statements demonstrate, expand  the CFTC's jurisdiction via §6(c)(1) to nationwide antifraud authority over each and every cash commodity sale in interstate commerce, irrespective of market/price impact on the futures markets within the CFTC's jurisdiction.  Yet the CFTC here still asserts authority over *every retail* commodity transaction whether cash, leveraged, margined or financed and whether for deferred or immediate delivery; it would thus have antifraud jurisdiction over ordinary, everyday cash transactions.  This is as rogue as it gets; the CFTC cannot through a litigation-specific agenda gain jurisdiction over Monex in defiance of

1   Congressional intent.

2          But even supposing that the CFTC had jurisdiction, its fraud and individual

3   control person allegations would nevertheless be deficient.  Similarly, the CFTC

4   cannot convert otherwise truthful or non-actionable statements into fraud by alleging

5   that Monex had a (non-existent) duty to disclose customer track records.  Nothing in

6   any firm-wide marketing or training gives rise to such a duty.  Further, the CFTC

7   presents none of the required Rule 9(b) details in its few anecdotal and individualized

8   unnamed customer allegations against unnamed account representatives who allegedly

9   made non-specific oral profit claims, contrary to Monex's robust written and oral risk

10  disclosures.

11                                  **ARGUMENT**

12  **I.     THE RECORD PROVES BOTH THE CFTC'S LACK OF**

13         **JURISDICTION AND ITS DUE PROCESS VIOLATIONS.**

14         **A.     The Statute And On-Point Final Guidance Control.**

15         Notwithstanding that the CFTC seeks to: (1) shut down Monex's Atlas

16  business, (2) freeze Monex's assets, and (3) appoint a monitor, the CFTC justifies

17  its failure even to mention the glaring "actual delivery" exemption because the lack

18  of CFTC jurisdiction is Monex's "affirmative defense."  CFTC's Opp. to Mot. to

19  Dismiss ("MTD Opp.") at 4-6 (Dkt. 164).

20         Pleading burdens aside, the complaint's utter silence on both the dispositive

21  statutory provisions – it doesn't mention the "actual delivery" exemption – and on

22  the CFTC's own public Guidance is emblematic of the CFTC's jurisdictional

23  overreaching, detached from fundamental law and facts.  Thus, the CFTC's

24  complaint makes no mention of the precise statutory provision on which the dispute

25  admittedly turns – CEA § 2(c)(2)(D)(ii)(III)(aa) – and which expressly exempts from

26  CFTC jurisdiction financed retail commodity transactions resulting in "actual

27  delivery" within 28 days.  The CFTC's complaint also makes no mention of the

28  CFTC's own 2011 Interpretation and Request for Comment, or its 2013 Final

1   Guidance, both of which provide unambiguously in on-point "Example 2" that

2   "Actual delivery *will have occurred* if, within 28 days, the seller has: (1) Physically

3   delivered the entire quantity of the commodity purchased by the buyer, including any

4   portion of the purchase made using leverage, margin, or financing, whether in

5   specifically segregated or fungible bulk form, into the possession of a

6   depository other than the seller and its . . . *affiliates* . . .; and (2) has transferred title

7   to that quantity of the commodity to the buyer."  Defs.' Req. for Judicial Not. in Opp.

8   to PI ("PI RJN"), Ex. 6 at 77672 (Dkt. 172); *id.*, Ex. 5 at 52428.  Even in its

9   preliminary injunction motion, where it argues vociferously that Monex makes no

10  "actual delivery," the CFTC buries the only mention of its on-point Final Guidance,

11  Example 2, in a footnote.  *See* Pl.'s Mem. ISO Mot. for Prelim. Inj. ("PI Mem.") at

12  22 n.22 (Dkt. 7.1).

13         Instead of relying on the relevant statutory provision and its own public

14  Guidance, the CFTC pushes its post Dodd-Frank "control and possession" notion

15  borrowed from the inapplicable *Hunter Wise* decision where no metals existed.

16  Indeed, as CFTC counsel in *Worth* admitted in open court, the CFTC is trying

17  through litigation to change its long-standing, publicly announced "actual delivery"

18  rules based only on its gross distortion of *Hunter Wise*.  *See* Defs.' Mot. to Dismiss

19  ("MTD") at 28-31 (discussing the CFTC's abrupt change of position following

20  *Hunter Wise* and quoting the CFTC's admissions in the *Worth* hearing transcript that

21  "all of the rules have changed" as a result of *Hunter Wise*).  The CFTC again alludes

22  to this improper agenda in its instant opposition, where it still touts and

23  mischaracterizes *Hunter Wise* and discusses the "series of enforcement actions" it is

24  now bringing against metals dealers.  MTD Opp. 1.  Importantly, however, the

25  CFTC's actual public Guidance has never changed, as the CFTC admits.  *See id.* 10.

26         Significantly, while the CFTC maintains that it need not plead a lack of "actual

27  delivery," it now argues strenuously that its complaint pleads abundant facts

28  defeating "actual delivery."  *Id.* at 6, 8 ("[T]he Complaint is devoted to facts showing

1   that Monex is operating a leveraged commodity trading platform that does not

2   involve the actual delivery of metals. . . . but instead at all times retains possession

3   and control over any metals associated with Atlas transactions.").  The record proves

4   the opposite as a matter of law.

