UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  SACV 17-01868 JVS (DFMx)  Date  May 1, 2018

Title  Commodity Futures Trading Commission v. Monex Credit Company, et al.

Present: The Honorable  James V. Selna

Karla J. Tunis — Deputy Clerk
Not Present — Court Reporter

Attorneys Present for Plaintiffs:  Not Present
Attorneys Present for Defendants:  Not Present

**Proceedings:**  (IN CHAMBERS)  **(Corrected May 17, 2018)**
Order Granting Defendants' Motion to Dismiss;
Denying Plaintiff's Motion for Preliminary Injunction as Moot; and
Denying Defendant's Motion to Exclude CFTC's Expert Report of Dr. Robert D. Salvaggio as Moot

Before the Court are three motions.

First, Defendants Monex Deposit Company, Monex Credit Company, Newport Services Corporation (collectively, "Monex"), Michael Carabini, and Louis Carabini (the "Individual Defendants" and, with Monex, "Defendants") move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) Plaintiff Commodity Futures Trading Commission's ("CFTC") Complaint.  (Notice of Motion to Dismiss ("MTD"), Docket No. 40; Mem. re MTD, Docket No. 41-1.)  The CFTC filed an opposition.  (Opp'n to MTD, Docket No. 164.)  Defendants filed a reply.  (Reply re MTD, Docket No. 180.)

For the following reasons, the Court **grants** the motion to dismiss.

Second, the CFTC filed a motion for preliminary injunction pursuant to § 6c(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 13a-1(a).  (Mot. for Preliminary Injunction ("PI"), Docket No. 6.)  Defendants opposed.  (Opp'n to Mot. for PI, Docket No. 166.)  The CFTC replied.  (Reply re Mot. for PI, Docket No. 177.)

For the following reasons, the Court **denies** the motion for preliminary injunction as moot.

Third, Defendants filed a motion to exclude the evidence of the CFTC's expert Dr.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

Robert D. Selvaggio pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). (Motion to Exclude ("MTE"), Docket No. 154.) The CFTC opposed. (Opp'n to MTE, Docket No. 165.) Defendants replied. (Reply re MTE, Docket No. 175.)

For the following reasons, the Court **denies** the motion to exclude as moot.

## I. Background

The CFTC alleges the following facts. Monex, located in Newport Beach, California, offers retail customers two type of transactions. (Compl., Docket No. 1 ¶¶ 14, 24.) Through the first type, which is not at issue in this case, retail customers pay full price for precious metals. (Id. ¶ 24.) Through the second type, called the Atlas program, Monex offers precious metals on a leveraged, margined, or financed basis: retail customers purchase precious metals by only paying a portion of the purchase price, and the balance is financed. (Id.) Customers with Atlas trading accounts may take open positions in precious metals, but the trading does not take place on a regulated exchange or board of trade. (Id. ¶ 25.) Monex acts as the counterparty to every transaction and sets the price for every trade. (Id. ¶¶ 25, 34.)

When Atlas customers trade "on leverage" or "on margin," Monex finances a portion of their trading positions. (Id. ¶ 28.) Monex requires that Atlas customers deposit funds to serve as margin for open trading positions in their trading accounts, generally 22-25% of the value of the trading account's open positions. (Id.) If equity in a customer's trading account declines to Monex's "call" level, Monex can issue a margin call and require its customer to immediately deposit additional funds. (Id. ¶ 31.) Monex can change its margin requirements at any time in its sole discretion. (Id.) Trading positions can be liquidated without notice in "forced liquidations." (Id. ¶ 32.) Monex automatically liquidates trading positions if a customer's account equity falls to 7% and can also liquidate a customer's trading position at any time in its sole discretion. (Id.)

Atlas customers must sign an Atlas account agreement.[1] (Id. ¶ 38.) Atlas

---

[1] Exhibits to a complaint are considered part of the complaint for purposes of a Rule 12(b)(6) motion. Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

customers with open trading positions do not take physical delivery of the metals. (Id. ¶ 39.) The metals are stored in depositories, subject to contracts between Monex and the depositories. (Id.) Atlas customers may only get physical possession of the metal if they make full payment, request actual delivery of specific physical metals, and have Monex ship the metals to them, a pick-up location, or the customer's agent. (Id. ¶ 40.) When an Atlas customer opens a long position, Monex transfers the customer ownership of all the metals underlying his position. (Id. ¶ 41.) The CFTC asserts that this transfer is just a book-entry in Monex's records because it can close out the customer's position at any time in its sole discretion, at a price of its choosing, and without notice. (Id.) When customers open a short position, Monex claims that it loans the customer metals that the customer immediately sells back to Monex. (Id. ¶ 42.) The CFTC also argues that this purported transfer is just a book-entry in Monex's records. (Id.)

