Carlin Metzger *(pro hac vice)*
cmetzger@cftc.gov
Joseph Konizeski *(pro hac vice)*
jkonizeski@cftc.gov
Ansley Schrimpf *(pro hac vice)*
aschrimpf@cftc.gov
Attorneys for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe, Suite 1100
Chicago, Illinois 60661
Tel. 312-596-0700; Fax 312-596-0714

Kent Kawakami, California Bar #149803
Assistant United States Attorney
United States Attorney's Office, Civil Division
Central District of California
kent.kawakami@usdoj.gov
300 North Los Angeles St., Room 7516
Los Angeles, California 90012
Tel.: 213-894-4858; Fax: 231-894-2380
Local Counsel

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT CALIFORNIA
## SOUTHERN DIVISION

---

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION<br><br>Plaintiff,<br><br>vs.<br><br>MONEX DEPOSIT COMPANY, MONEX CREDIT COMPANY, NEWPORT SERVICES CORPORATION, MICHAEL CARABINI, AND LOUIS CARABINI<br><br>Defendants. | Case No: 8:17-cv-01868-JVS-DFM<br><br>**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>Filed Concurrently with Declarations of Jeffrey Gomberg, Carlin Metzger, Billie Craner, Zain Dumont, Raymond Gahan, Richard Jordan, and Mehran Tavakoli<br><br>Hon. James V. Selna<br>Dept. 10C<br>Hearing Date: December 14, 2020<br>Hearing Time: 1:30 p.m. |

# **TABLE OF CONTENTS**

I.   Monex Does Not Transfer Possession or Control in Atlas Platform Transactions.......2

   A.  The Events of March 16, 2020 Illustrate Monex's Sham Delivery and the Results of Monex's Scheme to Defraud. ...................................................................................2

   B.  The Ninth Circuit Has Ruled: Monex Does Not Transfer Possession or Control to Customers in Leveraged Atlas Transactions. ...........................................................4

        i.   The Ninth Circuit's Description of the Atlas Platform is Accurate. ......... 5
        ii.  Atlas Platform Metals are in Monex's Chosen Depository, and Never Exchange Hands. ……………………………………………………….. 8
        iii. Atlas Platform Metals are Subject to Monex's Exclusive Control. ...... 10
        iv. Atlas Platform Customers Have No Substantial, Non-Contingent Interests..…………………………………………………………………. 12

II.  "Due Process" Is Not an Obstacle to a Preliminary Injunction....................................12

   A.  The Plain Language of the Statute Dictates the Result. ...........................................13

   B.  Monex Sought and Received Due Process in All Three Branches of the U.S. Government. ................................................................................................................15

        i.   Monex Petitioned Congress and was Rejected. …………………..……15
        ii.  Monex Petitioned the Commission and was Rejected. ……………….....16
        iii. Monex has Litigated its Position for More Than Six Years in Federal Courts. …………………………………………...…………………………..17

   C.  It is Irrelevant to this Case that Worth May Also Be Violating the Law................18

III. Monex's Fraud Continues, Unabated. .......................................................................19

   A.  Monex Continues to Lure Victims into the Atlas Trap..........................................19

   B.  The Commission's Expert Witness is Both Qualified and Correct in His Assessment of the Monex Platform.........................................................................21

        i.   The Numbers Do Not Lie. ………..…………………………………19
        ii.  The Victims Do Not Lie.…..……………………..……………………… 20

IV. The Court Should Grant the Commission's Requested Relief to Stop Ongoing Illegal Transactions and Customer Harm. ...........................................................................22

V.   Conclusion ..............................................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Allergan v. Athena*,
    2012 WL 12895673 *3-4 (C.D. Cal. 2012)………………..……4

*Bouie v. City of Columbia*,
    378 U.S. 347, 352 (1964)…………………………………....13

*CFTC v. British Am. Commodity Options Corp.*
    560 F.2d 135, 141–42 (2d Cir. 1977),
    *cert. denied*, 438 U.S. 905 (1978)……………………………… 23

*CFTC v. Driver*,
    877 F. Supp. 2d, 968 at 981 (C.D. Cal. 2012)…………………..23

*CFTC v. Hunt*
    591 F.2d 1211, 1220 (7th Cir. 1979)…………………………… 23

*CFTC* v. *Hunter Wise Commodities, LLC*,
    749 F.3d 967 (2014)………………………………………… 14-16, 19

*CFTC v. J. S. Love & Assoc. Options, Ltd.*,
    422 F. Supp. 652, 661 (S.D.N.Y. 1976)………………………... 23-24

*CFTC v. Noble Metals Int'l, Inc.*,
    67 F.3d 766 (9th Cir. 1995)…………………………………… 5

*CFTC v. S. Trust Metals, Inc.*,
    180 F.Supp.3d 1124 (S.D. Fla. 2016)…………………………... 19

*CFTC* v. *S. Trust Metals, Inc.*,
    894 F.3d 1313 (11th Cir. 2018)…………………………………19

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239, 253 (2012) …………………………………………13

*Fed. Election Comm'n v. Furgatch*,
    869 F.2d 1256, 1261 (9th Cir. 1989)…………………………….... 23

ii

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*

*Firth v. United States*,
    554 F.2d 990, 993 (9th Cir. 1977)…………………………………………..4

*Heckler v. Chaney*,
    470 U.S. 821, 831 (1985)………………………………………………..18

*Nguyen v. United States*,
    792 F.2d 1500, 1502 (9th Cir.1986)……………………………...4

*NLRB v. Bell Aerospace Co., Div. of Tex-tron, Inc.*,
    416 U.S. 267, 295 (1974)………………………………………………13

*Richardson v. United States*,
    841 F.2d 993, 996 (9th Cir. 1977)……………………………….... 4

*SEC v. Lek Securities Corp.*,
    2019 WL 1198599, (SDNY March 14, 2019)…………………. 21, 22

*Trailer Train Co. v. State Bd. of Equalization*,
    697 F.2d 860, 869 (9th Cir. 1983)…………………………… 23

*U.S. v. Hall*,
    48 F.Supp.2d 386, 386 (S.D.N.Y. 1999)……………………..… 22

*U.S. ex rel. Lujan v. Hughes Aircraft Co.*,
    243 F.3d 1181, 1186 (9th Cir. 2001)……………………………..4

## **Federal Rules and Regulations**

76 Fed. Reg. 77,670 (Dec. 14, 2011)…………………………………..16

78 Fed. Reg. 52,426 (Aug. 23, 2013)…………………………………..14, 16

## **Federal Statutes**

7 U.S.C. § 2(c)(2)(C)………………………………………………...15

7 U.S.C. § 2(c)(2)(D)…………………………………………….. 1, 12, 14,

                                         15, 16, 18

Dodd-Frank Wall Street Reform and Consumer Protection Act
    Pub. L. No. 111-203, § 742(a)(2), 124 Stat. 1732……………… 12

