1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION<br>        Plaintiff,<br><br>                vs.<br><br>MONEX DEPOSIT COMPANY, MONEX CREDIT COMPANY, NEWPORT SERVICE CORPORATION, MICHAEL CARABINI, AND LOUIS CARABINI<br>        Defendants. | Case No: 8:17-cv-01868-JVS-DFM<br><br>**CONSENT ORDER [415]**<br><br>Hon. James V. Selna<br>Dept. 10C |

**CONSENT ORDER FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTY AND OTHER <u>EQUITABLE RELIEF</u> <u>AGAINST ALL DEFENDANTS</u>**

### I.   INTRODUCTION

On September 6, 2017, the Commodity Futures Trading Commission ("Commission" or "CFTC"), filed a complaint against Defendants Monex Deposit Company, Monex Credit Company, Newport Service Corporation (referred to herein collectively as "Monex" or "Monex Entity Defendants"), Louis Carabini, and Michael Carabini (referred to herein together with Monex as "Defendants") seeking injunctive and

other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26, and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2021). ("Complaint," ECF No. 1.).[1] Defendants filed their Answer (Dkt. 230) on March 27, 2020, in which they denied the Complaint allegations and asserted various affirmative defenses.

## II. CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Defendants without a trial on the merits or any further judicial proceedings, Defendants:

1. Consent to the entry of this Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against All Defendants ("Consent Order");

2. Affirm that they have read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the CFTC or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order;

3. Acknowledge service of the summonses and Complaint;

4. Admit the jurisdiction of this Court over them and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

5. Admit the jurisdiction of the CFTC over the conduct and transactions at issue in this action pursuant to the Act;

6. Admit that venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e);

7. Waive:

a. Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2021), relating to, or arising from, this action;

b. Any and all claims that they may possess under the Small Business Regulatory

---

[1] The CFTC filed an Amended Complaint on March 13, 2020 (ECF No. 225) alleging the same violations against the same Defendants.

CONSENT ORDER – PAGE: 2

Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

      c.    Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

      d.    Any and all rights of appeal from this action;

      8.    Consent to the continued jurisdiction of this Court over them for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Defendants now or in the future reside outside this judicial district;

      9.    Agree that they will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waive any objection based thereon;

      10.    Agree that neither they nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint, the Amended Complaint, the Court's October 28, 2021 order on the parties' motions for summary judgment (ECF No. 339, the "Summary Judgment Order"), or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint, Amended Complaint, Summary Judgment Order, and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect their: (a) testimonial obligations, or (b) right to take positions in other proceedings to which the Commission is not a party. Defendants shall comply with this agreement, and shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement;

      11.    Consent to the entry of this Consent Order without admitting or denying the allegations of the Complaint or any findings or conclusions in this Consent Order, except as to jurisdiction and venue, which they admit;

12. Consent to the use of the Findings of Fact or Conclusions of Law in this Consent Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, and agree that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

13. Do not consent, however, to the use of this Consent Order, or the Findings of Fact or Conclusions of Law herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party, other than: a statutory disqualification proceeding pursuant to Section 8a(2), (3) and (4), 7 U.S.C. § 12a(2), (3), (4); proceeding in bankruptcy, or receivership; or proceeding to enforce the terms of this Order; and

14. Defendants further do not consent to the use of this Consent Order, or the findings or conclusions in this Order, by any other party in any other proceeding; but Defendants agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendants in any other proceeding.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.

**A.   Findings of Fact**

**1.   The Parties to this Consent Order**

15. Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act and the Regulations.

16. Monex Deposit Company and Monex Credit Company are California limited partnerships organized in 1987. Newport Service Corporation is a California corporation formed in 1987. All three entities are located in the same building at 4910 Birch Street,

Newport Beach, California. Monex Deposit Company, Monex Credit Company, and Newport Service Corporation have never been registered with the Commission in any capacity. As set out in further detail in the Summary Judgment Order, the Monex Entity Defendants operated as a common enterprise and are referred to collectively in this Consent Order as "Monex."