### B.   The CFTC's Own Complaint And Matters Subject To Judicial Notice Establish That Monex Makes "Actual Delivery."

7        The CFTC's "hide the ball" approach to jurisdiction is unavailing because the

8   facts relevant to "actual delivery" are admitted or subject to judicial notice.

9   Regardless of who bears any pleading burdens, there is no dispute that Monex:

10  (1) delivers within 28 days to unaffiliated depositories in fungible bulk form the

11  financed metals purchased for its customers, and (2) transfers title of each customer's

12  quantity and type of metal to the customer, just as the CFTC's own Final Guidance,

13  that admittedly has never changed, approves.

14       Relying on *Hunter Wise*, the CFTC instead contends that Atlas delivery is a

15  sham because individual customers who have not yet paid off their loans do not have

16  physical "possession and control" of their metals stored at independent depositories.

17  MTD Opp. 7 ("[T]he transfer of title alone, without possession and control going to

18  the customer, is constructive and not 'actual' delivery.).  The CFTC contends that

19  "possession and control" – words which nowhere appear in the statute or in on-point

20  Example 2 of the CFTC's Final Guidance – requires that delivery be directly into the

21  customer's physical possession or to a depository chosen and contracted by the

22  customer.  *E.g.*, *id.*; Compl. ¶¶ 39-40.  The CFTC also contends that Monex's ability

23  to issue margin calls, and to liquidate the positions of customers who fail to meet

24  them, defeats the "possession and control" notion they now say is necessary for

25  "actual delivery."  *E.g.*, Compl. ¶¶ 32-33; MTD Opp. 7.

26       It is a question of law then for the Court to decide whether these alleged and

27  supposed "sham" factors defeat "actual delivery" by creating any risk to Atlas

28  customers that Congress stated it intended to eliminate.  The CFTC dispositively

alleges no such risk. The CFTC instead pushes its "possession and control" notion fabricated solely from its gross distortion of *Hunter Wise*. *See* MTD 20; Defs.' Opp. to Mot. for Prelim. Inj. ("PI Opp.") at 15 (Dkt. 166). The CFTC's new litigation-only definition of "actual delivery" directly contravenes the language of the statute, its legislative history and the CFTC's own prior Guidance. *See* MTD 20-21; PI Opp. 17. While Monex respectfully refers the Court to its prior briefing, a few points illustrate the pervasive fallacy of the CFTC's position:

1) *Hunter Wise* bears no resemblance to this case because the metals dealer there possessed no metals to deliver, but was instead a bucket shop that engaged in naked book-entry accounting of customer transactions. *See* MTD 22; *CFTC v. Monex Deposit Co.*, 824 F.3d 690, 694 (7th Cir. 2016). *Hunter Wise* was thus the paradigm of what Congress was attempting to stop with Dodd-Frank. PI RJN Ex. 1 (Subcommittee Hearing) at 12, 37-38; PI Opp. 11-12. *Hunter Wise* itself quoted with approval the CFTC's 2013 Final Guidance that expressly allows delivery, not just to the customer, but to any independent depository that is a non-affiliate of the seller. *See CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 980 (11th Cir. 2014); PI RJN Ex. 5 (Final Guidance) at 52429.

2) Monex, by contrast, admittedly delivers all financed customer metals to independent depositories and transfers title, but the CFTC now illogically insists contrary to its own Final Guidance that direct physical possession by the customer, even prior to loan repayment, is required. *See* MTD Opp. 7 ("[T]he transfer of title alone, without possession and control going to the customer, is constructive and not 'actual' delivery.").

3) The *Worth* court emphatically rejected the CFTC's post-*Hunter Wise* flip-flop to avoid its own Guidance and prior statements. *See CFTC v. Worth*, 2014 WL 11350233 (S.D. Fla. Oct. 27, 2014). It sensibly noted that the CFTC's post-*Hunter Wise* possession and control notion "would mean that, regardless of Worth's allocation procedures, recordkeeping, and whether it purchased physical metals at all,

each and every financed transaction would violate Dodd-Frank." *Id*. at *2; *see also* PI Opp. 18.

4) Congress explicitly used Monex as the model for the "actual delivery" exemption and the legislative record demonstrates that everyone, including the CFTC and the National Futures Association (both of which were at the 2009 Sub-Committee hearings), understood that Monex's Model Code-compliant delivery would be exempted. *See* PI RJN Ex. 1 at 17, 18-19, 31; PI Opp. 8.

5) The CFTC's own public Guidance twice directed the market to this very legislative history for the definition "actual delivery." *See* PI RJN Ex. 5 (Final Guidance) at 52428, Ex. 6 (Request for Comments) at 77671 n.12; PI Opp. 11.