The CFTC filed suit against Defendants alleging four causes of action for (1) off-

---

Documents not physically attached to the complaint may nonetheless be considered on a Rule 12(b)(6) motion if the complaint refers to the document, the document is central to the plaintiff's claim, and no party questions the authenticity of the copy attached to the motion to dismiss. Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds by Galbraith v. Cty. of Santa Clara, 307 F.3d 1119, 1127 (9th Cir. 2002). This "incorporation by reference" doctrine allows courts to look beyond the pleadings without converting the Rule 12(b)(6) motion into a motion for summary judgment. See Knievel v. ESPN, 393 F.3d 1068, 1076–77 (9th Cir. 2005). Though the Atlas account agreement is not attached to the Complaint or the motion to dismiss, it is attached to the motion for preliminary injunction. (See Declaration of Jeffrey Gomberg ("Gomberg Decl."), Docket No. 8-2, Ex. 14.) Monex filed an evidentiary objection to the agreement based on the Declarant's purported failure to authenticate the agreement in the declaration, but did not otherwise contest the authenticity of the agreement. (Docket No. 171 ¶ 3.) Therefore, the Court can consider the agreement without converting the motion to dismiss into a motion for summary judgment.

The agreement provides that "Borrower hereby grants to [Monex Credit Company ('MCC')] a security interest in: (a) all commodities belonging to Borrower and held for Borrower by Farmers and Merchants Bank of Long Beach, California, Delaware Depository Service Company, LLC, Wilmington, Delaware or any other bailee or bailees substituted by MCC (such bailees are hereinafter referred to individually and collectively as 'Bank'), either directly or in other depositories; (b) all commodities or contractual rights in which Borrower has an interest which shall hereafter be delivered to or come into the possession, custody or control of Bank, [Monex Deposit Company ('MDC')] or MCC in any manner or for any purpose; (c) all cash deposited with MCC or MDC by or for Borrower; and (d) all Borrower's accounts and debts with MCC. Bank may hold or transfer such property (the 'Collateral') to any facility within its control." (Gomberg Decl., Docket No. 8-2, Ex. 14 at 22.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

exchange transactions in violation of CEA § 4(a), 7 U.S.C. § 6(a); (2) fraud in violation of CEA § 4b(a)(2)(A), 7 U.S.C. § 6b(a)(2)(A), (C); (3) fraud in violation of CEA § 6(c)(1) and Regulation 180.1(a)(1)–(3), 7 U.S.C. § 9(1) and 17 C.F.R. § 180(a)(1)–(3); and (4) violation of CEA § 4d, 7 U.S.C. § 6d, for failure to register with respect to financed transactions.

## II. DISCUSSION

### A. Motion to dismiss pursuant to Rule 12(b)(6)

#### 1. Legal Standard

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In resolving a Rule 12(b)(6) motion under Twombly, the Court must follow a two-pronged approach. First, the Court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Second, assuming the veracity of well-pleaded factual allegations, the Court must "determine whether they plausibly give rise to an entitlement to relief." Id. at 679. This determination is context-specific, requiring the Court to draw on its experience and common sense, but there is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id. For purposes of ruling on a Rule 12(b)(6) motion, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008). However, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    SACV 17-01868 JVS (DFMx)                               Date    May 1, 2018

Title    Commodity Futures Trading Commission v. Monex Credit Company, et al.

Under Federal Rule of Civil Procedure 9(b), a plaintiff must plead each element of a fraud claim with particularity, *i.e.*, the plaintiff "must set forth *more* than the neutral facts necessary to identify the transaction." Cooper v. Pickett, 137 F.3d 616, 625 (9th Cir. 1997) (emphasis in original) (quoting In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994)). A fraud claim must be accompanied by "the who, what, when, where, and how" of the fraudulent conduct charged. Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting Cooper, 137 F.3d at 627). "A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir. 1989). Statements of the time, place, and nature of the alleged fraudulent activities are sufficient, but mere conclusory allegations of fraud are not. Id.

        2.      The Actual Delivery Exception

The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 742, 124 Stat. 1376 (2010) ("Dodd-Frank"), expanded the enforcement authority of the CFTC. CFTC v. Hunter Wise Commodities, LLC, 749 F.3d 967, 970 (11th Cir. 2014). Relevant to the present action, Dodd-Frank added CEA § 2(c)(2)(D) (the "Retail Commodity Provision"), which extended the scope of CEA §§ 4(a), 4(b), and 4b to apply to covered "retail commodity transactions," as if they were contracts of sale of a commodity for future delivery, unless the transactions resulted in "actual delivery" within 28 days (the "Actual Delivery Exception"). 7 U.S.C. § 2(c)(D); CFTC v. Worth Grp., Inc., No. 13-80796-CIV, 2014 WL 11350233, at *1 (S.D. Fla. Oct. 27, 2014). Only retail commodity transactions "entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis" fall within this authority. 7 U.S.C. § 2(c)(2)(D)(i)(II). The CEA does not otherwise define the term "actual delivery" in the statute. Worth, 2014 WL 11350233, at *1; Hunter Wise, 749 F.3d at 978 (citing 7 U.S.C. § 1(a)).

Defendants argue that the CFTC lacks regulatory jurisdiction over this case pursuant to the Actual Delivery Exception.[2] (Mem. re MTD, Docket No. 41-1 at 20.)

---

    [2] The parties debate whether the Exception is an exception or an exclusion. The CFTC argues that it is an exception to its jurisdiction and, therefore, Defendants bear the burden of establishing that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

Relying on the CFTC's own final interpretation of the Exception, see Retail Commodity Transactions Under Commodity Exch. Act, 78 Fed. Reg. 52426 (Aug. 23, 2013), and the Eleventh Circuit's construction of "actual delivery," see Hunter Wise, 749 F.3d at 978, Defendants argue that "leveraged precious metals transactions fall *outside* of the scope of the CFTC's authority if: (1) they result in the physical delivery of the purchased metals to an independent depository; and (2) the seller has transferred title to all purchased metals (including leveraged metals) to the customer." (Mem. re MTD, Docket No. 41-1 at 23 (emphasis in original).) Also relying on Hunter Wise, the CFTC argues that "actual delivery" only occurs once there has been a transfer of possession of and control over the purchased commodities. (Opp'n to MTD, Docket No. 164 at 6.)