The significance of the Ninth Circuit's ruling in this case is clear. "Actual delivery" of commodities under Section 2(c)(2)(D) the Commodity Exchange Act ("CEA") requires a transfer of "some meaningful degree of possession and control" over commodities. *CFTC v. Monex Credit Co.*, 931 F.3d 966, 974 (9th Cir. 2019), *cert. denied sub nom. Monex Deposit Co. v. CFTC*, 19-933, 2020 WL 3492657 (U.S. June 29, 2020). The evidence before this Court shows conclusively that Defendants ("Monex") do not transfer possession of, or control over, precious metals to customers in leveraged Atlas transactions. Using the Ninth Circuit's analytical framework: (1) Monex's metals inventory underlying its Atlas trading platform are stored in Monex's chosen depositories; (2) the metals never change hands and are subject to Monex's exclusive control; and (3) customers have no substantial, non-contingent interests in the metals. Monex retains the exclusive right to dispose of Atlas platform metals, supposedly "delivered" to customers, at any time, in its sole discretion. The law requires that Monex conduct its leveraged Atlas transactions on a registered board of trade, and that Monex register as a Futures Commission Merchant.

Beyond operating an unregistered commodity trading platform, Monex continues to defraud thousands of retail customers into risky leveraged Atlas platform trading, where these victims have lost hundreds of millions of dollars. Loss figures have increased since the initial filing of this motion: over 13,000 leveraged Atlas platform accounts have now lost more than $365 million during the relevant period in this case. Meanwhile, Monex has made more than $230 million in revenue. It remains accurate that about 90% of leveraged Atlas traders lose money. Customer losses mount daily. Monex has continued to operate its off-exchange Atlas commodity trading platform without material change, and Monex has continued to lure victims into its Atlas trap despite knowing that the vast majority of leveraged Atlas traders lose money. Monex will undoubtedly continue offering off-exchange leveraged trading, and customers will continue to suffer massive losses, absent an order from this Court. Therefore, this Court should grant the Commission's Motion for a Preliminary Injunction.

## I.     Monex Does Not Transfer Possession or Control in Atlas Platform Transactions.

### A. The Events of March 16, 2020 Illustrate Monex's Sham Delivery and the Results of Monex's Scheme to Defraud.

Monex's purported "delivery" is a sham.  The events of March 16, 2020 (which Monex conveniently ignores in its Opposition brief) perfectly expose this sham and highlight the results of Monex's fraud.  On March 16, 2020 alone, Monex "force liquidated" 911 metals trading positions in 408 customer accounts.  (Gomberg Supp. Decl. ¶ 31 and Ex. 1, Table I.)  More than $30 million worth of precious metals supposedly "owned" by Monex customers were automatically transferred back to Monex without any input from customers.  (*Id.*; Metzger Decl., Ex. 8-22.)  Customers received apologetic, form emails from Monex stating: "Recent fluctuations in market prices of precious metals have unfortunately caused the equity in your [Monex] account to fall below minimum required levels, compelling us to liquidate positions in your account. (*See, e.g.,* Metzger Decl., Ex. 10, 11, 13.)  "We deeply regret such actions.  However, the enforcement of minimum equity requirements is essential at times of extreme adverse market moves."  (*Id.*)

Every one of these customers signed Monex's Atlas Account Agreement; every single one of these customers "appointed Brinks as its agent for receipt of metals."  Every one of these customers received a "Commodity Title Transfer Notice" printed out by Monex and mailed by Brinks.  Monex told every one of these customers that they "owned" metals.  Yet the metals were transferred back to Monex unilaterally, leaving the customers empty-handed.  The customers did not have possession of these metals, and certainly did not have control.

What protection did Monex customers receive from having the "title" notice that Monex generated?  None.  What protection did Monex customers receive from Brinks who was acting "as agent *for the customer's receipt of*" these metals?  None.  Brinks acts *only* at the instruction of Monex, and has a contract only with Monex.  Monex's

2

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*

customers have absolutely no control as to the disposition of the metals supposedly stored "on their behalf." Monex's use of the term "agent" in this context is deceptive. Brinks is contractually required to follow Monex's instructions – not Monex's customers' instructions – regarding the handling and disposition of metals that in reality are in Monex "sub-accounts" at Brinks. (*See* Gomberg Decl., Ex. 47, Monex-Brink's Storage Agreement, Dkt. 8-4 at PageID 1343.)

Beyond demonstrating the sham of Monex's purported "delivery" of metals in leveraged Atlas trades, this mass force liquidation event exposes the inevitable results of Monex's fraudulent scheme, and the dramatic impact Monex's fraud has on victims who fall into the Atlas trap. Many Monex customers who thought they owned physical precious metals in March 2020 lost every ounce, and some only discovered those losses after calling Monex months later to inquire about their metals. (*See, e.g.,* Jordan Decl. ¶ 24, Tavakoli Decl. ¶ 22.) Monex paints a rosy picture of safety, security and profitability to lure customers into leveraged Atlas trading, boldly holding itself out as a "trusted" name in precious metals. But victim after victim attests otherwise. On top of the numerous declarations already on file, the Commission submits with this Reply five additional declarations of Monex victims, four of whom have suffered significant losses in leveraged Atlas trading since the Commission filed this action. (*See* Tavakoli Decl., Jordan Decl., Dumont Decl., Craner Decl., Gahan Decl.) Funds saved over a lifetime vanish, with obvious and drastic results. *Id.*

The testimony of these victims illustrates the complete lack of possession and control that Atlas customers have over metals. But their testimony only begins to illuminate the full scope of and consequences of Monex's fraud. As detailed further below, 2,383 leveraged Atlas accounts had a trading position force liquidated between July 16, 2011 and June 31, 2020. (Gomberg Supp. Decl., ¶ 18 and Ex. 1, Table D.) During that same time period (the "Updated Review Period"), 4,323 leveraged Atlas accounts suffered either a margin call or forced liquidation. *Id.* Monex misleadingly claims that "forced liquidation is rare." (Opposition, Dkt. No. 246 at 9; and Suppl.

3

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*

Carabini Decl., Dkt. No. 246.1, ¶ 35).  The evidence shows otherwise.  Monex can and does liquidate customer trading positions without any customer input, demonstrating that it is offering an illegal, off-exchange leveraged commodity trading platform.

### B. The Ninth Circuit Has Ruled: Monex Does Not Transfer Possession or Control to Customers in Leveraged Atlas Transactions.

Monex diminishes the adverse ruling by the Ninth Circuit, describing it as "constrained by the motion to dismiss standard."  Despite the procedural posture, the Ninth Circuit gave explicit instructions not only as to the legal standard to be applied, but also how the standard must be applied in this case.  "Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1977); *see also United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1186 (9th Cir. 2001) ("The law of the case doctrine requires a district court to follow the appellate court's resolution of an issue of law in all subsequent proceedings in the same case.")  "When a case has been decided by an appellate court and remanded, the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court." *Firth v. United States*, 554 F.2d 990, 993 (9th Cir. 1977).  The mandate of an appellate court "forecloses the lower court from reconsidering matters determined in the appellate court, [but] leaves to the district court any issue not expressly or impliedly disposed of on appeal." *Nguyen v. United States*, 792 F.2d 1500, 1502 (9th Cir.1986); *see also Allergan v. Athena*, 2012 WL 12895673 *3-4 (C.D. Cal. 2012) (Selna, J.).