17. Michael Carabini is the primary owner of the Monex Entity Defendants, holding ownership interests directly and through various corporate entities and trusts. Michael Carabini resides in this judicial district. He was the CEO of Monex during the Relevant Period in this case. Michael Carabini is not currently registered with the Commission in any capacity, but has been registered in the past as an Associated Person of Monex International, Ltd., and Monex Trading Corporation, and as a Principal of Monex Options, Ltd.

18. Louis Carabini is the founder of Monex. He resides in this judicial district. He is not currently registered with the Commission, but has been registered in the past as an Associate Member, Associated Person and Principal of Monex International, Ltd., Monex Trading Corporation, and Monex Options Ltd.

**2.      Monex's Off-Exchange "Atlas" Commodities Trading Platform**

19. During the Relevant Period (July 16, 2011 to August 31, 2021), through its "Atlas" trading account, Monex allowed retail customers to trade gold, silver, platinum and palladium on a leveraged basis. Atlas transactions did not take place on a regulated exchange or board of trade. Instead, Monex operated its own retail over-the-counter platform, allowing customers to speculate on precious metals price movements, with Monex acting as the counterparty to every transaction.

20. During the Relevant Period, thousands of Monex Atlas customers engaged in leveraged trading through Monex's Atlas program ("leveraged Atlas Accounts"). Many leveraged Atlas Accounts were subject to a margin call or had trading positions force-liquidated. In addition, the majority of leveraged Atlas Accounts realized losses (including losses from trading, interest charges, and other fees) during the Relevant Period.

21. Further details about the structure of Monex's Atlas platform are discussed in the Court's findings in the Summary Judgment Order, ECF No. 339.

### 3. Monex's Fraudulent Conduct

22. Monex solicited customers to engage in leveraged trading by first touting the benefits of investing in precious metals as an asset class. Monex emphasized the benefits and importance of having physical precious metals in a portfolio of investments as a hedge against inflation, political and economic uncertainty, civil unrest and other factors and claimed that physical metals are intrinsically valuable, "unlike stocks and bonds."

23. Monex highlighted the potential profitability of precious metals investments, including in a "Profit Opportunity" section of its website. Monex claimed elsewhere on its website that "precious metals can offer outstanding price appreciation and profit potential," and made other similar claims such as: "What's more, in recent years, precious metals have also proven to be outstanding short-term trading vehicles, offering traders periods of outstanding profit potential as metals prices fluctuate, sometimes dramatically, on world markets."

24. After statements about the security, intrinsic value and potential profitability of physical precious metals investments, certain Monex sales representatives told customers that trading with leverage in an Atlas account is one potential way to achieve profitability with physical precious metals investments.

25. Monex had a vast amount of customer transactional information at its disposal. Monex monitored its Atlas customers' realized and unrealized gains and losses. Among other statistics, Monex monitored the value of its customers' open precious metals positions, cash balance, and profits or losses.

26. For example, in a daily "Position Report," Monex captured a detailed snapshot of each Atlas customer account with information including the account's equity, cushion before a margin call, cash balance, position market value, and the profit or loss on the positions. In its "Position Report Summary," Monex tracked information for each Atlas customer account including the number of trades executed by the account, profits or losses, the current number of long versus short trades, the total market value of trading

positions for each account, and available equity for additional trades. A monthly "Customer Unrealized Loss" report showed Atlas customer account unrealized losses, realized profits or losses and the market value of open trading positions for certain customers. "Forced Liquidations" and "Equity Calls" reports showed the number of forced liquidations and margin calls issued during a month.

27. Monex made available these and other reports to management, including defendants Louis and Michael Carabini, summarizing customer data. Many reports during the Relevant Period showed significant losses in leveraged Atlas accounts.

28. The majority of leveraged Atlas accounts lost money during the Relevant Period. Monex did not disclose its customers' performance to its customers or prospects.