6) The statute itself and its "actual delivery" exemption, as well as the CFTC's Final Guidance, expressly apply only to leveraged, margined or financed retail commodity transactions. By definition, financing implies loans. Loans imply terms; which in turn imply collateral, margin and liens. Margin implies margin calls and liquidations for failure to meet margin calls. Far from being sham factors, these are ordinary attributes of the exempted transactions. The CFTC would have the Court read the words "leveraged," "margined" and "financed" out of both the statute and its Final Guidance, and make it impossible as a practical matter for such transactions to occur, contrary to explicit Congressional intent. *See* PI Opp. 11.

7) The CFTC's Final Guidance expressly permits fungible bulk-form delivery to seller-unaffiliated depositories of metals purchased on a leveraged, margined or financed basis. In addition, fungible bulk-form delivery on behalf of a seller's customers collectively is impossible if each customer gets to choose his/her own depository. And delivery to a depository "other than the seller" and its affiliates, as expressly allowed in the Guidance, cannot sensibly mean delivery only to a customer directly or to a depository directly contracted by the customer. *See* MTD 20-25; PI RJN Ex. 5 at 52428; PI Opp. 14-15.

8) The CFTC's Final Guidance *expressly endorses* Model Code delivery as

generally fulfilling "actual delivery," and the Model Code in turn provides for
independent depository storage, financing, collateral and liens.  *See* PI Opp. 9, 15;
MTD 2-3.  It is extraordinary, indeed galling, that the CFTC would itself endorse
Model Code delivery in its Final Guidance and then posture in its present opposition
that: (1) the statute nowhere refers to Model Code delivery, and (2) the Supremacy
Clause thus trumps and preempts any such state law.  *See* MTD Opp. 8-9.  The
CFTC cannot tell the world in its public Guidance to look to Model Code delivery
for how to make "actual delivery" under the CEA and then reject it as inconsistent
with federal law.  *See* PI Opp. 24.

9) When enacting the statutory exemption, Congress itself specifically rejected
the CFTC's attempt to re-define "actual delivery" to preclude "delivery to a third
party in a financed transaction where the commodity is held as collateral."  Thus, the
CFTC improperly attempts here through litigation to achieve precisely what
Congress considered and then rejected.  *See* MTD 24 n.32; PI Opp. 12-13.  It is
difficult to imagine a more brazen attempt by a federal regulator to nullify
Congressional intent.

10) Indeed, the CFTC fails to allege, or anywhere to explain, how the
supposed sham factors it now advances against Monex create any risk, let alone the
risk that Congress sought to eliminate with its "actual delivery" exemption
requirement: namely, bucket shops and Ponzi schemers who possessed no metals to
deliver.  *See* PI RJN Ex. 1 (Subcommittee Hearing) at 12, 37-38; PI Opp. 18-22.

Against all of this, the CFTC stubbornly argues that its Final Guidance allows
it to consider factors such as ownership, possession, and location, and concludes that
those factors applied in this case show Monex's delivery to be a sham.  *See* MTD
Opp. 10.  But a plain application of those very factors to this case proves that Monex
delivers precisely as the CFTC says in Example 2 that "[a]ctual delivery will have
occurred."  Indeed, the CFTC explains in the Final Guidance that while the
Commission "will" determine that "actual delivery" has occurred under Example 2,

other delivery mechanisms "may" suffice as well.[1]  Far from limiting Example 2 delivery, the CFTC explains that notwithstanding Example 2's requirement that delivery be to a depository unaffiliated with the seller (consistent with Monex Atlas), it may under appropriate circumstances also allow delivery even to "an affiliate of the seller."  PI RJN Ex. 5 at 52427.  Yet, here is the CFTC telling the Court that Monex's delivery to unaffiliated depositories is not good enough and that Monex must instead deliver directly to the customer or a customer-contracted depository.

The CFTC through rogue regulatory action aims perversely to injure (and has injured) Monex, which Congress held out as the appropriate delivery model that it intended to apply with the Dodd-Frank amendments and its "actual delivery" exception.  Agencies have no statutory jurisdiction or standing to deploy complaints to contradict Congressional intent and to injure parties who do not present the risk against which Congress legislated.  Indeed, in *CFTC v. American Precious Metals*, 845 F. Supp. 2d 1279, 1287 (S.D. Fla. 2011), the court chastised three of these same CFTC Enforcement Division counsel for asserting litigation positions that were inconsistent with prior CFTC Guidance, holding that ***no** Chevron* deference is appropriate in these circumstances and dismissing the CFTC's complaint.

Because all of these dispositive facts are contained in CFTC's complaint without any allegation of risk, as admitted in the CFTC's opposition, or are subject to judicial notice, it is irrelevant who bears the burden to plead and prove jurisdiction or lack thereof.  The record proves as a matter of law that Monex makes "actual delivery" and that Atlas transactions are thus exempted from CFTC jurisdiction.