The Eleventh Circuit is the only circuit to have analyzed the meaning of "actual delivery" in the context of the Exception. Applying the "ordinary meaning of the term," the court defined "delivery" to mean "'[t]he formal act of transferring something'; it denotes a transfer of possession and control." Hunter Wise, 749 F.3d at 978 (quoting Black's Law Dictionary 494 (9th ed. 2009)). Further, it concluded that "'[a]ctual delivery' denotes '[t]he act of giving real and immediate possession to the buyer or the buyer's agent.' 'Actual' is that which 'exist[s] in fact' and is 'real,' rather than constructive." Id. at 979 (citations omitted). The court's holding does not require that a buyer take actual possession and control of the purchased commodities; it requires instead that the possession and control of commodities that exist in fact be transferred from the seller. Id. ("If 'actual delivery' means anything, it means something other than simply 'delivery.'"). But the court did not "define the precise boundaries of 'actual delivery'" because it found that the Exception clearly did not apply to the "sort of constructive delivery" at issue in the case. Id. The defendant in Hunter Wise "did not own a sufficient inventory of metals to cover its liabilities to the retail customers." Id. at 979–80. Rather than possessing or controlling an inventory of metals from which it could deliver purchased metals to retail customers, the defendant had margin trading accounts with its suppliers that were subject to minimum margin requirements and margin calls. Id. at 980. Accordingly, the court found that the defendant had nothing to

---

the exception applies. (Opp'n to MTD, Docket No. 164 at 4–6.) Defendants argue that it is an exclusion, meaning that the CFTC bears the burden of proving that the exception does not apply. (Mem. re MTD, Docket No. 41-1 at 24–25.) The Court declines to resolve this argument because, regardless of who bears the burden, Defendants show that the Actual Delivery Exception precludes the application of §§ 4, 4b, and 4d to Defendants' conduct.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

deliver, actually or constructively. Id. at 979.

Defendants argue that the CFTC's own interpretation does not require physical delivery to the customer. (Mem. re MTD, Docket No. 41-1 at 21.) On December 14, 2011, the CFTC issued an interpretation and request for public comments regarding the meaning of "actual delivery." Retail Commodity Transactions Under Commodity Exch. Act, 76 Fed. Reg. 77670 (Dec. 14, 2011). The CFTC indicated that it would consider "ownership, possession, title, and physical location of the commodity purchased or sold, both before and after execution of the agreement, contract, or transaction; the nature of the relationship between the buyer, seller, and possessor of the commodity purchased or sold; and the manner in which the purchase or sale is recorded and completed" to determine whether actual delivery had occurred. Id. at 77672. By way of example, the CFTC provided that "[a]ctual delivery will have occurred if, within 28 days, the seller has physically delivered the entire quantity of the commodity purchased by the buyer, including any portion of the purchase made using leverage, margin, or financing, whether in specifically segregated or fungible bulk form, into the possession of a depository other than the seller and its parent company, partners, agents, and other affiliates." Id. Additionally, the CFTC stated that "an agreement, contract, or transaction that results in 'physical delivery' within the meaning of section 1.04(a)(2)(i)-(iii) of the Model State Commodity Code ["Model Code"[3]] would ordinarily result in 'actual delivery' under new CEA section 2(c)(2)(D)(ii)(III)(aa), absent other evidence indicating that the purported delivery is a sham." Id. at 77672 n.25. The factors and the example were adopted by the CFTC in its final interpretation issued in 2013. 78 Fed. Reg. at 52428. Though the Eleventh Circuit did not rely on the final interpretation in construing "actual delivery," it found that the CFTC's guidance comported with its construction of the term. Hunter Wise, 749 F.3d at 980.

The CFTC argues that Monex's alleged conduct does not fall within the example provided in its own interpretation because the purported delivery is a "sham." (Opp'n to MTD, Docket No. 164 at 11.) It argues that the Complaint alleges the following facts

---

[3] Under the Model Code, physical delivery "shall be deemed to have occurred if, within the 28-day period, the quantity of precious metals or foreign currencies purchased by the full or partial payment is actually physically delivered (whether in specifically segregated or fungible bulk form) into the possession of a depository (other than the seller)." Cal. Corp. Code § 29531(b) (California's enactment of the Model Code).

Case 8:17-cv-01868-JVS-DFM Document 195 Filed 05/01/18 Page 8 of 20 Page ID #:7792

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No. SACV 17-01868 JVS (DFMx) Date May 1, 2018

Title Commodity Futures Trading Commission v. Monex Credit Company, et al.

showing that Monex's delivery is in fact a sham:

> customer positions can be liquidated any time and in Monex's sole discretion, without notice to customers (Compl. ¶¶ 32-33); more than 3,000 leveraged Atlas accounts were subject to a margin call and at least 1,850 had trading positions force-liquidated between July 2011 and March 2017 (id. ¶ 33); the terms of the Atlas account agreement and Monex's agreements with its depositories deprive customers of all control and authority over any metals that underlie their trading positions (id. ¶¶ 38-39); and Atlas customers with open trading positions do not possess any precious metals as a result of Atlas transactions (id. ¶¶ 39-40).