The Ninth Circuit defined "actual delivery," holding that "the plain language [of the statute] tells us that actual delivery requires at least some meaningful degree of possession or control by the customer." *Monex Credit Co.*, 931 F.3d at 974.  The Ninth Circuit also gave direction on the application of this standard to the facts of this case. The Court rejected Monex's argument that it "actually delivers" metals to customers because inventory is stored in a third-party depository.  The court said "[i]t is possible for

[the Actual Delivery] exception to be satisfied when the commodity sits in a third-party depository, but not when, as here, metals are in the broker's chosen depository, never exchange hands, and are subject to the broker's exclusive control, and customers have no substantial, non-contingent interests." *Id.*  The Ninth Circuit also rejected Monex's argument that issuing "title transfer" notices to customers after Atlas platform trades results in "actual delivery."  Referencing its prior decision in *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995), the court noted that "delivery" in the CEA "cannot be satisfied by the simple device of a transfer of title." *Id.* at 974-975. Monex's sham title transfer notices are not "actual delivery."

The Ninth Circuit made clear that Monex, or really any company operating a leveraged commodity platform for retail traders as Monex does with its Atlas platform, does not make actual delivery.  Referencing the facts in the complaint, the court put its ruling succinctly:

> Here, customers have no contractual rights to the metal; Monex, not customers, has a relationship with depositories; Monex maintains total control over accounts and can liquidate at any time in its own discretion; and the entire transaction is merely a book entry. This amounts to sham delivery, not actual delivery. *Id.* at 975.

The facts described by the Ninth Circuit in reaching its conclusion are true and have not changed in the intervening time since the ruling.  Therefore, the result is clear: Monex does not transfer possession of or control over metals to customers in leveraged Atlas transactions.  As a matter of law, Monex's form of depository delivery and transfer of title are, at best, constructive delivery and do not constitute "actual delivery."

### i.   The Ninth Circuit's Description of the Atlas Platform is Accurate.

The Ninth Circuit's description of Monex's Atlas platform is accurate.  "Through Atlas, investors can purchase commodities on 'margin.' Also known as 'leverage,' the concept is simple: A customer buys precious metals by paying only a portion of the full price. The remaining amount is financed through Monex." *Monex Credit Co.*, 931 F.3d

5

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*

at 970. This description of the fundamental structure of the Atlas platform is accurate.
Monex continues to collect "margin" from customers as a deposit against trading
positions. (Gomberg Supp. Decl. ¶¶ 7-9.) "Once a customer opens an account, she may
take open positions in precious metals. But the trading occurs 'off exchange'— that is, it
does not happen on a regulated exchange or board of trade. Instead, Monex controls the
platform, acts as the counterparty to every transaction, and sets the price for every trade."
*Monex Credit Co.*, 931 F.3d at 970. This description of the platform remains accurate;
customers continue to open "long" or "short" trading positions. (Gomberg Supp. Decl. ¶
13.) Monex is the counterparty to and sets the price for every leveraged trade. (Walker
Decl., Dkt. No. 246.4, ¶ 25.) None of this trading takes place on a regulated exchange or
board of trade.

The Ninth Circuit cited statistics from the Complaint that helped to show that
Monex is operating a leveraged commodity trading platform. "Since mid-2011, Monex
has made more than 140,000 trades for more than 12,000 Atlas accounts, each of which
requires margin of 22–25% of the account's total value." *Monex Credit Co.*, 931 F.3d at
970. Given the passage of time, these figures have increased. As of June 2020, Monex
has executed more than 190,000 trades in more than 13,100 leveraged Atlas accounts.
(Gomberg Supp. Decl. ¶ 14). "About a quarter of trading positions in leveraged Atlas
accounts open and close within two weeks." *Monex Credit Co.*, 931 F.3d at 970.
Updated Review Period figures show the same: more than 25% of Monex's leveraged
trades in the had a duration of 14 days or less. (Gomberg Supp. Decl. ¶ 13, Table B).

The Ninth Circuit's overview of Monex's margin call and force liquidation process
remains apt:

> Over time, the account's value changes—it goes up and down—as markets
> do. The difference between the account's total value and the amount the
> customer still owes to Monex is the account's 'equity.' And if that difference
> falls below a certain threshold, Monex can issue a 'margin call'—it can
> require customers to immediately deposit more money into the accounts to

6

increase the equity.  Monex can do so at any time, and it can change margin

requirements whenever it wants.  *Monex Credit Co.*, 931 F.3d at 970.

Monex has not altered any of these features of its Atlas program.  Monex issues margin

calls and force liquidations based on changes in account equity; Monex's Atlas account

agreements allow Monex to do this at any time; and, Monex can change margin

requirements whenever it wants.  Margin calls and forced liquidations remain significant

on Monex's Atlas platform.  (Metzger Decl., Ex. 8-22; s*ee also* Carabini Decl., Dkt. No.

167 ¶¶ 16-17, 43-45, Suppl. Carabini Decl., Dkt. No. 264.1 ¶¶ 29-37; *see also* account

agreements in Suppl. Walker Decl., Dkt. No. 246.4).  New data from Monex shows that

during the Updated Review Period:

- 2,383 leveraged Atlas accounts (18% of leveraged Atlas accounts) were
  subject to a forced liquidation.

- 3,688 leveraged Atlas accounts (27.96% of leveraged Atlas accounts) were
  subject to a margin call.

- 4,323 leveraged Atlas accounts (32.77% of leveraged Atlas accounts) were
  subject to either a margin call or forced liquidation.

(Gomberg Supp. Decl. ¶ 18, Table D.)  The numbers of accounts, and percentages of

accounts, have increased when accounting for Monex's Atlas platform transactions since

the filing of this case. (Dkt. No. 8.1 ¶ 130.)

In its Opposition, Monex completely avoids addressing the short trading positions

it offers on its Atlas platform.  (Opposition, Dkt. No. 246.)  Of the 81,898 trading

positions opened and closed during the Updated Review Period by leveraged Atlas

customer accounts, 12,402 – or 15.1% – of them were short positions.  (Gomberg Decl.¶

13, Table B).  But the Ninth Circuit's opinion makes it clear that without regard to the

direction of the position, absent possession and control, a book entry is insufficient:

This structure applies to both long and short positions. For a long position,

Monex retains the right to close out the position at any time in its sole

discretion and at a price Monex chooses.  Metal remains in the depository, but

Monex claims to transfer ownership of the metals to the customer.  The same is true for short positions, except that instead of transferring ownership, Monex loans the customer metals that the customer immediately sells back to Monex.  According to the CFTC, Monex simply makes a "book entry" when customers make trades—nothing more."  *Monex Credit Co.*, 931 F.3d at 970. Monex's Atlas platform remains a futures exchange look-alike, allowing traders to take speculative long and short trading positions in precious metals.  Except Monex is operating the platform without registration, and without following any of the critical laws and rules imposed on regulated exchanges.