29. Certain Monex sales training materials encouraged sales representatives to sell prospects on the benefits of leveraged Atlas trading by emphasizing profit potential. For example, Monex training materials used during the Relevant Period provided examples of phrases on sales calls such as:

   a. "If gold were to increase in value by $100 per ounce in the next year, and you had a 30% to 40% net gain, you'd feel pretty good, wouldn't you?"
   b. "I'd like to show you some ways that you might earn a very positive return on investments in precious metals today."
   c. "Discover an opportunity to invest with defined risk, while enjoying the possibility of unlimited upside potential."
   d. "Would you like the potential to earn an annualized rate of return of 20% or more on your money?"
   e. "Since you're looking for short term profit, but with defined risk, I think you're going to love the proposal I have for you."

30. Claims like these were misleading because reports distributed to management during the Relevant Period showed that the majority of leveraged Atlas customers lost money.

31. In addition, in unrecorded sales calls during the Relevant Period, certain Monex sales representatives misleadingly pitched the profit potential of investing with

leverage through the Atlas Program.

32. Monex training materials used during the Relevant Period taught sales representatives to "close" sales with solicitations designed to earn the trust of prospective customers, and with language emphasizing profit potential. A video used to train sales representatives during the Relevant Period stated that Monex sales representatives have a fiduciary relationship to Atlas customers analogous to the relationship between a lawyer and her client.

33. Despite the availability of transactional data showing significant losses being suffered by Atlas customers during the Relevant Period, Monex trained and incentivized its sales representatives to encourage prospects to open Atlas trading accounts, and to encourage leveraged trading in these accounts.

34. Monex's compensation structure for sales representatives reinforced the goal to open Atlas accounts and encourage leveraged trading in these accounts. Sales representatives (and Monex) made more money when customers purchased and sold precious metals using leverage in their Atlas accounts. The higher the volume and dollar amount of purchases and sales, the more commissions and bonuses Monex sales representatives made. The higher the volume and dollar amount of transactions, the more sales revenue Monex made. The higher the loan and transaction amount, the more interest and service and storage fees Monex charged.

35. Certain of Monex's claims about the profitability of leveraged Atlas transactions during the Relevant Period were misleading. Certain leveraged Atlas customers who expected they would profit from engaging in leveraged Atlas transactions during the relevant period instead suffered losses.

### 4. Michael and Louis Carabini Are Controlling Persons of Monex

36. Louis Carabini is the founder of Monex. Despite passing on many operational responsibilities to his son Michael, Louis Carabini remained involved in Monex's operations during the relevant period.

37. During the relevant period, Michael Carabini was the primary operational overseer of Monex and was the majority owner of both Monex Deposit Company and

Monex Credit Company.

38. All Monex employees ultimately reported to Michael and Louis Carabini during the relevant period, including high level executives such as Monex's C.F.O., the head of Monex's Sales department, and the head of Monex's Trading department. Michael Carabini and Louis Carabini do not report to anyone. They supervise, direct, manage, determine compensation for, and hire and fire sales managers, department heads, in-house and external counsel, and compliance officers.

39. Michael and Louis Carabini controlled Monex's bank and financial accounts. Michael Carabini was a signatory on all of the Monex (and its various corporate affiliates) bank and other financial accounts during the relevant period. Louis Carabini was a signatory on most of the same accounts.

40. Michael and Louis Carabini had access during the Relevant Period to data and information from Monex's transactional database showing losses by Monex Atlas customers, and gains by Monex and its sales representatives.

41. Michael and Louis Carabini were involved in reviewing and responding to certain Monex customer complaints during the Relevant Period.

42. Michael Carabini was primarily responsible for Monex's marketing function, including its advertisements and the content of the Monex website located at www.monex.com. Michael and Louis Carabini were involved in developing Monex's sales materials, and its sales policies and procedures, during the Relevant Period.

### C. Conclusions of Law

#### 1. Jurisdiction and Venue

43. This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that the CFTC may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the CFTC that any person has

engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

44. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because Defendants reside in this jurisdiction and the acts and practices in violation of the Act occurred within this District.