## C.   If Necessary To Resolve Jurisdiction, The Court Can Consider Matters Outside The Rule 12(b)(6) Record.

If the Court believes that Monex has the burden to defeat jurisdiction, and that

---

[1] "The Commission may also determine that actual delivery has occurred in circumstances beyond those described in the first two examples if it can readily determine within a reasonable period of time that the purported delivery is not simply a sham and that actual delivery has occurred within 28 days within the meaning of new CEA section."  PI RJN Ex. 5 at 52428.

1   the complaint and judicial notice facts are not sufficient, the Court can and should

2   convert this Rule 12(b)(6) motion to a Rule 56 summary judgment motion and

3   dismiss the case for lack of jurisdiction. Fed. R. Civ. P. 12(d); *Anderson v.*

4   *Angelone*, 86 F.3d 932, 934 (9th Cir. 1996). Because the CFTC convinced the Court

5   to hear the Rule 12 and preliminary injunction motions simultaneously, the Court

6   now has before it a robust evidentiary record that includes facts relevant to

7   jurisdiction. In addition, the CFTC has investigated Monex for almost 4 years to

8   establish jurisdictional facts to support its claims before filing this enforcement

9   action. It would therefore elevate form over substance to ignore the evidentiary

10  record, if the Court deems those facts necessary to its jurisdictional determinations.

11      The CFTC's own 30(b)(6) witness admitted the material jurisdictional facts

12  proving that Monex makes "actual delivery." *See* PI Opp. 15-16. His testimony also

13  demonstrated that the CFTC is through the admittedly non-controlling *Hunter Wise*

14  decision seeking to read the "actual delivery" exemption out of the statute; he could

15  not identify one financed dealer which complies with the CFTC's new, post-Final

16  Guidance and post-*Hunter Wise* definition of "actual delivery." *See id.* at 17-18 (and

17  testimony cited therein). His testimony was a booming echo of *Worth*'s observation

18  that the CFTC's post-*Hunter Wise* gambit would mean that "each and every financed

19  transaction would violate Dodd-Frank." *Worth*, 2014 WL 11350233, at *2.

20      In this context, the court's observations in *EEOC v. The Chicago Club*, 86

21  F.3d 1423 (7th Cir. 1996) – a case the CFTC seeks to distinguish on the now-

22  immaterial question of who bears the burden of pleading jurisdiction – are

23  compelling. The question there was whether defendant was a "private club" which

24  would be exempt from EEOC jurisdiction. Getting to the nub of the matter, the court

25  stated: "The simple fact is that if we were to endorse EEOC's eviscerating

26  interpretation of [the exclusion], no organization in the United States could meet the

27  statutory definition of a bona fide private membership club." *Id.* at 1425. The court

28  noted that the EEOC's position there, like the CFTC's position here, conflicted with

1  its own prior guidance, thus suggesting the agency had an agenda to expand its

2  regulatory jurisdiction by changing the rules of the game:

3  > EEOC spends a great deal of effort promulgating guidelines like the

4  > policy statement excerpted above, and it is curious that the EEOC

5  > affords it cursory reliance in a case in which it is directly applicable.

6  > This suggests EEOC's recognition that it had no proper basis going after

7  > the Club under its own established interpretation of [the relevant

8  > exclusion].  It can be concluded that the actual aim of this lawsuit was to

9  > change the rules of the game so as to facilitate EEOC's implementation

10 > of its ambitious agenda for oversight of private clubs under Title VII.

11 *Id.* at 1433.  The court then asked the million-dollar question proving the agency's

12 attempt to nullify the statutory exemption: "If the Chicago Club isn't a private club,

13 then what is?"  *Id.* at 1437.

14 The CFTC's 30(b)(6) witness was unable to answer that same dispositive

15 question here.  That, of course, is why the CFTC's complaint and preliminary

16 injunction Motion are silent on its own on-point Guidance but for a single footnote.

17 Even more extreme than in *Chicago Club*, is the open court admission of CFTC

18 counsel in *Worth* – that the CFTC has indeed changed its own definition of "actual

19 delivery" following *Hunter Wise*.  Then, compounding that admitted flip-flop, we

20 have CFTC counsel here telling the Court they are merely applying the plain and

21 ordinary definition of "actual delivery" that all along should have been apparent to

22 anyone.  *See* MTD Opp. 9-10.  That it was not apparent to the CFTC itself pre-

23 *Hunter Wise*, when they issued their still operative "Final" Guidance, makes *Chicago*

24 *Club*'s related observations painfully applicable as well: "we are also amazed by the

25 [federal agency's] adamant refusal to acknowledge at oral argument that it may have

26 overreached in this case. . . . In the process it has diminished its reputation and

27 needlessly squandered both its own resources and those of the federal courts."

28 *Chicago Club*, 86 F.3d at 1437.

Just as the EEOC in *Chicago Club* sought to expand its jurisdiction through litigation, the CFTC now sues Monex using its *Hunter Wise* misdirection to eliminate the jurisdictional exemption and re-exhume its proposed Dodd-Frank amendment that Congress rejected. *Compare* MTD 22, *and* PI Opp. 22, *with* MTD Opp. 1.