(Id.) However, all of these allegations relate to Monex's business model of selling commodities on a leveraged basis.[4] Sections 4(a), 4(b), and 4b only apply to covered retail commodity transactions, which must be entered into or offered on a leveraged or margined basis, or financed by the offeror. 7 U.S.C. § 2(c)(2)(D)(i)(II). If this conduct alone negated "actual delivery," "every financed transaction would violate Dodd-Frank." Worth, 2014 WL 11350233, at *2. The Court can conceive of no plausible leveraged retail transaction of fungible commodities that would not involve at least some of the same alleged practices. Thus, if the Court were to adopt the CFTC's construction, the result would be to eliminate the Actual Delivery Exception from the CEA. See E.E.O.C. v. Chi. Club, 86 F.3d 1423, 1426 (7th Cir. 1996) (refusing to endorse the Equal Employment Opportunity Commission's "eviscerating interpretation" of "bona fide private membership club" when doing so would mean no organization would satisfy the statutory definition). This Court has no basis to do so. See Corley v. United States, 556 U.S. 303, 314 (2009) ("The Government's reading is thus at odds with one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" (quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004)).

---

[4] Significantly, there are no allegations that Monex exercises the rights granted by virtue of its secured position in any manner other than the contract provides.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

    Finally, the CFTC argues that the transfer of title to metals held at a third-party depository does not constitute "actual delivery." (Opp'n re MTD, Docket No. 164 at 7.) The Ninth Circuit's decision in CFTC v. Noble Metals International, Inc., 67 F.3d 766, 772 (9th Cir. 1995), a pre-Dodd-Frank case, concerned the distinction between a futures contract and a cash forward contract under the CEA. The CEA excluded cash forward contracts from CFTC jurisdiction if both parties to the contract contemplated and intended future delivery of the actual commodity. Id. The defendants argued that their contracts were cash forward contracts and satisfied the delivery requirement by transferring title to investors. Id. Instead of delivering the purchased metals to their customers, the defendants arranged for third-party depositories to take delivery on their behalf. Id. at 769. But no metal would change hands. Id. Instead of taking delivery from the third-party, customers would contract for the third-party to receive, and then sell, the metal. Id. The third-party sold the metal back to the defendants in a paper transaction. Id. Under this scheme, the court found that there was "no legitimate expectation" that the defendants' customers would take actual delivery. Id. at 773.

    Noble Metals is distinguishable for two primary reasons. First, and most notably, it predates Dodd-Frank. The court did not construe "actual delivery" within Dodd-Frank's statutory framework. Instead, the court assessed whether the defendants could take advantage of the cash forward exclusion to the CEA. Second, the court found that the defendants' contracts did not contemplate "actual delivery" of the purchased metals because they merely transferred title to the metals. Id. Though not discussed by the Ninth Circuit, Defendants did not have enough metals on hand to satisfy their delivery obligations. (Request for Judicial Notice[5] ("RJN"), Docket No. 189-4, Ex. 5 at 31; see also RJN, Docket No. 189-2, Ex. 4 at 32.) Even if this Court were to apply the definition of "delivery" applicable to the cash forward contract exclusion, Monex's contracts differ from the Noble Metals defendants' contracts. Regardless, the Court is not persuaded that the definition of "delivery" applicable to the cash forward contract exclusion similarly applies to the Actual Delivery Exception.

    Moreover, the legislative history of Dodd-Frank supports the Court's

---

[5] Where cited, the Court impliedly deems judicial notice appropriate under Federal Rule of Evidence 201 and takes judicial notice of the requested documents.

Case 8:17-cv-01868-JVS-DFM Document 195 Filed 05/01/18 Page 10 of 20 Page ID #:7794

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

conclusion that Congress did not intend to exclude the sort of conduct the CFTC alleges Monex engaged in from the ambit of the Actual Delivery Exception. The Senate adopted an earlier version of § 2(c)(2)(D) that excluded from the definition of "actual delivery" any "delivery to a third party in a financed transaction in which the commodity is held as collateral." H.R. 4173, 111th Cong., 2nd Sess. § 742(2)(D)(v) (May 20, 2010). The final bill omits this exclusion. "As a general canon of statutory construction, where the final version of a statute deletes language contained in an earlier draft, a court may presume that the earlier draft is inconsistent with ultimate congressional intentions." In re Town & Country Home Nursing Servs., Inc., 963 F.2d 1146, 1151 (9th Cir. 1991). The Court therefore presumes that Congress did not intend to exclude the conduct alleged against Monex — the actual delivery of precious metals in financed transactions where the metals are held as collateral by a depository — from the definition of "actual delivery."[6]

---

[6] The CFTC does not distinguish between short and long positions in describing how the metals are stored by depositories. (See, e.g., Compl. Docket No. 1 ¶¶ 39, 41–42 ("Atlas customers with open trading positions do not take physical delivery of the precious metals that underlie their trading positions. Rather, the metals are stored in depositories subject to contracts between Monex and the depositories which provide Monex with exclusive authority to instruct the depositories as to the disposition of metals . . . . When an Atlas customer opens a long position, Monex claims to transfer to the customer ownership of all of the metals underlying his position, including the financed portion of the position. This 'transfer,' however, is in reality just a book-entry in Monex's records. . . . In the context of a short position, Monex claims to loan the customer metals that the customer immediately sells back to Monex. As with a long position, the purported transfer of metals is in reality a book-entry in Monex's records that Monex can close out at any time in its sole discretion and at a price of Monex's choosing.")