### ii. *Atlas Platform Metals are in Monex's Chosen Depository, and Never Exchange Hands.*

In its Opposition, Monex reluctantly acknowledges that its Atlas account agreements require that metals must be stored in Monex's chosen depositories, with which only Monex has a contractual relationship.  (Walker Decl., Dkt. No. 246.4.) "Monex does not hand over any metals, and customers never possess or control any physical commodity.  Instead, Monex stores the metals in depositories with which Monex has contractual relationships."  *Monex Credit Co.*, 931 F.3d at 970.  This fundamental aspect of Monex's Atlas platform remains accurate and is fundamentally undisputed.

Monex's recent revisions to its Atlas account agreements do not materially alter the structure of the relationship between Monex and its Atlas platform customers.  The depository Monex chooses (and with which Monex, not the customer, has a contract) always has possession.[1]  (*See* Redlined Atlas "Loan, Security and Storage Agreement" ("LSSA"), Dkt. 246.5 at Page ID # 8447.)  This is true based on the language of Monex's

---

[1] Walker Decl., Ex. 246.4; Redline LSSA, Dkt. No. 246.5, Page ID 8449, ¶¶ 6, 9: Depositories currently include "Brinks Global Services, Springfield Gardens, NY, CNT, Inc. Bridgewater, MA, Delaware Depository Service Company, LLC, Wilmington, DE or any other bailee or bailees substituted by [Monex]."  *See also* Redline PSA, Dkt. No. 246.5, Page ID 8438, ¶ 7.3.

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*

Atlas account agreements, and it also remains a requirement imposed upon Monex to obtain its own financing for Monex operations.  Monex has entered into at least one new financing arrangement since the Commission filed this action.  (*See* Metzger Decl., Ex. 1, Monex-CFC Loan Servicing Agreement dated 9/7/2018.)  This agreement, like others, allows Monex to finance the operation of its trading platform through asset-backed loans. Significantly (and as with Monex's other financing vehicles), Atlas customer metals are collateral for this financing.  (*Id.* at ¶ 5.)[2]  And as with Monex's other financing vehicles, it is a requirement that Monex have the authority and ability to sell metals stored at Brink's, whether "titled" to Monex or to customers, at its discretion.  (*Id.* at Exhibit A.)

As described by the Ninth Circuit, "Monex retains exclusive authority to direct the depository on how to handle the metals; investors and the depositories have no contractual relationship with each other."  *Monex Credit Co.*, 931 F.3d at 970.  These facts remain true, as evidenced by the updated Atlas "Purchase and Sale" ("PSA") agreement[3] and LSSA agreement[4] Monex filed with its Opposition, as well as the 2015 contract between Monex and Brinks.[5]  "Customers can get their hands on the metals only

---

[2] "Collateral.  All collateral securing the Loans shall be stored with Brinks Global Services USA, Inc. ("Brinks") for the benefit of Lender.  Servicer shall have no authority to direct Brinks to move or allocate any of the Collateral, without Lender's prior written approval."

[3] Monex 2020 PSA, Dkt. No. 246.5, Page ID 8443, ¶ 15.7: "Customer agrees that ***Depository may act upon any instructions received from [Monex]*** concerning delivery, transfer of title, sale or disposition of commodities held by Depository on Customer's behalf."

[4] Monex 2020 LSSA, Dkt. 246.5, Page ID 8450, ¶ 12: "Borrower hereby appoints [Monex] its Attorney-in-Fact to make any transfer of title of the Collateral permitted by this Agreement and to deliver all instruments to accomplish such transfer.  ***Depository may act upon instructions from [Monex] concerning the sale or other disposition of the Collateral***."

[5] Monex-Brinks 2015 Precious Metals Storage Agreement, Dkt. No. 8.4, PageID # 1343 ¶ 2: "In no event will any Account be held in any name other than Monex Deposit Company and/or Monex Credit Company."  PageID # 1345 ¶ 5: "Brinks and [Monex] agree . . . ***Brinks holds possession of such Metals as custodian for [Monex] . . .***"

9

by making full payment, requesting specific delivery of metals, and having the metals shipped to themselves, a pick-up location, or an agent." *Monex Credit Co.*, 931 F.3d at 970. This remains true, as evidenced by the updated Atlas agreements Monex filed with its Opposition. Monex's leveraged Atlas customers can only receive actual delivery of metals by paying for the specific metals in full plus shipment costs.[6]

### iii. Atlas Platform Metals are Subject to Monex's Exclusive Control.

Monex has not changed any of the material provisions of its Atlas account agreements that give Monex exclusive control over its inventory of metals backing its Atlas platform. It remains the case that "Customers must sign the Atlas account agreement, which gives Monex control over the metals." *Monex Credit Co.*, 931 F.3d at 970. "Monex also retains sole discretion to liquidate trading positions without notice to the customer if equity drops too low, and it controls the price for every trade." *Id.* Looking at the updated Atlas agreements Monex filed with its Opposition, the evidence on shows:

- Monex can demand repayment of the "loan" to Atlas platform customers at any time, in its complete discretion;[7]

- Monex can liquidate customer trading positions at any time, in its sole discretion;[8]

- There is no need for any demand or notice to the customer;[9]

---

[6] Monex 2020 LSSA, Dkt. No. 246.5, Page ID 8448, ¶ 6: "Borrower may take personal possession of commodities held as collateral *upon full payment of the loan balance and any applicable handling and delivery charges*."

[7] Monex 2020 LSSA, Dkt. No. 246.5, Page ID 8447, ¶ 1: "The Customer . . . promises to pay [Monex] *on demand* . . . the sum of all outstanding cash advances ("loan balance") made by [Monex] . . ."

[8] Monex 2020 LSSA, Dkt. No. 246.5, Page ID 8448, ¶ 3: "[Monex] also has the right *in its sole discretion* to make such a sale or purchase *without making a request* that the Borrower reduce the outstanding balance […] Similarly, [Monex] also has the right *in its sole discretion* to require Borrower to increase Borrower's security deposit, *if at any time [Monex] deems* the collateral securing the obligations of Borrower to … be inadequate."

[9] Monex 2020 LSSA, Dkt. No. 246.5, Page ID 8448, ¶ 11: "*At the option of [Monex]*

10

- Monex can simply re-title metals supposedly "owned" by a customer back to Monex;[10]

- Monex can dispose of the metals at any time of the day or night, any day of the week;[11]

- Monex can change the terms of its "loan" to customers at any time;[12] and

- Monex customers have no rights whatsoever to use the metals supposedly "delivered" to them.[13]

Monex's Atlas account agreements make it explicit that Monex always has complete control of the metals. Nothing that Monex cites in its Opposition brief says otherwise.