### 2. Off-Exchange Transactions in Violation of Section 4(a) of the CEA

45. By the conduct described above in paragraphs 19 through 21, and paragraphs 36 through 42, between July 16, 2011 and August 31, 2021, Defendants Louis Carabini and Michael Carabini violated Section 4(a) of the CEA, 7 U.S.C. § 6(a), by conducting an office or business in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in retail commodity transactions.

46. Further, as more specifically set forth in paragraphs 36 through 42, Louis Carabini and Michael Carabini controlled Monex and knowingly induced, directly or indirectly, the acts constituting Monex's execution of off-exchange retail commodity transactions. As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b), Louis Carabini and Michael Carabini are liable as controlling persons for Monex's violations of Section 4(a) of the CEA, 7 U.S.C. § 6(a), set out in this Court's Summary Judgment Order.

### 3. Fraud in Violation of Section 4b(a)(2)(A) and (C) of the CEA

47. Between July 16, 2011 and August 31, 2021, Monex defrauded customers, attempted to defraud customers, and deceived or attempted to deceive customers in regard to orders for, or the disposition or execution of, financed retail commodity transactions.

48. As more specifically set forth in paragraphs 22 through 35, Monex knowingly made materially misleading statements to customers during the Relevant Period about the profit potential of financed trading on its Atlas trading platform, and knowingly failed to disclose material information necessary to make those representations not materially misleading.

49. Pursuant to Section 2(c)(2)(D)(iii) of the CEA, 7 U.S.C. § 2(c)(2)(D)(iii), Monex's financed retail commodity transactions are subject to Section 4b of the CEA, 7 U.S.C. § 6b, as if they are contracts of sale of a commodity for future delivery.

50. Therefore, Monex violated Section 4b(a)(2)(A) and (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A), (C).

51. As more specifically set forth in paragraphs 36 through 42, Louis Carabini and Michael Carabini controlled Monex and knowingly induced, directly or indirectly, the acts constituting Monex's violations alleged in this count. As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b), Louis Carabini and Michael Carabini are liable for Monex's violations of Section 4b(a)(2)(A) and (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A), (C), as controlling persons.

### 4. Fraud in Violation of Section 6(c)(1) of the CEA and Regulation 180.1(a)(1)-(3)

52. As more specifically set forth in paragraphs 22 through 35, between August 15, 2011 and August 31, 2021, in connection with contracts of sale of commodities in interstate commerce, Monex knowingly made materially misleading statements to customers about the profit potential of financed trading on its Atlas trading platform, and knowingly failed to disclose material information necessary to make those representations not materially misleading.

53. Monex therefore violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021).

54. As more specifically set forth in paragraphs 36 through 42, Louis Carabini and Michael Carabini controlled Monex and knowingly induced, directly or indirectly, the acts constituting Monex's violations. As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b), Louis Carabini and Michael Carabini are liable for Monex's violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021), as controlling persons.

## IV. PERMANENT INJUNCTION

55. Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the CEA, 7 U.S.C. § 13a-1, Defendants Louis and Michael Carabini are permanently restrained, enjoined and prohibited from directly or indirectly conducting any office or business anywhere in the United States, its territories or possessions, for the purpose of

soliciting or accepting any order for, or otherwise dealing in retail commodity transactions within the scope of and not excepted from Section 2(c)(2)(D) of the Commodity Exchange Act, 7 U.S.C. § 2(c)(2)(D).