### D.    The CFTC's Flip-Flop Violates Defendants' Due Process Rights.

The CFTC's chutzpah in telling the Court that its Guidance should have put Monex on notice of its new "actual delivery" definition proves its denial of due process. *See* MTD Opp. 10.  Example 2 states that "Actual delivery *will have occurred*" by the very delivery that Monex: (1) admittedly does make, (2) was making when Congress used Monex as the model for "actual delivery" during the Dodd-Frank hearings with the CFTC present, and (3) has been making consistently for over 30 years.  The CFTC's bald assertion of  "sham" factors with no allegation of increased risk, reads the exemption out of the statute and achieves *de facto* the Congressionally-rejected CFTC definition of actual delivery.  The CFTC nevertheless tells this Court that their litigation definition is not "new," *id*. at 9, even though they told the federal court in *Worth* the exact opposite.  *See* MTD 30.  That denial of reality should end the inquiry and establish a clear due process violation.

### E.    Congress Limited CEA §6(c)(1) To Fraudulent Manipulation That Potentially Impacts Market Prices But Did Not Take Back §2 Limitations On CFTC Authority Over Retail Transactions.

Not content with eliminating the "actual delivery" jurisdictional exemption in CEA §2, the CFTC next claims Congress gave it plenary general antifraud authority over the entire national retail economy under CEA §6(c)(1).  *See* MTD Opp. 19-20 (arguing it has general fraud jurisdiction over each and every commodity sale in interstate commerce).  Congress, however, directed §6(c)(1) at fraud-based market manipulation, not at garden variety fraud in all retail transactions (which is instead specifically covered in CEA §4, as limited by §2 to leveraged retail transactions not resulting in actual delivery).  The CFTC plucks the words: "any manipulative or

deceptive device or contrivance" "in connection with . . . a contract for sale of a commodity, in interstate commerce" from §6(c)(1) out of context, and claims that this language "lends itself to no other meaning," than to exponentially expand the CFTC's jurisdiction from a narrow class of transactions which §2 specifically defines (such as certain futures and options contracts) to embrace general fraud jurisdiction over all commodities in American commerce.  MTD Opp. 20.  But, even the one §6(c)(1) decision on which the CFTC relies (*id*. 20:3-6) rejected the CFTC's "plain meaning" interpretation, and held that "manipulative or deceptive" must be read as "deceptive" modifying "manipulative."  *CFTC v. Kraft Foods Grp., Inc*., 153 F. Supp. 3d 996, 1010 (N.D. Ill. 2015) (discussed in Defendants' PI Opp. at 31).  Further *Kraft* never endorsed the CFTC's reading that §6(c)(1) incorporates wholesale all of SEC §10(b) customer fraud law, beyond anti-manipulation doctrine; indeed, *Kraft* itself was only a manipulation case.

Section 6(c)(1), like any statutory provision, must be sensibly read in conjunction with the statute as a whole.  To begin with, CFTC jurisdiction comes from CEA §2, not from §6(c)(1) by itself.  *CFTC v. White Pine Trust Corp*. 574 F.3d 1219, 1223, 1227 (9th Cir. 2009); discussed in PI Opp. 25-26.  When Congress as part of the Dodd Frank amendments (§741) overruled *White Pine*'s result of no jurisdiction over pooled foreign currency transactions, Congress' legislative fix was to amend CEA §2 to include CFTC jurisdiction over those transactions.  RJN Ex. 2 at S5924.  This Congressional Dodd Frank fix confirms *White Pine*'s controlling holding here that it is CEA §2 that gives the CFTC its jurisdiction and that all substantive provisions must be read in conjunction with, not as overriding, §2 jurisdiction limits.  Congress' action leaves no room for the CFTC either to search for jurisdiction in §6(c)(1), or alternatively to claim that the CEA must, in addition to the  §2(c)(2)(D)(ii) jurisdiction exemption, somewhere else in the CEA superfluously exempt Atlas from jurisdiction.  *Compare with* MTD Opp. 20:14-21:15.[2]

---

[2] Cash transactions were already, and always, outside the Commission's

Section 6(c)(1) must also be read in conjunction with the other simultaneously enacted Dodd-Frank amendments,[3] and with a view to its legislative context, in order to avoid absurd results.[4]  The context of the §6(c)(1) amendments was the unprecedented 2008 collapse of financial markets based on rampant, fraudulently-manipulative schemes in derivatives and swaps which the CFTC has always regulated.  *See* Reply RJN Ex. 1 at S9557-59 (Sen. Cantwell).  All reported contemporaneous discussion of §6(c)(1), both in Congress when Dodd-Frank was enacted and with the Commission during rulemaking, focused on such fraudulent manipulation schemes that had the potential to impact the integrity and prices of the commodity markets over which the CFTC already had §2 jurisdiction.  While §2 did not specifically cover cash markets, courts traditionally read it to give the CFTC limited jurisdiction over cash market transactions where manipulation of the cash markets also impacted futures markets and prices.  *See* PI Opp. 29, n.27 (citing authorities).  The §6(c)(1) Dodd-Frank amendments were meant only to "augment" the CFTC's "existing authority" over such schemes by lowering proof standards to prove actual market or price effects against market manipulators.  *Id*. at 29.