There are two reasons for treating long transactions and short transactions similarly. First, by virtue of the CFTC's investigations in 1987 and 1998, Congress was aware of the phenomenon of short sales in commodities in the years before Dodd-Frank was adopted. (See Declaration of Gregory Walker ("Walker Decl."), Docket No. 169 ¶¶ 12–13.) Second, and more critical to the goal of the Actual Delivery Exclusion, the commodities are actually there. There is no contention that Monex does not in fact possess the commodity which the customer borrows, and then sells. The investor takes title, and the title is transferred to Monex by virtue of the customer's sale. (L. Carabini Depo., Docket No. 9-2, Ex. 14 at 97–98.) Louis Carabini points out that the borrower need not sell the commodity, but could maintain it, presumably in a depository. (Id.) The analysis would be different if the commodities borrowed and sold were non-existent. Moreover, possession is no longer relevant when the customer completes the short transaction since the purpose of a short transaction is to sell the commodity and divest the investor of ownership.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

In sum, the Court finds that, based on the Eleventh Circuit's construction of "actual delivery" in Hunter Wise, the CFTC's own final interpretation, and the legislative history of the Dodd-Frank amendments to the CEA, Monex's alleged practices of delivering precious metals to independent depositories within 28-days of their purchase by retail customers on margin falls within the Actual Delivery Exception to the CFTC's authority. Accordingly, the Court grants Defendants' motion to dismiss counts one, two, and four[7] of the Complaint.

3. The Actual Delivery Exception does not bar enforcement of CEA § 6(c)(1) against Monex.

Monex argues that the Actual Delivery Exception divests the CFTC of jurisdiction over all claims in the Complaint. (Mem. re MTD, Docket No. 41-1 at 25.) The CFTC contends that it had broad anti-fraud enforcement authority, independent of § 2(c)(2)(D), and therefore § 6(c)(1) nevertheless applies to Monex. (Opp'n to MTD, Docket No. 164 at 19.)

The Court's "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. [The Court's] inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) (citation omitted). Section 2(a)(1)(A) provides that the CFTC "shall have exclusive jurisdiction, except to the extent otherwise provided in . . . subsections (c) and (f)." 7 U.S.C. § 2(a)(1)(A). Section 2(c)(2)(D)(ii) provides that "[s]ections 6(a), 6(b), and 6b of this title apply to any agreement, contract or transaction described in clause (i), as if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery." Id. § 2(c)(2)(D)(iii). Clause (i) describes the retail commodity transactions covered by "this subparagraph," excepting those transactions described in clause (ii). Id. §

---

[7] CEA § 4d(a) applies only to a "futures commission merchant." 7 U.S.C. § 6d(a). Section 1a(28)(A)(i)(I)(aa)(DD) defines the term "futures commission merchant" to mean an entity that is engaged in "any agreement, contract, or transaction described in . . . section 2(c)(2)(D)(i) of this title." 7 U.S.C. § 1a(28)(A)(i)(I)(aa)(DD). Because the transactions that the CFTC alleges Monex engaged in are excluded from § 2(c)(2)(D)(i) by the Actual Delivery Exception, § 4d(a) does not apply to Defendants.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

2(c)(2)(D)(i). As noted above, clause (ii) in turn provides that "[t]his *subparagraph* shall not apply to . . . a contract of sale that . . . results in actual delivery within 28 days." Id. § 2(c)(2)(D)(ii) (emphasis added). Thus, the plain language of the subparagraph provides the CFTC with exclusive jurisdiction over covered retail commodity transactions to enforce §§ 4(a), 4(b), and 4b of the CEA, 7 U.S.C. §§ 6(a), (b), 6b.

Monex argues that CFTC jurisdiction comes from § 2 only, and the CFTC cannot rely on § 6(c)(1) without a jurisdictional grant from § 2. (Reply re MTD, Docket No. 180 at 12.) Section 2 provides the CFTC with exclusive jurisdiction over certain accounts, agreements, and transactions, and divests the CFTC of authority over others, but does not otherwise grant the CFTC jurisdiction to enforce the provisions of the CEA. See id. § 2(a)(1)(A). Monex's reliance on CFTC v. White Pine Trust Corp., 574 F.3d 1219 (9th Cir. 2009), to argue otherwise, is misplaced. (See Reply re MTD., Docket No. 180 at 12.) White Pine concerned foreign currency options trading accounts and a different section of the CEA, § 4c(b), 7 U.S.C. § 6c(b). 574 F.3d at 1223. Section 4c(b) only applies to "transactions involving any commodity regulated under this chapter." 7 U.S.C. § 6c(b). The Ninth Circuit construed that limitation to exclude transactions exempted from the CEA's coverage by § 2(c). White Pines, 574 F.3d at 1223. Section 2(c)(1) provides that "[e]xcept as otherwise provided in paragraph (2), nothing in this chapter . . . governs or applies to an agreement, contract, or transaction in foreign currency." 7 U.S.C. § 2(c)(1). However, paragraph (2) restored jurisdiction over certain foreign currency transactions. Id. § 2(c)(2)(B). The court ultimately concluded that neither § 2(c)(2)(B) nor § 6c(b) granted the CFTC jurisdiction over the trading accounts at issue in the case. White Pines, 574 F.3d at 1227.