### iv. Atlas Platform Customers Have No Substantial, Non-Contingent Interests.

Monex claims in its Opposition that Atlas customers have a "possessory interest"

---

*and without necessity of demand or notice*, all or any part of the Indebtedness . . . shall immediately become due and payable [if] . . . *[Monex] determines at any time and in [its] sole discretion* that Borrower's Indebtedness is insufficiently secured. [. . .] [Monex] shall have the right . . . to foreclose upon all or any part of the Collateral.

[10] Monex 2020 LSSA, Dkt. No. 246.5, Page ID 8448, ¶ 12: ". . . *[Monex] may, at any time, at its election*, apply, set off, collect or sell, in one or more sales, with or without any previous demands, notice or advertisement, the whole or any part of the Collateral, in such order as [Monex] may elect, and purchase any commodities borrowed by Borrower with the funds deposited to secure such borrowings.")

[11] Monex 2020 LSSA, Dkt. No. 246.5, Page ID 8448, ¶ 11: "Foreclosure may be effected *at any time of the day or night, on regular business days or otherwise, without prior notice* . . ."

[12] Monex 2020 LSSA, Dkt. No. 246.5, Page ID 8448, ¶ 12: "Borrower authorizes [Monex] *without notice of demand* and without affecting Borrower's liability hereunder or on the Indebtedness to: (a) change the time for payment or otherwise change the terms of the Indebtedness, or any part thereof, including the rate of interest thereon.")

[13] (LSSA, Dkt. No. 246.5, Page ID 8448, ¶ 10: "Until the Indebtedness is repaid in full, Borrower shall not sell, encumber or otherwise transfer any interest in the Collateral or permit to exist any encumbrance of any kind on the Collateral other than [Monex]'s security interest under this Agreement.")

11

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*

in metals.  (Opposition, Dkt. No. 246, at 5.)  This term "possessory interest" is
meaningless in the context of the Atlas platform; it is make-believe.  Monex's attempt to
fabricate this so-called interest is undermined by the very language of the agreements
Monex cites to support its claim.  As noted above, these agreements explicitly state that
metals must be stored only in Monex's depositories, and Monex has complete control
over the disposition of these metals.  Monex touts that customers "authorize [Monex's]
depository as their agent to accept custody of their delivered metals," (*citing* PSA, Dkt.
No. 246.5, ¶ 7.3; LSSA, Dkt. No. 246.5, ¶ 6).  This is in actuality an acknowledgment by
Monex that only Monex's depositories (those identified in the Atlas agreements, with
which only Monex has a contract) have possession of Atlas platform metals, and the
customer authorizes Monex's depositories to rely entirely on Monex's instructions with
respect to these metals.  Read in conjunction with the remainder of the language in
Monex's Atlas customer account agreements, it is abundantly clear that the account
agreements that Monex cites to support this "possessory interest" proposition completely
undermine Monex's argument.

The term "possessory interest" might make sense in the context of a lease of real
property, where a person is living in a rented apartment owned by someone else.  It does
not make sense in the context of leveraged trading positions on Monex's Atlas platform,
where Monex's depository has exclusive possession of the metals, and the customers can
never obtain possession unless and until they pay in full for those metals, plus additional
delivery fees.  To the extent that any "possessory interest" exists, it is contingent on
Monex's exclusive right to dispose of the metals underlying the Atlas platform in its sole
discretion, as it pleases.

## II.    "Due Process" Is Not an Obstacle to a Preliminary Injunction.

Ten years after Congress added Congress added Section 2(c)(2)(D) to the
Commodity Exchange Act ("CEA") in the Dodd-Frank Wall Street Reform and
Consumer Protection Act (Dodd-Frank Act) (Pub. L. No. 111-203, § 742(a)(2), 124 Stat.

12

1732), three years after the Commission filed this enforcement action (Compl., Dkt. No. 1), and more than one year since the Ninth Circuit provided its interpretation of the plain language of the provision of that law at issue in this case (*Monex Credit Co.*, 931 F.3d), Monex continues to advance a meritless "Due Process" argument.  Monex effectively argues that this Court should ignore the plain language of the retail commodity transactions provision of the CEA at issue, and the Ninth Circuit's plain language interpretation of that provision.  The plain language of the statute controls.  Monex has received fair notice that it is illegally operating its leveraged Atlas trading platform, and chosen to ignore it.  Whether another company (Worth Group Inc. ("Worth")) is violating the law as well does not alter the result.

### A. The Plain Language of the Statute Dictates the Result.

The Due Process Clause requires "fair notice of what is prohibited."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted).  Clear statutory text generally provides such notice.  *See Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964) (holding that due-process principles forbade "judicial construction" that penalized "conduct clearly outside" of statute's scope).  When a statute is ambiguous, a party may show that he or she reasonably relied on an agency pronouncement, though only for "actions which were" in fact "taken in good-faith reliance" on that pronouncement. *NLRB v. Bell Aerospace Co., Div. of Tex-tron, Inc.*, 416 U.S. 267, 295 (1974).  Monex has taken no action, of course, in response to any legal announcement, development or otherwise, whether from Congress, the CFTC or any of a number of federal courts. Monex has not materially changed its leveraged Atlas platform since the passage of the Dodd-Frank Act.

As the Ninth Circuit concluded, on its face, 'actual delivery' unambiguously requires the transfer of some degree of possession or control.  Because the statutory text is unambiguous, Due Process is satisfied on this issue.  Monex has had notice of what is prohibited since the passage of Dodd-Frank in 2010 but chose not to alter or change its

business model in any meaningful way.  Monex similarly ignored other significant developments in the law.

Two years after Section 2(c)(2)(D) was enacted, the Commission published guidance on how it would apply the actual-delivery exception. 78 Fed. Reg. 52,426, 52,426 (Aug. 23, 2013). That guidance indicated that the Commission would focus on factors that drew Monex's Atlas platform into serious question: the physical location of the commodity before and after the transaction; the relationships among the buyer, seller, and possessor of the commodity; how the transaction is marketed; and whether a transaction is more than a book entry. *Id*. at 52,428.  Here, the physical location of Atlas metal does not change after a transaction; Monex retains control at all times; only Monex has a relationship with the depository; each transaction is in reality a book entry on Monex's records, that Monex can alter at any time at its discretion; and Monex's "short" trades do not resemble actual sales of commodities at all.  Dkt. No. 205-1, at 9.  Monex could not reasonably have understood the 2013 guidance to endorse the legality of its Atlas platform.