56. In addition, based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, Defendants Monex Deposit Company, Monex Credit Company, Newport Service Corporation, Louis Carabini, and Michael Carabini are permanently restrained, enjoined and prohibited from directly or indirectly:

    A.    Cheating or defrauding, or attempting to cheat or defraud, other persons in or in connection with any order to make, or the making of, any retail commodity transactions in violation of Section 4b(a)(2)(A) of the CEA, 7 U.S.C. § 6b(a)(2)(A);

    B.    Willfully deceiving or attempting to deceive customers in regard to orders for, or the disposition or execution of, retail commodity transactions in violation of Section 4b(a)(2)(C) of the CEA, 7 U.S.C. § 6b(a)(2)(C);

    C.    Using or employing, or attempting to use or employ, a scheme or artifice to defraud in violation of 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1), 17 C.F.R. § 180.1(a)(1) (2021);

    D.    Making, or attempting to make, in connection with contracts of sale of commodities in interstate commerce, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the statements made not untrue or misleading, in violation of 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2021);

    E.    Engaging in, or attempting to engage in, acts, practices, or a course of business that operated or would operate as a fraud or deceit on Monex's customers in violation of 6(c)(1) of the CEA, and Regulation 180.1(a)(3), 17 C.F.R. § 180.1(a)(3) (2021);

    F.    Making material misrepresentations or omissions to its customers or prospective customers about the safety, security, profit potential, or risk of investing in or trading of commodities; and

    G.    failing to disclose material information to customers or prospective customers in connection with investments in or trading of commodities.

57.    Defendants are also permanently restrained, enjoined and prohibited from directly or indirectly:

    a.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40)), unless such trading is for their own personal account or any account in which they have a direct or indirect interest and is for hedging, which may include taking or making delivery of the underlying commodity;

    b.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)); and

    c.    Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests.

58.    Defendants are also restrained, enjoined and prohibited for a period of ten (10) years from directly or indirectly:

    a.    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and/or

    b.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9) (2021).

## V. RESTITUTION AND CIVIL MONETARY PENALTY

**A. Restitution**

59.    Defendants shall pay, jointly and severally, restitution in the amount of Thirty-

Three Million Dollars (**$33,000,000**) ("Restitution Obligation") within thirty (30) days of the date of entry of this Consent Order. If the Restitution Obligation is not paid in full within thirty days of the date of entry of the Consent Order, then post-judgment interest shall accrue on the unpaid portion of the Restitution Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

60. To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' customers, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall receive restitution payments from Defendants and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

61. Defendants shall make Restitution Obligation payments, and any post-judgment interest payments, under this Consent Order, to the Monitor in the name "MONEX SETTLEMENT RESTITUTION FUND" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendant(s) and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

62. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' customers identified by the CFTC or may defer distribution until such time as the Monitor deems appropriate. It is the intent of this Consent Order that the entirety of the Restitution Obligation will be distributed to Defendants' customers to effect payment of the Restitution Obligation. In the event that the amount of Restitution Obligation

payments remaining to be made by the Monitor are of a de minimis nature such that the Monitor determines that the administrative cost of making further distributions to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC following the instructions for civil monetary penalty payments set forth in Part V. B. below.

63. Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

64. The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' customers during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

65. The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exists under state or common law.

66. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Consent Order and to hold Defendants in contempt for any violations of any provision of this Consent Order.

67. To the extent that any funds accrue to the U.S. Treasury for satisfaction of

Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

### B. Civil Monetary Penalty

68. Defendants shall pay, jointly and severally, a civil monetary penalty in the amount of Five Million Dollars ($5,000,000) ("CMP Obligation"), within thirty (30) days of the date of the entry of this Consent Order. If the CMP Obligation is not paid in full within thirty days of the date of entry of this Consent Order, then post-judgment interest shall accrue on the unpaid portion of the CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

69. Defendants shall pay their CMP Obligation and any post-judgment interest, by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> 6500 S. MacArthur Blvd.
> HQ Room 266
> Oklahoma City, OK 73169
> 9-amz-ar-cftc@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Tonia King or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendant(s) and the name and docket number of this proceeding. Defendant(s) shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

### C. Provisions Related to Monetary Sanctions

70. Partial Satisfaction: Acceptance by the CFTC or the Monitor of any partial payment of Defendants' Restitution Obligation or CMP Obligation shall not be deemed a

waiver of Defendants' obligation to make further payments pursuant to this Consent Order, or a waiver of the CFTC's right to seek to compel payment of any remaining balance.