Indeed, the title of the §6 amendment itself is "Derivative Market Manipulation Prevention Act of 2009."  RJN Ex. 1 at S9557.  The title of subsection (c)(1), the specific section at issue here, is "Prohibition Regarding Market

---

jurisdiction, except when used to manipulate futures prices.  PI Opp. 29 n.27.  The new Dodd Frank §2(c)(2)(D) was a limited carve out from the long established CEA's lack of jurisdiction over cash transactions.  Actual delivery within 28 days was therefore the carve out from the carve out; nothing more is necessary.

[3] Sections of the same statute, particularly when passed at the same time, must be read consistently with one another.  *See, e.g.*, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 371 (1988) ("[s]tatutory construction . . . is a holistic endeavor").

[4] *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 455 (1989) ("Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention, since the plain-meaning rule is 'rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.'").

1   Manipulation." *Id.*  When Senator Cantwell introduced the bill in the Senate on

2   September 17, 2009, she made clear two points.  **First**, Congress was not attempting

3   with the amendment to police ordinary consumer fraud, but to catch those bad actors

4   manipulating commodity prices and markets essential to the American economy.

5   Thus, Senator Cantwell, described how: "when bad actors like Enron and Amaranth

6   Advisors, LLC, manipulate commodities prices, it means that Americans pay more

7   for commodities like oil, gasoline, heating oil, food and natural gas." *Id.*  Congress

8   borrowed from the SEC's anti-manipulation doctrine to catch "***only those*** who

9   attempt to affect the market or prices by artificial means unrelated to the natural

10  forces of supply and demand." *Id.* (emphasis added); *see also* PI RJN Ex. 4 at S3348

11  (Sen. Cantwell, introducing §753) (using same language in 2010 ); *id.*

12  ("Unfortunately, current law does not protect our economy with a tough enough

13  standard to prevent, deter, and enforce illegal market manipulation ***in critical***

14  ***commodity futures markets***." (emphasis added)).

15      **Second**, Congress' incorporation of SEC §10(b) language into CEA §6(c)(1)

16  was meant only to reduce the CFTC's burden of proving manipulation scienter and

17  impact in commodities markets already subject to the CFTC's jurisdiction, not to

18  wholesale create a new CFTC mission to cover every retail fraud in those cash

19  commodity markets which had always been outside the CFTC's jurisdiction except

20  in the limited manipulation context where futures prices were also affected.  *See* RJN

21  Ex. 1 at S9557 (noting the amendment gives "the CFTC the same anti-manipulation

22  standard currently employed by the SEC," meaning the "recklessness" standard that

23  courts use under §10(b) of the Securities Exchange Act); PI RJN Ex. 4 at S3348

24  (noting it was important to have a strong "law on the books against manipulation.").

25  Thus, Congress was not delegating to the CFTC plenary SEC §10(b) securities

26  investor fraud authority, but only anti-manipulation authority: "I hope my colleagues

27  will support this strong anti-manipulation standard being inserted into the

28  Commodity Exchange Act."  PI RJN Ex. 4 at S3348.  Thus, Congress did not insert

into §6(c) other SEC §10(b) provisions or analogies that were not necessary to address the CFTC's traditional anti-market manipulation authority.[5]  To underline Congress' historical anti-manipulation precedents and now Congress' anti-manipulation focus on the CEA, Senator Cantwell noted that the Energy Policy Act granted the "same anti-manipulation authority to [FERC] . . . as a result of the Enron market manipulation . . . [and resulted in FERC using] its authority to conduct 135 investigations [including] enforcement actions against manipulation, one against Amaranth for $291 million." *Id.*

Nothing then supports the CFTC's view that Congress was delegating to the CFTC wide ranging authority to enforce its general anti-fraud Rules and theories against tens of millions of individual participants in all commodity markets, big and small, covering billions of dollars in daily transactions from grocery stores to pawn shops.  This has never been the CFTC's futures and derivative enforcement/ regulation mission.  Such an historical increase in an agency's authority would require clear Congressional statements,[6] in contrast to the CFTC's notion of Congress expanding agency delegation through wished for subtexts.[7]

Nor does §6(c)(1) or its legislative history suggest a Congressional intent to nullify the very limitations on CFTC jurisdiction over retail commodity transactions that Congress had just simultaneously enacted in CEA §2.  *See* PI Opp. 26.  Yet, the

_____

[5] Senator Lincoln introduced materials to the Senate Record explaining Dodd Frank §753: "Importantly, this new enforcement authority . . . supplements, and does not supplant, its existing anti-manipulation authority[.]"  RJN Ex. 2 at S5924.  It "re-formats CEA Section 6(c), which is where the new anti-manipulation authority is placed" – changes were "not to effect substantive changes to these provisions."  *Id.*

[6] *FDA v. Brown & Williamson Tobacco Corp*,  529 U.S. 120, 126, 160 (2000) (noting Congress' long history of not granting the FDA explicit powers to regulate tobacco constituted evidence that it did not intend to do so: "We are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion").