The jurisdictional provision at issue in White Pines is not at issue here. Section 2(c)(1) limits the types of transactions over which the CFTC has jurisdiction, but it does not exclude retail precious metal transactions. See 7 U.S.C. § 2(c)(1). Therefore, the Court need not look to § 2(c)(2)(A) or § 2(c)(2)(B) to determine whether or not the conduct at issue here is nevertheless within the CFTC's jurisdiction. Instead, § 2(c)(2)(D) merely specifies, irrespective of the exclusions described in § 2(c)(1), which retail commodity transactions to which §§ 4(a), 4(b), and 4b apply, "as if [they were] a contract of sale of a commodity for future delivery." Id. § 2(c)(2)(D)(iii).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

Moreover, unlike § 4c, § 6(c)(1) does not limit its enforcement to "any transaction involving any commodity regulated under this chapter." By its plain language, § 6(c)(1) applies broadly "to any swap, or a contract of sale of any commodity in interstate commerce." 7 U.S.C. § 9(1). "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004) (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000)). Section 6(c)(1) provides that "[i]t shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate." Id. Thus, it is not similarly limited to transactions regulated by the CEA.

Monex argues that the rule of lenity mandates a narrow reading of the CFTC's authority in this case. (Mem. re MTD, Docket No. 41-1 at 26.) However, the rule only applies where "after consulting traditional canons of statutory construction, [the Court] is left with an ambiguous statute." Burgess v. United States, 553 U.S. 124, 135 (2008) (quoting United States v. Shabani, 513 U.S. 10, 17 (1994)). Section 6(c)(1) unambiguously applies broadly to the use or attempted use of any manipulative or deceptive device "in connection with any swap, or a contract of sale of any commodity in interstate commerce."

      4.     Section 6(c)(1) prohibits only fraud-based market manipulation.

Monex argues that, regardless of the limitations imposed by the Actual Delivery Exception, § 6(c)(1) only confers anti-fraud jurisdiction where a particular commodity transaction manipulates or potentially manipulates the derivatives market. (See Mem. re MTD, Docket No. 41-1 at 27; Opp'n to Mot. for PI, Docket No. 166 at 28.) The CFTC argues that § 6(c)(1) is not limited to futures market contracts and applies to retail commodities transactions with or without market manipulation. (Opp'n to MTD, Docket No. 164 at 23.)

Courts must defer to an agency's construction of a statute it administers if Congress has not "spoken directly to the precise question at issue" and the agency's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

construction of the statute is "permissible." Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984). However, if "Congress has directly spoken to the precise question at issue," courts "must give effect to the unambiguously expressed intent of Congress." Id. Courts apply "traditional tools of statutory construction" to ascertain whether Congress expressed such an intent. Id. at 843 n.9. Additionally, regulations enacted pursuant an express delegation of authority "to elucidate a specific provision of the statute by regulation . . . are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to statute." Id. at 843–44. Therefore, the Court must first decide whether the CEA unambiguously forecloses the CFTC's interpretation and, if not, whether the interpretation is otherwise an impermissible construction of the CEA. Id. at 843; Barnhart v. Walton, 535 U.S. 212, 218 (2002).

To determine the meaning of a statutory provision, courts "look first to its language, giving the words used their ordinary meaning." Artis v. District of Columbia, 138 S. Ct. 594, 603 (2018) (quoting Moskal v. United States, 498 U.S. 103, 108 (1990)). Section 6(c)(1), titled the "[p]rohibition against manipulation,"[8] makes it unlawful to use, "in connection with any swap, or a contract of sale of any commodity in interstate commerce, . . . *any manipulative or deceptive* device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate." 7 U.S.C. § 9(1) (emphasis added). Terms connected by a disjunctive must ordinarily be given separate meanings. Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979). Pursuant to that rule, the plain language of § 6(c)(1) suggests that Congress intended to prohibit either manipulative or deceptive conduct. However, the rule is not steadfast. See De Sylva v. Ballentine, 351 U.S. 570, 573 (1956) (noting that "the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity"). Another district court interpreting § 6(c)(1) has rejected the argument that its use of "or" necessarily means that the section bars two distinct types of conduct. CFTC v. Kraft Foods Grp., Inc. ("Kraft I"), 153 F. Supp. 3d 996, 1010 (N.D. Ill. 2015) (holding that the §6(c)(1) barred only fraudulent manipulation, not manipulation in the absence of

---

[8] The section of Dodd-Frank adding these amendments is titled "Anti-*Manipulation* Authority." § 753, 124 Stat. at 1750; see Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998) (noting that titles of statutes and section headings are tools available for statutory construction).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

fraud).[9]  The title of § 6(c)(1) sheds light on whether the Court should construe "or" in the disjunctive.  See Bhd. of R. R. Trainmen v. Baltimore & O. R. Co., 331 U.S. 519, 529 (1947) (concluding that section headings are may be used as tools for "the resolution of a doubt").  Section 6(c) is titled "Prohibition regarding manipulation and false information."  7 U.S.C. § 9.  While § 6(c)(1) is the "Prohibition against manipulation," § 6(c)(2) is the "Prohibition regarding false information," and § 6(c)(3) is entitled "Other manipulation."  These headings imply that § 6(c)(1) and § 6(c)(3) concern forms of market manipulation, and § 6(c)(2) alone concerns false information.  Section 6(c)(2) prohibits making false or misleading statements to the CFTC, but does not otherwise prohibit fraudulent conduct.  While "the title of a statute and the heading of a section cannot limit the plain meaning of the text," these headings suggest that the court should construe the prohibition on the use of "manipulative or deceptive device[s] or contrivance[s]" to require both manipulative and deceptive conduct, not one or the other.  See Bhd. of R. R. Trainmen, 331 U.S. at 528–29.