Six months after the Commission issued the 2013 guidance, the Eleventh Circuit decided *CFTC* v. *Hunter Wise Commodities, LLC*, 749 F.3d 967 (2014).  That decision, which the Ninth Circuit followed here, *Monex Credit Co.*, 931 F.3d at 973-974, explained that the phrase "'[a]ctual delivery' denotes 'the act of giving real and immediate possession to the buyer or the buyer's agent.'"  *Hunter Wise*, 749 F.3d at 979 (brackets and citation omitted).  The Eleventh Circuit observed that "constructive delivery" was insufficient and that, per the Commission's 2013 guidance, "a book entry purporting to show that delivery has been made or that the sale has been covered or hedged would not suffice." *Id.* at 980.  Even if Monex had previously been uncertain about the scope of Section 2(c)(2)(D), the "judicial gloss" in *Hunter Wise* satisfied any fair-notice requirement.  *United States* v. *Lanier*, 520 U.S. 259, 266 (1997).

14

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*

### B. Monex Sought and Received Due Process in All Three Branches of the U.S. Government.

#### i. Monex Petitioned Congress and was Rejected.

Monex actively sought legislative relief during 2008 and 2009, but Congress did not grant it specific relief.  Monex continues to argue that Section 742 of the Dodd-Frank Act was passed in order to exempt Monex from federal regulation.  This is wrong.  *See* Reply Memo in Supp. Of Motion for Prelim. Inj., Dkt. No. 177, Section II.C., pp. 4-7.  Section 2(c)(2)(D) of the CEA was added by the Dodd-Frank Act as a part of a sweeping overhaul of the U.S. financial system, the goals of which included increased transparency and stability in financial markets as well as consumer protection.  Congress did not base this amendment on a state commodity code or use Monex as a model for actual delivery.  In fact, Section 742 of the Dodd-Frank Act was modeled after (and mirrors the structure and language) of Section 2(c)(2)(C) of the CEA, a provision added to the CEA in 2008 to give the CFTC authority over leveraged foreign exchange trading platforms offered to retail customers (retail forex).  The language of the two provisions is identical in all material respects relevant to this case, including their application to leveraged trading by retail customers, as well as the exception for "a contract of sale that . . . results in actual delivery."  *Compare* 7 U.S.C. § 2(c)(2)(C), *with* 7 U.S.C. § 2(c)(2)(D).  *See also* Dkt. No. 177, Reply Appendix, Ex. 1.  The key "actual delivery" language came from a parallel provision in the CEA, not Monex or a model state law.

Monex again asks the Court to rely on excerpts from a 2009 congressional subcommittee hearing, primarily comments by that hearing's witnesses including Monex's own representative.  But like anything else that preceded the Dodd-Frank Act, that 2009 subcommittee hearing does not support Monex's assertion that the Commission misled them about a statute Congress passed a year later.  At the time of the 2009 hearing, no bill yet existed, and nobody discussed the meaning of "actual delivery."  Although Monex's representative urged the subcommittee not to close a loophole available to metals, Congress instead chose to extend the actual-delivery requirement that

15

had previously applied only to foreign currency under Section 2(c)(2)(C) of the CEA, 7 U.S.C. 2(c)(2)(C).  *See* 7 U.S.C. 2(c)(2)(D).  Congress rejected Monex's arguments in 2010.  Nonetheless, Monex did not change its business model or register with the Commission.

### ii.  Monex Petitioned the Commission during the Interpretive Guidance Process and was Rejected.

Thereafter, Monex received Due Process in the executive branch through the Commission.  In 2011 the Commission published a notice of proposed interpretation in the Federal Register.  In its 2011 Federal Register release, the Commission warned market participants that the 1985 letter issued by the Commission's Office of General Counsel relating to off-exchange futures "is not relevant to a determination of whether 'actual delivery' has occurred within the meaning of new CEA section 2(c)(2)(D)(ii)(III)(aa)."  76 Fed. Reg. 77,670, 77,671 n.20 (Dec. 14, 2011); see *Hunter Wise*, 21 F. Supp. 3d at 1344 (deeming it "highly unreasonable" for a metals dealer to rely on the 1985 letter after 2011).  Monex filed a public comment in February 2012 as part of that public process, but the Commission rejected its proposed change.  (78 Fed. Reg. at 52,427).

Monex has since argued in its Petition for Certiorari to the U.S. Supreme Court in this case (which was denied), and again here, that the Commission's 2013 guidance approved "the precise form of delivery that Monex has utilized for more than 30 years."  *Monex Deposit Co. v. CFTC*, Pet. for Cert., at 29; Opposition, Dkt. No. 246, at 15.  In fact, the complete control that Monex exercises over the metals stored in Monex's chosen depositories make Monex's purported delivery a perfect example of "sham" delivery described in the Commission's interpretive guidance.  The guidance also explains that delivery to a depository would not constitute "actual delivery" if there is "evidence indicating that the purported delivery is a sham," 78 Fed. Reg. at 52,428 n.25.  Moreover, Monex does not claim that anything in the guidance supports their "short" trades, in which Monex purports to lend a customer metal that he or she instantly sells back to

16

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*

Monex.  *See* Opposition, Dkt. No. 246.  Monex has been on unambiguous notice for ten years that operating a leveraged commodity trading platform is illegal.  But Monex still did not change its business model or register with the Commission.

### iii. Monex has Litigated its Position for More Than Six Years in Federal Courts.

Finally, Monex received Due Process in multiple federal courts.  The Commission began the investigation leading to this enforcement action in approximately 2014, but Monex contested the agency's jurisdiction to investigate.  See *CFTC* v. *Monex Deposit Co.*, No. 14-6131, 2014 WL 7213190, at *1 (N.D. Ill. Dec. 17, 2014) (*In re CFTC Subpoena*), *aff'd sub. nom. CFTC* v. *Monex Deposit Co.*, 824 F.3d 690 (7th Cir. 2016). Early in that investigation, the Commission informed Monex that it had "concerns about whether Monex really transfers possession and control of metals to retail customers" and about "the legitimacy of the 'short' trading positions Monex offers."  14-6131 D. Ct. Doc. 3, at 8, *In re CFTC Subpoena* (N.D. Ill. Aug. 8, 2014).  Investigation-stage warnings can also satisfy the requirement of fair notice.  *See General Elec. Co.* v. *EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).  And if Monex nevertheless *still* harbored misconceptions about the Commission's views, the subpoena-enforcement action ought to have disabused them: Repeatedly during that litigation, the Commission asserted that actual delivery requires the seller to transfer possession and control, and that Monex's purported delivery appeared to be a sham.  *See*, *e.g.*, 15-1467 C.A. Doc. 25, at 32-33, *CFTC* v. *Monex Deposit Co.* (7th Cir. May 13, 2015); 14-6131 D. Ct. Doc. 48, at 2, *In re CFTC Subpoena* (N.D. Ill. Jan. 23, 2015); 14-6131 D. Ct. Doc. 27, at 4, *In re CFTC Subpoena* (N.D. Ill. Sept. 18, 2014).  Monex knew the Commission's view, and Monex contested that interpretation.  The Seventh Circuit eventually ordered Monex to comply with the CFTC's subpoena.  See *CFTC* v. *Monex Deposit Co.*, 824 F.3d 690 (7th Cir. 2016).

Despite two circuit courts finding the Commission's position to be consistent and correct, Monex still has not changed its business model or registered with the Commission.