## VI. MISCELLANEOUS PROVISIONS

71. Until such time as Defendants satisfy in full their CMP and Restitution Obligations under this Order, upon the commencement by or against Defendants of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of Defendants' debts, all notices to creditors required to be furnished to the Commission under Title 11 of the United States Code or other applicable law with respect to such insolvency, receivership bankruptcy or other proceedings, shall be sent to the address below:

> Secretary of the Commission
> Commodity Futures Trading Commission
> Three Lafayette Centre
> 1155 21st Street N.W.
> Washington, DC 20581

72. Notice: All notices required to be given by any provision in this Consent Order, except as set forth in paragraph 71 above, shall be sent certified mail, return receipt requested, as follows:

Notice to CFTC:

> Robert Howell
> Deputy Director, Division of Enforcement
> Commodity Futures Trading Commission
> 77 W. Jackson Blvd., Ste. 800
> Chicago, Illinois 60604

Notice to Defendants:

> Elizabeth Dorsi
> Farella Braun Martel LLP
> 235 Montgomery Street, 17th Floor
> San Francisco, California 94104

All such notices to the CFTC shall reference the name and docket number of this action.

73. **Change of Address/Phone:** Until such time as Defendants satisfy in full their Restitution Obligation and CMP Obligation as set forth in this Consent Order, Defendants shall provide written notice to the Commission by certified mail of any change to their telephone numbers and mailing addresses within ten calendar days of the change.

74. **Entire Agreement and Amendments:** This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date. Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

75. **Invalidation:** If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

76. **Waiver:** The failure of any party to this Consent Order or of any customer/pool participant/client at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or customer/pool participant/client at a later time to enforce the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

77. **Continuing Jurisdiction of this Court:** This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Consent Order.

78. **Injunctive and Equitable Relief Provisions:** The injunctive and equitable relief provisions of this Consent Order shall be binding upon the following persons who receive actual notice of this Consent Order, by personal service or otherwise: (1) Defendants; (2) any officer, agent, servant, employee, or attorney of the Defendants; and (3) any other persons who are in active concert or participation with any persons described in subsections

(1) and (2) above.

79. **Authority:** Michael Carabini hereby warrants that he is CEO of the Monex Entity Defendants (Monex Deposit Company, Monex Credit Company, and Newport Service Corporation), and that this Consent Order has been duly authorized by these Monex Entity Defendants and he has been duly empowered to sign and submit this Consent Order on behalf of the Monex Entity Defendants.

80. **Counterparts and Facsimile Execution:** This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

81. **Contempt:** Defendants understand that the terms of the Consent Order, except with respect to restitution, are enforceable through contempt proceedings, and that, in any such proceedings they may not challenge the validity of this Consent Order.

82. **Agreements and Undertakings:** Defendants shall comply with all of the undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief forthwith and without further notice.

IT IS SO ORDERED on this 19th day of December, 2022.

_____
JAMES V. SELNA
UNITED STATES DISTRICT JUDGE

CONSENT ORDER – PAGE: 19

| | |
|---|---|
| CONSENTED TO AND APPROVED BY: | Dated _____ |
| | |
| _____ | Approved as to form: |
| Monex Deposit Company | |
| Date: | _____ |
| | Elizabeth Dorsi |
| _____ | Farella Braun Martel LLP |
| Monex Credit Company | Attorney for Monex Deposit Company, Monex Credit Company, Newport Service Corporation, Louis Carabini, and Michael Carabini |
| Date: _____ | |
| | 235 Montgomery Street, 17th Floor |
| _____ | San Francisco, California 94104 |
| Newport Service Corporation | |
| Date: | |
| | |
| _____ | |
| Louis Carabini, individually | |
| Date: _____ | |
| | |
| _____ | |
| Michael Carabini, individually | |
| Date: _____ | |

_____
Carlin Metzger
Senior Trial Attorney
Commodity Futures Trading Commission
77 W. Jackson Blvd., Suite 800
312-596-0536
CMetzger@cftc.gov