[7] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes.").

CFTC asserts here that – notwithstanding Congress' limited "*Zelener* fix" delegation of CFTC authority over certain deferred-delivery financed retail commodity transactions in §2 – Congress really intended with §6(c)(1) to delegate to the CFTC authority over each and every retail commodity transaction, not only for limited anti-manipulation purposes as Congress repeatedly and carefully delineated, but for ordinary sales fraud and enforcement purposes nowhere suggested in the legislative history. The CFTC is as wrong here as it is in its strawman argument that Defendants oppose the CFTC's jurisdiction over cash markets. MTD Opp. 23:16-33. Defendants agree that the CFTC has Congressionally delineated jurisdiction over cash markets for the sole purpose of stopping market and price manipulation which impacts futures markets. *Compare* p.12-13 above and fn.2, citing to MTD.

The CFTC's current litigation-specific reading of §6(c)(1) would also impermissibly render CEA §4's customer fraud provisions superfluous, since §6(c)(1) would, as the CFTC reads it, already prohibit CEA §4 fraudulent conduct, but in broad terms when contrasted with CEA §4's specificity. *See Kungys v. United States*, 485 U.S. 759, 778 (1988) (Scalia, J., plurality opinion) (it is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant"). The CFTC's reading would then also violate the statutory maxim that specific statutory provisions, such as the precise §2(c) exemption, control the more general §6(c)(1), and not the other way around. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."[8]

Unable to fashion a §6(c)(1) statutory or policy interpretation to justify its grab for all retail commodity transactions irrespective of any potential for market price manipulation, the CFTC myopically focuses on footnote 37 of its Rule 180.1. The

---

[8] *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) (discussed at MTD 26); *Am. Fed'n of Gov't Emps., Local 2782 v. FLRA*, 702 F.2d 1183, 1187 (D.C. Cir. 1983) (noting that where an agency's interpretation would deprive a statutory provision of virtually all effect, a court should not affirm the agency's interpretation absent "legislative history of exceptional clarity").

1    CFTC asserts that this footnote supports its jurisdictional claim here, although the

2    footnote only suggests a possible fraud action against a metals selling "entity" under

3    explicitly undefined circumstances.  *See* MTD Opp. 23.  The CFTC conveniently

4    ignores the text to which footnote 37 is directly appended, and which actually defines

5    and controls the circumstances where the CFTC will apply Rule 180.1.  The CFTC

6    wrote this text in response to market participants' expressed fears that the CFTC

7    might try to use Rule 180.1 to expand its authority over "virtually every commercial

8    transaction in the economy."  RJN Ex. 3 at 41401.  The CFTC assured the

9    marketplace to the contrary – that "although" the statute and Rule reads broadly:

10           [T]he Commission expects to exercise its authority under 6(c)(1) to

11           cover transactions related to the futures or swaps markets, or prices of

12           commodities in interstate commerce, or where the fraud or manipulation

13           has the potential to affect cash commodity, futures, or swaps markets or

14           participants in these markets.

15    *Id.* (Rule 180.1).  The Commission also referred to subsection G of the rules, which

16    said that "in connection with" means in connection with futures contracts.  *Id*. at

17    41406.  The CFTC itself thus announced that §6(c)(1)'s reach to commodities in

18    interstate commerce is tethered to deceptive schemes having the potential to

19    manipulate commodity markets and prices.

20           This text then makes nonsensical the CFTC's litigation-only suggestion that

21    Rule 180.1 or its footnote 37 could ever reach Monex, whose Atlas transactions

22    between Monex and customers obviously could not affect futures markets or

23    commodity prices.  In contrast, there are fraudsters such as the notorious Hunt

24    brothers, whose manipulation of cash transactions can and do have the potential to

25    affect futures markets and who thus come squarely within Congress' intention in

26    §6(c)(1) to augment the CFTC's anti-manipulation tools.  It is these types of

27    transactions and bad actors to which footnote 37, with its explanatory text, logically

28    refer.  So the CFTC did not apparently then in 2013 read the statute or its Rule 180.1

n.37 the way it now asserts to impermissibly expand CFTC jurisdiction.  But it is nonetheless now doing precisely what it assured the market it would not do: assert authority over every commodity sale in interstate commerce.  If the CFTC secretly intended in footnote 37 to do other than what the text stated, it was doubly misleading the market and Congress regarding both §6(c)(1)'s focus on market manipulators, and Congress' §2(c) exemption of Atlas-modeled financed retailers.