The rule against surplusage also supports interpreting "manipulative or deceptive" to require both manipulative and deceptive conduct.  "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (quoting Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989)).  Section 4b already prohibits fraud in covered retail commodity transactions.  7 U.S.C. §§ 2(c)(2)(D)(iii), 6b(a)(2)(A) (making it unlawful "for any person, in or in connection with an order to make, or the making of, any contract of sale of any commodity for future delivery or swap, . . . to cheat or

---

[9] The CFTC suggests that a subsequent order in this case undermines this construction.  (Reply re Mot. for PI, Docket No. 177 at 18.)  In that order, the district court explained that *Rule 10b-5 claim* requires proof of either deception or manipulation.  CFTC v. Kraft Foods Grp., Inc. ("Kraft II"), 195 F. Supp. 3d 996, 1006 (N.D. Ill. 2016).  The effect of that requirement was that there was a class of *manipulation* claims that did not require deception or misrepresentation.  Id.  While the court noted that "most forms of manipulation involve deception in one form or another," in the securities context, market manipulation claims do not "always require an explicit misrepresentation."  Id. at 1007 (quoting Ploss v. Kraft Foods Grp., Inc., 197 F. Supp.3d 1037, 1050–51 (N.D. Ill. 2016)).  This does not defeat the Court's earlier conclusion that "'manipulative' connotes 'intentional or willful conduct designed to *deceive or defraud* investors by controlling or artificially affecting the price of securities.'" Kraft I, 153 F. Supp. 3d at 1009 (emphasis in original) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

defraud or attempt to cheat or defraud the other person"). The Actual Delivery Exception exempts retail commodity transactions that result in actual delivery within 28 days from the application of § 4b. Id. § 2(c)(2)(D)(ii)(III)(aa). If the Court were to construe § 6(c)(1) to prohibit all fraud made in connection with any swap, or contract of sale of any commodity in interstate commerce, it would necessarily cover all retail commodity transactions, including those that result in actual delivery within 28 days. Not only would such a construction render § 4b superfluous, it would also eliminate the Actual Delivery Exception. See Corley, 556 U.S. at 314. Moreover, it would make § 6(c)(3), which already prohibits the manipulation of the price of any swap or commodity in interstate commerce, redundant. The Court may not construe § 6(c)(1) to render any other section of the CEA redundant or inoperative. Rather, the Court must "fit, if possible, all parts [of the CEA] into an harmonious whole." Brown, 529 U.S. at 133 (quoting FTC v. Mandel Bros., Inc., 359 U.S. 385, 389 (1959)). Construing § 6(c)(1) to prohibit fraudulent conduct alone would violate that basic principle.[10]

However, yet another interpretive tool clashes with the rule against superfluity in this instance. "[C]ourts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter." United States v. Novak, 476 F.3d 1041, 1051 (9th Cir. 2007) (en banc). Section 10(b) of the Securities Exchange Act ("SEA") similarly prohibits "any manipulative or deceptive device or contrivance" used "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U.S.C. § 78j(b). Though the Supreme Court has held that the SEA "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)," it has also explained that "the statute should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'" S.E.C. v. Zandford, 535 U.S. 813, 819–20 (2002) (citations omitted). Moreover, while the Supreme Court has "recognized that the interest in 'preserving the integrity of the securities markets' was one of the purposes animating the [SEA]," it has "rejected the

---

[10] The Court notes that the rule against surplusage is "not absolute." Lamie, 540 U.S. at 536. However, it generally yields only when words are rejected as "inadvertently inserted" or "repugnant to the rest of the statute." Chickasaw Nation v. United States, 534 U.S. 84, 94 (2001). The CFTC does not point to any examples of "inartful drafting" in Dodd-Frank, which might lead this Court to question the utility of the rule in this instance. See King v. Burwell, 135 S. Ct. 2480, 2483 (2015).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

notion that § 10(b) is limited to serving that objective alone." Id. at 821–22. The Securities Exchange Commission ("SEC") routinely uses §10(b) and Rule 10b-5 to prosecute fraud in connection with the purchase or sale of securities. See, e.g., id. at 825 (holding that allegations of a fraudulent scheme alone adequately stated a claim for violation of § 10(b)).