### C. It is Irrelevant to this Case that Worth May Also Be Violating the Law.

Monex's reliance on apparent violations of the law by another company (Worth) to justify its own ongoing illegal conduct must be rejected.  Monex seeks to divert the Court's attention by pointing to Worth, boldly proclaiming that Monex should be able to continue to operate an illegal trading platform because Worth is apparently doing so.  This case is about Monex and its actions, not the actions of others.  Any arguments regarding Worth are not germane.  Monex is essentially asking the court to infer that Monex's practice comports with 2(c)(2)(D) because the Commission has not filed a new enforcement action against Worth for violating the consent order resolving the Commission's prior enforcement action against Worth.  This notion of Due Process is utterly unsupported in constitutional jurisprudence.

Not only is this theory unsupported, it is illogical.  The Court cannot infer legality from the exercise of prosecutorial discretion.  The Commission's decision whether to enforce often involves a complicated balancing of a number of factors that are peculiarly within the Commission's expertise.  The Commission must not only assess whether a violation has occurred, but also whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, whether the agency has enough resources to undertake the action at all.  An agency generally cannot act against each technical violation of the statute it is charged with enforcing.  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

Monex attempts to paint the Commission's action in this case as a broad attack on the "precious metals industry."  This is nonsense.  Monex misleadingly analogizes its operations to those of commercial market participants.  The law at issue does not apply to commercial transactions.  The retail commodity transactions provision, as the wording suggests, only applies to *retail* transactions.  Monex also misleadingly claims that the Commission's action here is a broad assault on *all* retail precious metals sales.  This, too, is nonsense.  The law prohibits the operation of a leveraged commodity trading platform,

18

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*

not every day retail precious metals sales.  A quick web search shows a long list of precious metals dealers offering gold and silver to retail customers, albeit without offering them on a leveraged trading platform.  A customer can purchase gold and silver from these retailers on credit with a credit card, and receive actually delivery of that metal.  That type of retail sales, even if made with financing through a credit card, is not at issue here.  Monex's comparison of its Atlas trading platform to commercial dealers, or to the vast majority of precious metals retailers who are not illegally offering a commodity trading platform, fails.

It may well be that as of today, Monex (and perhaps Worth) are the only two entities in the U.S. operating an illegal retail commodity transaction trading platform.  The Commission has brought numerous enforcement actions against other firms in the past few years, successfully obtaining orders requiring that these firms cease violating the law.  *See e.g*., *Hunter Wise*, 749 F.3d; *CFTC v. S. Trust Metals, Inc.*, 180 F.Supp.3d 1124 (S.D. Fla. 2016), *aff 'd sub. nom. CFTC* v. *S. Trust Metals, Inc.*, 894 F.3d 1313 (11th Cir. 2018).  That is what the Commission is doing in this case as well.

### III.   Monex's Fraud Continues, Unabated.

#### A.  *Monex Continues to Lure Victims into the Atlas Trap.*

##### i.  *The Numbers Do Not Lie.*

During the pendency of this action, the total net loss for Monex leveraged Atlas customers since July 16, 2011 has grown from $290 million by the end of March 2017 to $365 million by the end of June 2020.  (Gomberg Supp. Decl. at ¶ 26, Table E.)  While the total losses have increased, the percentage of leveraged Atlas customers who lose money has remained consistent: about 90% of leveraged Atlas customers have lost money.  (*Id.,* at ¶ 23.)  During the Updated Review Period, the largest loss for a leveraged Atlas account was over $10.5 million, whereas the largest gain for a leveraged Atlas account was approximately $850,000.  (*Id.*)  The average losing account had a combined loss of more than $35,000, whereas the average profitable account had a profit of less than $9,500.  (*Id.*)  Traders on Monex's leveraged Atlas platform continue to rack up

massive losses.  Nonetheless, Monex continues to market its Atlas trading program as a safe and secure way to invest in precious metals.

Meanwhile, Monex keeps raking in cash from leveraged trading on its Atlas platform.  Leveraged Atlas account owners paid about $126.5 million in bid-ask spread during the Updated Review Period, and Monex charged those same customers more than $76 million in loan interest.  (*Id.* at ¶ 28, Table G.)  Monex leveraged Atlas customers also paid more than $9.5 million in service fees and at least $17 million in commissions during the Updated Review Period. (*Id.* at ¶ 29, Table G.)  Monex revenue from spread, interest, commissions, and service fees totaled more than $230 million.  (*Id.* at ¶ 28.)

### ii.  The Victims Do Not Lie.

Monex's Opposition brief describes the Commission's evidence as "stale, anecdotal customer declarations" from people who were customers "many years ago." (Opposition, Dkt. No. 264 at 19.)  Every victim declaration filed with the Commission's motion is an example of the human collateral damage of Monex's systemic fraud, and nothing about this is stale.  At least two new declarants closed their accounts in the past ten months after years of losses.  (Dumont Decl. ¶ 30, and Jordan Decl. ¶ 27).  The descriptions of the fraud by these victims is consistent, whether they were Monex customers in 2011 or in 2020.

Contrary to Monex's view of these customers as prospects whose life savings are their representatives' amounts "to spend," (*See* Gala Chats, Metzger Decl., Ex. 5) these victims are people who have trusted Monex with their sweat equity (Dumont Decl. ¶ 4 ;), life savings (Gahan Decl. ¶ 11), their grandchildren's college funds (Jordan Decl., ¶ 29), and their inheritance (Craner Decl. ¶ 7-18; Tavakoli Decl. 4, 25-26).  These victims experience mental health challenges, marital troubles, and compare the stress of dealing with the losses caused by Monex as second only to the loss of a child (Dumont Decl., ¶ 31; Tavakoli Decl. ¶ 26; Jordan Decl. ¶ 29).  These declarants are not just "anecdotes." Their accounts of Monex's fraud are consistent, and show that Monex is employing the same fraudulent tactics to deceive customers into risky Atlas trades throughout the

20

duration of the relevant period in this case.

Monex's ongoing fraud is an additional basis for the entry of a preliminary injunction order requiring that Monex cease offering leveraged Atlas trading pending a final judgment in this case.

### B. The Commission's Expert Witness is Both Qualified and Correct in His Assessment of the Monex Platform.

No rational investor would invest in Monex's Atlas platform given available alternatives. That is the conclusion of the Commission's expert, Dr. Robert Selvaggio, after a detailed analysis of the cost structure of the Atlas platform as compared with functionally equivalent trades in regulated ETFs or futures products. (Expert Report from Rutter Group, Dkt. No. 8.6, ¶ 33.) Monex's attorneys attempt to disparage Dr. Robert Selvaggio and his analysis by calling it "junk science." (Dkt. No. 246 at 19.) Yet they avoid confronting the substance of his analysis and conclusion. Dr. Selvaggio's credentials are impeccable, and his analysis of the cost-structure of Monex's Atlas platform is rock solid. His conclusion that no rational investor would choose Monex's Atlas platform over available equivalent investment vehicles is a necessary one, based on the data. (*See* Dkt. Nos. 8.6 and 165.1.) As it turns out, you can select any leveraged Atlas account for a similar analysis and the results would be the same. But the extreme nature of Monex's costs and fees is easier to illustrate, and better to test in comparison to alternative investments, in accounts with multiple transactions.