Thus, and also contrary to its assertions, the CFTC is entitled to no *Chevron* deference.  Even supposing charitably the CFTC's "plain reading" view of §6(c)(1), the CFTC's position would lead to patently absurd results contrary to Congressional intent.  *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) (if literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, those intentions must be controlling); *Chevron U.S.A. Inc. v. Nat. Res. Defense Council, Inc.,* 467 U.S. 837, 843 n.9 (1984).[9]  This is especially true where, as here, the CFTC's own prior interpretation in its Rule tells the world that §6(c)(1) and Rule 180.1 are directed at potential market manipulation frauds and schemes.[10]

Indeed, the very Congressional rulemaking delegation that the CFTC says proves its point, in fact demonstrates the exact opposite.  Thus, the CFTC claims that the only limit on its rulemaking under §6 is irrelevant:  a prohibition against any requirement that market participants disclose any "nonpublic information that may be material to the ***market price, rate or level*** of the commodity transaction[.]"  MTD Opp. 22-23 & n.7 (emphasis added).  Far from irrelevant, this very language illustrates Congress' understanding that the statute addresses potential market

---

[9] *See Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 105 (2007) (Stevens, J. concurring) (finding clear intent in legislative history where "legislative history is pellucidly clear and the statutory text is difficult to fathom"); *King v. Burwell*, 135 S. Ct. 2480, 2495 (2015) (no *Chevron* deference where interpretation inconsistent with Congressional intent with deep political implications).

[10] *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." (internal quotations omitted));  *Am. Precious Metals*, 845 F. Supp. 2d at 1287.

manipulations and frauds involving the prices, rates and levels of commodities. Congress, in its limited rulemaking delegation was concerned that the CFTC not go too far by requiring disclosure of nonpublic information even if withholding such information might have those very market impacts. But the CFTC goes much farther here, claiming to regulate the entire retail economy for all cash commodity transactions regardless of any impact or potential impact on futures prices or other §2 covered transactions. This type of breathtaking jurisdictional expansion goes beyond any notion of unfair surprise; it illustrates the CFTC's litigation-specific objective to expand its reach beyond Congress' delegation.[11]

## II.    THE CFTC's FRAUD ALLEGATIONS FAIL TO STATE A CLAIM.

The CFTC complains primarily about Monex's cost structure, about commissions that incentivize sales, about how customers are not qualified investors and how sales training exhorts sales persons to sell. None of this is unlawful. Its complaint neither challenges Monex's disclosure of costs and trading risks, nor suggests any suitability rule for financed commodity sales – there is no such rule.[12]

The CFTC instead tries to make fraudulent perfectly lawful statements about secure depository storage by contending that most customers lose, which alleged track record Monex thus had a duty to disclose. But none of the challenged firm-wide marketing materials or training comes close to the kind of unbalanced presentation that the split panel in *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1332 (11th Cir. 2002), found could give rise to such a disclosure duty. There defendants hyped in uniform presentations that the market was "ripe for 'huge' profits of '200-300 percent,'" based on the claimed inevitability of El Nino, with

---

[11] *See Akhtar v. Burzynski*, 384 F.3d 1193, 1202 (9th Cir. 2004) (denying *Chevron* deference to an agency's construction because it was contrary to congressional policy and would frustrate congressional intent).

[12] *Wasnick v. Refco, Inc.*, 911 F.2d 345, 348 (9th Cir. 1990) ("[T]here is no suitability rule under the Commodity Exchange Act."); *Trustman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1985 WL 28 (C.D. Cal. Jan. 24, 1985) ("no rule of suitability governs the commodity broker-customer relationship").

only generic risk disclosure and claims of a "limited risk" option contract, and with plenty of regulatory notice to defendants concerning their unbalanced presentation. *Id.* at 1333-34. Even with those extreme facts, the majority decision provoked a vigorous dissent that took the majority to task for inventing track record disclosure requirements. *Id.* at 1346 (Wilson, J., dissenting) ("This is not a case where the APs misrepresented the firm's track record or lied about successes in the past."). Here in contrast to *Fitzgerald*, the CFTC's puffing-type allegations pale in comparison to Monex's robust and repeated risk disclosures summarized at MTD 7-8. *See also* PI Opp. 38; *CFTC v. Commonwealth Fin. Grp., Inc.*, 874 F. Supp. 1345, 1353 n.10 (S.D. Fla. 1994) (noting that CFTC did not argue defendants' "salespeople are required to inform customers of losses" and agreeing that they are not, absent emphasis on profits).

Lacking any firm-wide touting of inevitable profits or past customer successes, the CFTC's conclusory allegations of a few individualized anonymous customer-account representatives relationships cannot salvage a preliminary injunction and freeze complaint under Rule 9(b).

## III.   THE CFTC's ALLEGATIONS AGAINST THE INDIVIDUAL DEFENDANTS ARE INADEQUATE.

Because the CFTC has no jurisdiction and has failed to allege an actionable fraud by Monex, the claims against the individual defendants necessarily fail. Additionally, nothing the CFTC says in it opposition cures the wholly deficient allegations against the individuals. Indeed, if the allegations the CFTC asserts against the individuals here were sufficient, then any owner would always be individually responsible for alleged frauds by the company. That is not the law.

Dated:  March 6, 2018                    Respectfully submitted,

                                         FARELLA BRAUN + MARTEL LLP

                                         By:  _____/s/ Neil A. Goteiner_____
                                                     Neil A. Goteiner
                                         Attorneys for Defendants