      The legislative history of § 6(c)(1) clarifies this ostensible conflict. Senator Cantwell introduced § 6(c)(1) as an amendment to the Senate's version of Dodd-Frank. 156 Cong. Rec. S3099-100 (daily ed. May 4, 2010). Introducing the amendment, Senator Cantwell emphasized that current law made it very difficult for the CFTC to prosecute market manipulation cases because it required the CFTC to prove "specific intent" to manipulate. (RJN, Docket No. 172-1, Ex. 4 at S3348.) She noted that the CFTC had only successfully prosecuted a single case of manipulation. (Id.) Senator Cantwell explained that the amendment would give the CFTC the same "antimanipulation standard" as the Securities Exchange Commission ("SEC"), which only requires a showing of recklessness. (Id.) She noted that the language of § 6(c)(1) closely tracks § 10(b) because "Federal case law is clear that when the Congress uses language identical to that used in another statute, Congress intended for the courts and the Commission to interpret the new authority in a similar manner." (Id.) However, she went on to note that the SEC's manipulation authority is only intended to cause "those who attempt to affect the market or prices by artificial means unrelated to the natural forces of supply and demand." (Id.) And she noted that Congress recently granted the same anti-manipulation authority to the Federal Energy Regulatory Commission ("FERC") "as a result of the Enron market manipulation," which FERC had used to bring "enforcement actions against manipulation." (Id.) Consistent with Senator Cantwell's remarks, Senator Lincoln, then-Chairman of the Senate Committee on Agriculture, explained that § 753 "adds a new anti-manipulation provision to the [CEA] addressing fraud-based manipulation" and that the "new enforcement authority being provided to the CFTC supplements, and does not supplant, its existing anti-manipulation authority."[11] (RJN, Docket No. 181-1, Ex. 2 at

---

[11] The CEA has long made it a felony for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap, or to corner or attempt to corner any such commodity or knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

S5920.)

      Nowhere does the legislative history contemplate extending CFTC's authority under § 6(c)(1) to allow it to combat fraud absent market manipulation. Senator Cantwell's references to § 10(b) make clear that Congress only intended to lower the scienter standard to recklessness, not adopt wholesale the full scope of enforcement available under § 10(b). (RJN, Docket No. 172-1, Ex. 4 at S3348.)

      Because § 6(c)(1) unambiguously forecloses the CFTC's interpretation, the Court owes no deference to its interpretation of the statute. However, the CFTC's interpretation of the statute and its regulations is not entirely inconsistent with the Court's construction. See Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398 (July 14, 2011). The CFTC focuses on footnote 37 in the interpretation, which provides that:

> By way of non-exclusive example, if an entity employed a deceptive device to sell precious metals to customers as a way for the customers to speculate on the value of such commodities, or if an entity employed a deceptive device to sell an agricultural commodity to persons seeking to hedge price risk in that commodity, depending on the facts and circumstances, the Commission would exercise its authority against the entity under Section 6(c)(1) and final Rule 180.1.

Id. at 41401 n. 37. Though the footnote, read in isolation, seems to cover the conduct alleged against Monex, read in context, it is clear that the CFTC only intended for the example to apply in instances of market manipulation. Footnote 37 appends the following sentence:

> And although CEA section 6(c)(1) and final Rule 180.1 give the Commission broad enforcement authority to prohibit fraud and manipulation in connection with a

---

inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce." 7 U.S.C. § 13(a)(2).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 17-01868 JVS (DFMx) | Date | May 1, 2018 |
| Title | Commodity Futures Trading Commission v. Monex Credit Company, et al. | | |

> contract of sale for any commodity in interstate commerce, the Commission expects to exercise its authority under 6(c)(1) to cover transactions related to the futures or swaps markets, or prices of commodities in interstate commerce, or *where the fraud or manipulation has the potential to affect cash commodity, futures, or swaps markets or participants in these markets*.

Id. at 41401 (emphasis added). The interpretation goes on to state that "[t]his application of the final Rule respects the jurisdiction that Congress conferred upon the Commission and fulfills its core mission and the purposes of the Act to protect market participants and promote market integrity." Id.

Read in its entirety, the CEA unambiguously forecloses the application of § 6(c)(1) in the absence of actual or potential market manipulation.[12] Fundamentally, the Court is tasked with interpreting § 6(c)(1) in a "holistic" manner. United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988). "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." Id. In this instance, the only plausible interpretation of the Dodd-Frank amendments mandates that § 4b alone prohibits fraud and deceptive conduct, § 6(c)(1) prohibits fraud-based manipulation, and § 6(c)(3) prohibits market manipulation in the absence of fraud.

### IV. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss. The Court denies the CFTC's motion for preliminary injunction and Defendants' motion to exclude as moot. The CFTC may amend its third cause of action to address the deficiencies identified in this order. The CFTC shall file an amended complaint

---

[12] Another district court recently found that the CFTC could state a claim for violations of § 6(c)(1) and Rule 180.1 based on allegations of fraud in connection with the sale of commodities alone. CFTC v. McDonnell, 287 F. Supp. 3d 213, 226–27, 229–30 (E.D.N.Y. 2018). However, the main concern in that case was whether the CFTC could regulate virtual currencies as a commodity. See id. at 228. The pro se defendant in that case did not raise the issue of whether § 6(c)(1) covered fraud in the absence of market manipulation. (See Mem., CFTC v. McDonnell, 287 F. Supp. 3d 213 (E.D.N.Y. 2018) (No. 18 Civ. 361), ECF No. 18-2.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  SACV 17-01868 JVS (DFMx)    Date  May 1, 2018

Title   Commodity Futures Trading Commission v. Monex Credit Company, et al.

within thirty (30) days.

**IT IS SO ORDERED.**

Initials of Preparer    kjt