Meanwhile, Monex's retained expert, David Ross, has had his opinions and analysis rejected by multiple courts where he attempted to serve as an expert on cross market strategy, spoofing, and other market manipulation. In *SEC v. Lek Securities Corp.*, 2019 WL 1198599, (SDNY March 14, 2019), Judge Denise Cote of the Southern District of New York found that Ross was not qualified to be an expert in layering and cross market strategy; and held that "[b]ecause Ross is unqualified to serve as an expert on layering and [c]ross-[m]arket [s]trategy, however, it is not surprising that the opinions he proffers regarding those topics are so unsound that they must be excluded on the

21

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*

merits. *** the opinions he offers rest on false assumptions, display faulty logic, depend on mischaracterizations, and would lead the jury astray if admitted." Moreover, the court cited other courts that had also criticized Ross's work as an expert. *See SEC v. Lek Securities Corp.* 2019 WL 1198599, at *17, n. 21 (citing *U.S. v. Hall*, 48 F.Supp.2d 386, 386 (S.D.N.Y. 1999) (Chin, J.) ("Moreover, in his writings he has taken positions at odds with established legal principles, including espousing a belief that 'trades should not be prohibited as manipulative regardless of the intent of the trader.'")

Dr. Selvaggio's analysis and conclusion is relevant and helpful in this case because Monex's Atlas platform is really a futures trading platform in disguise. Monex actively compares its prices and products to futures and ETFs, disparaging those in favor of Atlas trading. Monex pitches its Atlas platform as a better alternative that it is safe, secure and profitable. But an objective analysis of the cost structure shows that under no scenario would an investor's outcome be better trading on the Atlas platform than in regulated futures markets, or with regulated ETFs.

## IV.   The Court Should Grant the Commission's Requested Relief to Stop Ongoing Illegal Transactions and Customer Harm.

Absent a preliminary injunction order, Monex will undoubtedly continue to execute illegal leveraged commodity trades with retail customers without registering with the Commission or conducting the transactions on a regulated exchange. Monex will also continue to defraud customers, just as it has throughout this year. The Commission attached to its Renewed Motion for Preliminary Injunction a proposed order setting out in detail the relief requested from this Court. (Dkt. No. 205.3.) In brief, the key components of this relief are an order that:

(1) Requires Monex to immediately cease executing off-exchange leveraged Atlas trades;

(2) Prohibits Monex from destroying data or records, and requires the production by Monex of documents and data to the CFTC;

(3) Requires an accounting by Monex to determine the location and disposition of funds of Monex and funds of customers of Monex;

(4) Allows the CFTC expedited access to inspect and copy Monex records; and

(5) Appoints a monitor to ensure and manage Monex's compliance with the order.

The Commission requests injunctive relief that will prevent ongoing illegal conduct and ongoing injury to the public.  Monex argues that the Court should allow Monex to continue operating its leveraged Atlas trading platform unabated through a final judgment in this case.  That would result in thousands more illegal leveraged Atlas transactions, and likely tens of millions of dollars more in customer losses.  The real "status quo" in a case like this one is to halt the massive losses being suffered by customers on Monex's illegal leveraged commodity trading platform.

Monex also misinterprets the applicable standards for the entry of a preliminary injunction in a case brought by the Commission.  Unlike private actions, in actions for statutory injunctive relief, the Commission need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits.  *See CFTC v. Driver*, 877 F. Supp. 2d, 968 at 981 (C.D. Cal. 2012); *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979); *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983).  Rather, a prima facie showing that a violation of the law has occurred and that "there is some reasonable likelihood of future violations" is sufficient.  *Hunt*, 591 F.2d at 1220; *see also Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1261 (9th Cir. 1989) (in cases involving statutory injunctions on the basis of past violations, party moving for injunctive relief must show only that there is a "likelihood" of future violations*); CFTC v. British Am. Commodity Options Corp.* (British Am.), 560 F.2d 135, 141–42 (2d Cir. 1977), cert. denied, 438 U.S. 905 (1978) ("well-established" that agency need only show reasonable likelihood that wrong will be repeated for injunctive relief); *CFTC v. J. S. Love & Assoc. Options, Ltd.,* 422 F. Supp. 652, 661 (S.D.N.Y. 1976).

Monex has argued in this case that an order requiring that Monex cease leveraged Atlas trades would "destroy" its business. The CFTC suspects that is an exaggeration, given that a significant percentage of Monex's business is fully-paid (non-leveraged) precious metals transactions. But these claims by Monex are cause for concern that Monex may lack sufficient capital to continue operations, and may dissipate assets in the wake of an injunction from this Court. In its Renewed Motion (Dkt. No. 205), the CFTC is not seeking an immediate asset freeze.

Given the extent of customer losses as of June 2020 (in excess of $365 million), the Commission certainly has concerns that an asset freeze may be necessary in this case. A court-appointed monitor could provide this Court and the parties with an independent assessment of whether an asset freeze is necessary. Additionally, a court-appointed monitor would provide Monex's leveraged customers a level of protection against third-parties that claim rights against those customers' assets in the event of a Monex default— akin to protections the law provides leveraged customers of entities properly registered with the Commission. A court-appointed monitor could also quickly gather necessary documents, data and information to assess Monex's continued viability without leveraged Atlas trading, to ensure that Monex acts in its customers' interests as leveraged trading positions are unwound, and to report to the Court the results of these initial steps.

## V. Conclusion

The Ninth Circuit provided clear standards to govern the Commission's claims in this case. Monex's leveraged retail commodity transactions on its Atlas trading platform are illegal. Monex has not materially changed any aspects of its leveraged Atlas retail commodity transactions since July 2011, since the Commission filed this case in September of 2017, or even after the Ninth Circuit issued its opinion in July 2019. Monex continues to flout the law by operating an off-exchange leveraged commodity trading platform. Monex has chosen to ignore the Ninth Circuit's ruling, and it is necessary for this Court to enter a preliminary injunction requiring that Monex

24

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*

immediately cease engaging in illegal transactions, and appoint a Monitor to ensure compliance with this Court's order.

For the foregoing reasons, the Court should grant the Commission's Renewed Motion for a Preliminary Injunction.


Date:  November 30, 2020                Attorneys for Plaintiff Commodity Futures

                                        Trading Commission


                                        By: /s/ *Carlin R. Metzger*

                                        Commodity Futures Trading Commission
                                        525 W. Monroe St., Suite 1100
                                        Chicago, IL 60661
                                        (312) 596-0536
                                        cmetzger@cftc.gov

*Pl.'s Reply Memo. in Supp. of Renewed Mot. for Prelim. Inj. – Case No. 8:17-cv-01868-JVS-DFM*